UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------

JEFFRY ZICCARELLI,

                                    Plaintiff,

      -against-

NYU HOSPITALS CENTER a/k/a NYU
LANGONE MEDICAL CENTER and
CHERYL LONG, SHERYL BUSHMAN,
and NANCY BEALE,
Individually and As Employers.

                                    Defendants.

---------------------------------------------------------------------

Docket No.
15-CV-09307(JGK)(KNF)

# DECLARATION OF JEFFRY ZICCARELLI

**TABLE OF CONTENTS**

A. My Technology Background and Qualifications for the Position From Which I Was Demoted.                                                    1

    i. Educational Background                                             1

    ii. Information Technology Work Experience                           2

    iii. My Thirty Year Employment History with NYU                     4

    iv. My Employment in NYU's Medical Center Information Technology Department My Recent Pre-FMLA Performance at NYU.                                                              4

B. NYU MCIT and the Epic Group                                          15

    i. Epic System Environments                                        15

    ii. NYU MCIT Epic Organization and Application Lead position        15

    iii. The Application Lead Position                                  17
        a. My Pre-FMLA Promotion to the Application Lead Position-MCIT Epic Orders/Lab Team                        18
        b. Longs Pre-FMLA Support for my Promotion to Application Lead                                                      19
        c. Andrew Himes NYU Employment Background and Promotion to Application Lead                                    20

C. Nature of the Orders/Lab Team                                        22

D. Epic Goes "Live" at NYU                                              22

E. My Pre FMLA Performance as Application Lead                          24

F. My April 2013 Accident Shattering my Shoulder and Need to Take Medical Leave                                                        25

G. After Epic Goes Live and During my FMLA Leave-the Director of Orders/Lab Team Is Overwhelmed with Work                               26

**H. Long, Feeling Overwhelmed By Work In the Orders/Labs Team, And Team Members Unable to keep Up With the Work, Pressured Me to Return Early From My FMLA Leave.**    **29**

**I. NYU's Retaliation Against Me In Connection With My First FMLA Leave and Second Interference With My Restricted Hours Leave.**    **34**

**J. My Complaints to Long Re: Retaliation and Interference With the Modification of My Leave That Management Had Insisted Upon.**    **42**

**K. Impact on My Medical Condition Due to NYU's Interference with my FMLA Leave and Retaliatory Conduct.**    **44**

**L. NYU'S Purported Non-Harassment/ Non-retaliation/Non-Discrimination Policies.**    **47**

**M. My Early August 2013 Complaints to Other NYU Upper Management about FMLA Retaliation and FMLA Interference.**    **49**

     **i. Complaints to NYU Senior VP Howard**    **49**

     **ii. Additional Complaint to NYU Upper Management about FMLA Interference and Retaliation**.    **52**

     **iii. NYU'S Findings That Long Engaged in Unlawful Retaliatory, Discriminatory, Racist, Dishonest, Manipulative and Unprofessional Behavior.**    **53**

     **iv. NYU Upper Management Disregards its Own Managers' Recommendations That Long Be Removed from Any Supervisory Position Due to Her Unlawful and Unprofessional Conduct.**    **55**

**N. Further Retaliation by Long, Bushman and Beale**    **56**

**O. My Witnessing and Complaint of Bushman's Sexual Harassment in the Workplace**    **61**

**P. My Deteriorating Condition Due to Over Work and Stress Related to Defendants' Retaliation and FMLA Interference Results in My Having to Take a Further Medical Leave.**    **63**

**Q. NYU Top Management Attempts to Circumvent NYU Policy and Procedures by Handling My Sexual Harassment Complaint Against Bushman Outside of HR or Third Party Investigators.**      **65**

**R. My August 23/25, 2013 Complaint to NYU about Being Subjected to Retaliatory Conduct in Connection with My FMLA Leave and Complaint Against Long and Bushman's Sexual Harassment of Another Worker.**     **68**

**S. NYU'S Continued Interference with and Retaliation Against Me Causes My Condition to Deteriorate to the Point That I Am Medically Advised That Failure to Cease Work until I Properly Heal Could Result in My Loss of the Use of My Arm and Shoulder.**     **69**

**T. The Severity of the Hostile Environment Forced Me to Begin to Think about Other Employment**     **69**

**U. My Second Full-time Medical Leave.**     **69**

**V. My Concerns of Further Retaliation and Interference Expressed to HR Regarding My Part-time Return to Work in October 2013 and Part-time FMLA and Request for Mediation.**     **72**

**W. Defendants' Further Retaliation Against Me After My Second Medical Leave In Connection with My FMLA Leaves and Sexual Harassment Complaint Against Bushman.**     **77**

    **i. Defendants' Issuance of a False and Retaliatory Review That, While Supposed to Be an Annual Review, Was Restricted to the Period That I Was out on My First FMLA Leave and the Short Period after My Return from That Full-time Leave When I Was Recovering from My Injuries.**     **78**

    **ii. My Formal Response to the 2013 Performance Review.**     **81**

**X. My Post-Second Medical Leave Complaints of Retaliation and Interference**     **85**

**Y. Within Hours of Reviewing My Comments to the My 2013 Performance Review and My Stated Concerns As That Review Related to MY FMLA Leaves, and as Part of a Continuing Pattern of Retaliation, Long, with Beale's**

and Mherabi's Involvement and Approval, Issue Me a Fabricated Written
Warning in Violation of NYU's Own Corrective Action Policies.                    86

    i. The Retaliatory Written Work Warning.                                        86

    ii. NYU's Violation of its Own Progressive Discipline Policy in
    Issuing the Written Work Warning.                                                  91

AA. My December 5, 2013 Complaint of Retaliation.                               94

BB. The Retaliatory and Hostile Conduct Continues After My
December 5, 2013 Complaint.                                                      95

CC. Defendants' Retaliatory Actions Result In My Termination Unless I
Accept A Severe and Humiliating Two Level Demotion to a Non-Lead
Position.                                                                        95

DD. No Genuine Reorganization of MCIT Occurred in Late 2013- January
2014                                                                             96

EE. NYU's Policy to Fill Open Positions In-House .                              102

FF. Numerous Other Vacancies Existed in Epic at The Same Time That the
Decision Was Being Made to Terminate My Employment and Offer Me A
Low Level Position, Including Other Application Lead Positions.                  103

    i. At the Time That I Was Being Pressured by Beale to Leave or Accept
    the Two Level Demotion Beale Was Aware that Himes Was Leaving the
    Application Lead Position.                                                         104

    ii. NYU, Having Never Offered Me the Application Lead Position Being
    Vacated By Himes, Instead Hires a New Application Lead From
    Outside of NYU and In Contravention of Their Own Policies.                        105

    iii. The Open Application Lead Position for the EpicCare Ambulatory
    Support Team.                                                                      107

**iv. Beale Dodges HR's Inquiry About Transferring Me to A Position Commensurate With My Position and Skill As Required BY NYU Employment Policy, In Order to Avoid Compliance With That Policy.**                                            **111**

**GG. Post Demotion Conditions at NY and Continued Retaliation**            **112**

**i. After My Transfer Long and Bushman Continue to Retaliate and Create Conditions Designed to Force Me to Leave.**            **112**

**ii. Long's Post-Termination Fabricated Performance Improvement Plan.**                                            **114**

**HH. My May 7 Compliant of Retaliation Through My Attorney.**            **117**

**II. Still Further Retaliation and Hostility Leading to My Being Forced to Seek Out Other Employment.**                                            **117**

**JJ. The Impact of Defendants' and Other NYU Manager's Ongoing Retaliation on Me.**                                            **117**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------
JEFFRY ZICCARELLI,

                                      Plaintiff,

         -against-

NYU HOSPITALS CENTER a/k/a NYU
LANGONE MEDICAL CENTER and
CHERYL LONG, SHERYL BUSHMAN,
and NANCY BEALE,
Individually and As Employers.

                                     Defendants.
--------------------------------------------------------------------

Docket No.
15-CV-09307(JGK)(KNF)

**DECLARATION OF
JEFFRY ZICCARELLI**

JEFFRY ZICCARELLI, declares pursuant to 28 U.S.C. § 1746 that the following is true and correct under the penalties of perjury:

1. I am the plaintiff in the within action. Annexed hereto as Exhibit 1 is a true copy of the First Amended Complaint in this action.

2. I respectfully submit this declaration in opposition to Rule 56 motion for summary judgment of the defendant NYU Hospitals Center a/k/a NYU Langone Medical Center ("NYU"), and defendants Cheryl Long ("Long"), Dr. Sheryl Bushman ("Bushman"), and Nancy Beale ("Beale"), Individually and As Employers, (all of the foregoing defendants respectfully referred to as "Defendants").

**A. My Technology Background and Qualifications for the Position From Which I Was Demoted.**

       **i. Educational Background**

3.  I began my college studies at John Hopkins University where my field of study was in

pre-medicine.

4.  I also studied mathematics at the University of Pittsburgh.

5. While working as a full-time medical technician in the clinical labs at Mercy Hospital in Pittsburgh, I also audited classes in the medical technologist program at Mercy Hospital School of Medical Technology.

6.  I also received a Certificate in Business Information Technology from New York University School of Professional Studies.

**ii. Information Technology Work Experience**

7. Prior to 1996, I worked full time as a NY State Certified medical lab technologist for twelve years from 1984 to 1996 at NYU Medical Center, and from 1976 to 1983 as a phlebotomist and then as a medical technician.

8. I transitioned to IT after working 20 years as a medical lab technologist, twelve of those years at NYU.

9. I have been employed in the field health care information technology ("IT") since 1996. A true copy of my resume is annexed hereto as Exhibit 2.

10. I have extensive experience and training in a medical software application known as "Epic."

11. During the relevant time period and through the date that my employment at NYU terminated, I was certified in the following Epic applications:

> -EpicCare Ambulatory Certification/NVT- Certified in 2012-this is a core clinical application for outpatient services;
>
> -EpicCare Inpatient Procedure Orders Certification/NVT- Certified in 2012-this is a core clinical application for inpatient services;

-EpicCare Reporting Workbench Certification/NVT -Certified 2012- this is a core reporting application

12. I also have additional advanced certifications in the following software applications:

-EpicCare Ambulatory Graduate Program Certification;

-EpicCare Inpatient Orders Graduate Program Certification;

-Infection Control Certification;

-Beaker Graduate Program Certification;

- Beaker Clinical Pathology Certification;

-Epic Infection Control module ("Bugsy").

13. I also have an extensive background in Allscripts applications (formerly Eclipsys). I helped build the Sunquest Lab System when it was implemented at NYU, and hold the following Allscripts certifications:

-Sunrise XA Orders and Results
-Sunrise XA Configuration 1 & 2
-Sunrise XA Interfaces
-Sunrise XA Charger
-Sunrise XA Documentation: Worklists/Task Manager

14. Shortly before my demotion by NYU in January 2014, I was re-certified in the Orders application for Epic, the application that was administered for NYUHC by the Orders/Lab team, having achieved a 100% score. A true copy of an NYU email confirming my re-certification results is annexed hereto as Exhibit 3.

### iii. My Thirty Year Employment History with NYU.

15. Prior to NYU's two level demotion of me in January 2014, I had successfully performed in the following full-time positions at NYU:

-Epic Analyst II (2009-2012), NYU Langone Medical Center;

-Senior Ancillary Analyst, NYU Langone Medical Center/ICIS (Eclipsys Sunrise Clinical Manager): (2003-2009);

-Ancillary Analyst, NYU Medical Center (1996-2003);

-Technologist, Senior Technologist, Supervisory Technologist, NYU Medical Center (1984-1996).

16. At no time during those thirty years up until after my FMLA Leave, did I receive less than a satisfactory review rating, and was frequently rated as exceeding NYU's job requirements.

17. Although I had received various promotions and transferred to various different positions within my thirty years at NYU, and with the possible exception of when I was first hired by NYU and when I first transferred to IT, prior to 2014, I was not placed on or subjected to any probationary period.

18. When I was promoted to the position of Application lead in June 2012, I was not placed on or subjected to any probationary period.

### iv. My Employment in NYU's Medical Center Information Technology Department My Recent Pre-FMLA Performance at NYU.

19.  In 2007, NYU awarded me its Team Spotlight Award-HIS Migration Project.

20. On January 13, 2010, NYU issued me an Excellence Award for my work in 2009. The award reads as follows:

2009
Excellence Award
In recognition of your consistent record of excellence at NYU
Langone Medical Center and for embodying and supporting our
Mission Values and Vision of a World Class Patient-Centered,
Integrated Academic Medical Center.

Annexed hereto as Exhibit 4 are true copies of various awards/recognition statuary I received

from NY during the period from 2009 to 2013, as marked as Mherabi Ex. 4 and Bushman Ex. 13.

21. Beginning in 2010, I reported to Suzanne Howard ("Howard") after first joining the

Epic Ambulatory Care team. I had also worked directly with Howard during the period 2004 to

2008 when she was working with a vendor and before she became an employee of NYU in 2008,

in connection with the implementation of the Eclipsys software system that was being installed at

NYU during that time period, known at NYU as "ICIS." I also worked with Howard in 2009

when she asked me to assist her team with implementation of the EpicCare ambulatory software

application.

22. The purpose of any clinical application software is to standardize and potentially

automate any given process in a healthcare setting that involves delivery of patient care.[1]

23. Howard, after working with me on the Ambulatory care team in 2008 and after I

successfully assisted her 2009, recruited me for the position of Epic Analyst II on the Epic

Ambulatory team to help transition NYU to the EpicCare ambulatory software at that time.

---

[1]The application analyst first meets with the operational partner to determine the steps that need to be
completed to deliver a particular aspect of patient care. Then the analyst translates those steps using a system
application to design a workflow so those tasks can be performed in a standardized, repeatable and auditable way
in compliance with all clinical and regulatory requirements. Then the analyst configures the system (a.k.a. build),
tests the configuration and finally implements the configuration after getting sign-off from the operational partners
who will be using the system workflow.

24. In or about 2010, as an existing NYU employee, I was recruited for and interviewed with Howard as Epic Analyst II. Howard, aware of my strong background in the aspects of the clinical applications that that team was struggling with, recruited me for that position in 2010, after she had first enlisted my help with the Ambulatory team in 2009 and part of 2010, to aid the Ambulatory team in their conversion to Epic, which had been flailing with the lab orders component. During that same time period, I continued to work in my position of being responsible for maintaining the lab functionality in ICIS, thereby essentially working two jobs.

25.  Howard acted as mentor while I was working on a team that was within her group from the period in or about 2010 to 2011, when I stopped performing work for the team Howard was assigned to. Howard was then moved from position to position in various roles.

26. During the relevant time period, NYU had a policy of requiring managers to complete performance reviews of  employees on an annual basis (calendar year) through a software program known as "ePerformance."

27. For the annual review period for the year ending 2010, I received an overall review rating from Howard of "4" out of a possible "5" for my work as an Epic Analyst II on the EpicCare Ambulatory team.

28. NYU "4" rating on the 1-5 Overall Rating scale was defined at that time and until my employment at NYU terminated, as follows:

> 4 - "Exceeds Requirements" is defined as an employee whose performance is above average and whose performance, at times, exceeds some job expectations and requirements.

Annexed hereto as Exhibit 5 is a true copy of my 2011 Performance Review, as produced by Defendants, and marked as Long Ex. 1, which states at the top of the first page under "Last

Assessment" my performance review rating for the previous annual review period of 2010. *See also* Bierman Decl., Ex. 84, Long Dep. pp. 68 L 21-69 L. 9.

29. In 2011 I held the senior position then referred to as Epic Clinical Analyst II. In addition to performing IT work for other NYU departments such as respiratory therapy and pulmonary function testing, I worked extensively with hospital laboratories.

30.  In 2011, after being hired to the Epic group, in addition to working on the Orders team to get the system ready for both the Outpatient and Inpatient phases of the project, I continued to work with the Ambulatory team in the position then referred to as Epic Clinical Analyst II, as well as working with the Respiratory Care team, because I also had knowledge of their workflows[2] from working extensively with them in implementing the ICIS application.

31. For the annual review period for the year ending December 2011, which review was prepared by Long just over a year before I took my FMLA Leave, I received an overall review rating of "4" out of a possible "5". *See* Ex. 5. Long testified to having signed my 2011 Performance Review. Long Dep., Ex. 84, pp. 45 L 21-47 L 22.

Long wrote on that review :

Jeffrey spearheaded the entire LAB EAP/LRR cleanup from Phase l. He successfully lead a team of 3 peers to obtain his goals, and worked closely with the Medical Center Lab Dir to ensure quality and safety outcomes. Obstacles were identified early, with action plans accompanying them. During this time, he also kept his leadership and the CMIO

---

[2]Epic Lab workflows involve the following: The purpose of any clinical application software is to standardize and potentially automate any given process in a healthcare setting that involves delivery of patient care. The application analyst first meets with the operational partner to determine the steps that need to be completed to deliver a particular aspect of patient care. Then the analyst translates those steps using a system application to design a workflow so those tasks can be performed in a standardized, repeatable and auditable way in compliance with all clinical and regulatory requirements. Then the analyst configures the system (a.k.a. build), tests the configuration and finally implements the configuration after getting sign-off from the operational partners who will be using the system workflow.

[Bushman] clearly informed of all phases of his work. His confidence and growth
increased along the way, making Jeffrey an important leader on this team.

*Id.* at NYULH000358.

32. Of the eight job review components contained in NYU's reviews, Long in my 2011

review rated six as "4" (exceeding requirements) and two (30% of the reviewed job areas) as "5",

which NYU defines as:

5 - "Significantly Exceeds Requirements" is defined as an employee, who has made
significant contributions to the department's effectiveness, consistently exceeds job
expectations and requirements, and is a role model for others.

33. The two "5" ratings that Long assigned on my 2011 job description components were

involved important job functions as follows:

Troubleshooting problems and addressing questions from users, and providing off-hour
support on a rotating basis. Prioritizing and implementing changes requested for the
system. Coordinating software updates and changes with users.

and

Preparing details of specifications as needed. Aiding trainers during user trainer; keeping
trainers abreast of new functionality and system changes. Collecting information
regarding potential system enhancement needs.

*See* Ex. 5 hereto; *see also* Bierman Decl. Ex. 84, Long Dep. pp. 49 L 14-59 L 11.

34. With respect to my on-call work performance, Long assigned me a "5" the highest

rating possible. *See Id* at NYULH000353.

35. Prior to my First Medical Leave, I had regularly worked with NYU's Chief Medical

Information Officer, defendant Dr. Sheryl Bushman ("Bushman" or "Dr. Bushman") after she

was hired by NYU in early 2011.

36. At that time, I had a good working relationship with Dr. Bushman who frequently complimented and praised my work.

37. Typical, was an email Dr. Bushman wrote to me dated November 14, 2011, that she copied to Long and Nancy Dean as follows:

> Jeffry,
> You have done a fabulous job with the lab EAPs and the Results Review Tree. I REALLY appreciate your hard work and efforts to improve our system!
> **You are a keeper!** (capitalization and exclamation points in original, bold inserted.)

Attached hereto as Exhibit 6 is a true copy of an email exchange dated November 14, 2011, produced by Defendants at NYULH000583, as marked as Bushman Ex. 11.

38. After in or about December 2011, I stopped reporting to Long after she was assigned to the position Clinical Director of Applications. (*See* annexed hereto as Exhibit 7, a true copy of a document produced by Defendants approving change in Long's title on November 8, 2011, as marked as Mherabi Ex. 3.) I then did not officially report to Long, but instead reported to Nancy Dean, until July 1, 2013 when Long was officially assigned to the position of Director Orders/Lab Team.

39. On June 1, 2012, just before my promotion to Application Lead, in response to my having sent Long a list of completed tasks per her request, Long wrote:

**Great week, JZ. Thank you!** (exclamation point in original, bold supplied).

Annexed hereto is Exhibit 8 is a true copy of an email exchange between myself and Long dated June 1, 2012, ( as extracted from the document marked as Defendants Ex. 4, PL00479 ).  This was typical of the types of comments I would receive from Long about the quality of my work

prior to my first medical FMLA leave in April 2013 ("First FMLA Leave" or "First Medical Leave.")

40. Less than four weeks before my First FMLA Leave, and nearly a year after I began performing in the position of Application Lead, NYU's CIO and Senior VP, Nader Mherabi ("Mherabi"), who headed up the entirety of NYU's Medical Center Information Technology department ("MCIT"),  along with NYU's then VP for Clinical Systems and Integration, Kathryn McClellan, on behalf of themselves and the "entire NYULMC Leadership" wrote to me to thank me for all my work towards the successful implementation of Epic operating system, and to inform me that as the result of my excellent work, I would be receiving two bonuses, one in the amount of $12,500 that I would be receiving on March 29, 2013, and another in the amount of $25,000 that I would be receiving on May 14, 2013. Attached as Exhibit 4 at PL00064 is a true copy of Mherabi's March 18, 2013 letter.

41. The March 18, 2013 letter stated, among other things, as follows:

First and foremost, the entire NYULMC Leadership wants to acknowledge and thank you for your hard work, diligence and tireless dedication to the successful Epic implementation. The success is a direct result of you and your dedicated co-workers. This strategic initiative would not have been possible without the commitment and sacrifices that you have made during the projects implementation schedule.

*Id.*

42. I  received high praise for my work, and had a strong record of contributions in my first year as Application Lead (and despite my  having taken medical leave as discussed below), including, but not limited to:

-In 2012 I managed a complete revision of all Epic lab test orders to correct erroneous definitions from the initial 2009 build;

-In 2012 I made technical adjustments to Epic lab workflows to accommodate facility closings, post Hurricane Sandy;

-10-

-In 2012 and 2013 I developed, built, tested, and implemented Epic lab, blood bank and pathology workflows for the Cancer Center, all inpatient areas, and the Cancer Center infusion areas;

-In 2012 and 2013 I supported four month phased go-live of Epic for all inpatient areas as the hospital gradually came back on-line, post Hurricane Sandy;

- In 2013 I received recognition award for work effort made after Hurricane Sandy.

43. Less than three weeks before my injury on April 13, 2013 and medical leave in connection therewith, on March 26, 2013 I was given my 2012 Performance Review. Annexed hereto as Exhibit 9, as marked as Long Ex. 3, is a true copy of my 2012 Performance Review. Although I had been reporting to Dean, Long prepared my 2012 review. *See* Long Dep.,Bierman Decl. Ex. 84,  p. 86:8-87:10.

44. With respect to my 2012 Review, due to my having assumed the position of Application Lead in June of 2012, I had been in that position for only six months during the 2012 review period. I was informed that per NYU policy, persons holding a new position for only six months could not be rated higher than a "3" and that I should not assign my own review ratings higher than that, which I complied with in filling out my first review for my first six months in the position of Application Lead. *See* Exhibit 9.

45.Yet due to my strong performance as Application Lead in my first six months in that position, the period from approximately July 2012 through December 2012, I was rated a "4" or exceeds requirements, in 50% of the Job Description Components, which would typically result in a "4" overall rating. *Id.* I was also assigned the highest possible "3" rating in six of the ten Individual Contributor categories or 60%, which NYU defines as "strength" and "2" in the

remaining four Individual Contributor categories which NYU defines as "skilled". *Id.* at

NYULH000369-000371.

46.  In the Manager of Projects Category of my 2012 Performance Review, I was assigned

the highest possible rating in one of the two categories, or 50%, which involves the highly

essential tasks described in the review as follows:

> Process Management - Good at figuring out the processes to get things done; knows how
> to organize people and activities; understands how to separate and combine tasks into
> efficient work flows; knows what to measure and how to measure it; maximizes
> resources; uses resources efficiently and effectively.

*Id.* at NYULH000371. I was assigned the "2" or  "skilled" level for the other Manager of Projects

Category. *Id.* NYULH000371.

47. In my 2012 Performance Review, Long rated me a "4" as exceeding expectations in

the highly important performance review category:

> Participation in workflow design and system build in order to gain and maintain in-depth
> knowledge of why workflows have been designed as they have, and the important system
> functionality supporting those workflows.

*Id.* at 366.

48. In my 2012 Performance Review, Long assigned me a "3"  the highest possible rating

achievable in the following category:

> Critical Thinking - Can recognize even the toughest and most complex of problems;
> gleans meaning from whatever data is available; adds personal wisdom and experience to
> come to the best conclusion and solution, given the situation; uses multiple, problem-
> solving tools and techniques; embraces tough problems and actively engages in solving
> them; develops new solutions to problems; doesn't rely on old solutions; comes up with a
> lot of unique and new ideas.

Long further commented:

> Jeffry has provided critical thinking skills when assisting with the design of interfaces.

*Id.* at NYULH000369-000370.

49.  In my 2012 Performance Review, Long assigned me a "4" the highest possible rating achievable in the following category:

> Teamwork and Collaboration - Is seen as a team player and is cooperative; encourages collaboration; can be candid with peers; gains support and trust of peers; deals effectively with all races, nationalities, cultures, disabilities, ages, and both sexes; acts fairly.

*Id*. at NYULH000370.

50. Moreover, for the remaining four Job Description Components of my 2012 Performance Review, I was assigned a "3" or "meets expectations" rating because those categories involved principally training functions. The training functions were very limited during the first six months of my position in the Application Lead position, and due to the suspension of training activities after Hurricane Sandy in October, 2012, less than four months after I assumed the Application Lead position, and the need for all employee resources to be devoted to implementing NYU's computer systems after the storm. It took several months to implement NYU's computer systems, which I worked on for months after the storm, working twelve or more hours a day during that period.

51. In the important Performance Review category: "Expand EPIC knowledge by researching, building and implementing other areas of Orders team build," Long, in my 2012 Performance Review, assigned Me a "4" rating, the highest possible for that category, and commented:

> Jeffry was able to complete the Reporting Workbench certification. NVT's are completed. Jeffry has assisted with order set build, eap build, preference list build, report build to mention a few.

52. From the time that I was promoted to the position of Application Lead in June 2012, until the time that I took my First FMLA Leave in April 2013, I received repeated praise for my work from Long and Bushman, with whom I continued to have a good working relationship during that period of time.

53. From the time that I was promoted to the position of Application Lead in June 2012, until the time that I took my First FMLA Leave in April 2013, I received no negative comments or criticisms of my work by Long, Bushman or other NYU managers, and certainly none of the nature that I began to receive after I returned from my First FMLA Leave.

54. In April 2013, just before taking my First FMLA Leave, I received a memo from NYU VP Nancy Sanchez that I would receive a Merit Based Increase for my work in 2012. Annexed hereto as Ex. 4 is a true copy the April 2013 notice as marked as Mherabi Ex. 4 at PL00065. I was then awarded a 3% increase, the highest that the letter stated was available for persons in my job category.

55. On September 4, 2013, NYU CIO, Mherabi, wrote to me as follows:

We are very pleased to present you with this token of our esteem in recognition of your exceptional efforts following Hurricane Sandy. Your work to restore IT services and infrastructure to the Medical Center was truly outstanding and contributed significantly to the rapid recovery of our institution. We hope this reminder of the critical part you played in those challenging weeks and months will help you recall that extraordinary time with satisfaction and pride.

Annexed hereto as Ex. 4 is a true copy the September 4, 2013 letter from Mherabi, as marked as Mherabi Ex. 4, at PL00066.

**B. NYU MCIT and the Epic Group**

    **i. Epic System Environments**

56. The Epic software is a complex software system with multiple electronic environments through which various levels of patient information can be accessed. Epic is typically used in the medical industry by providers of patient care.

57. NYU also used a variety of other software applications from other software vendors that were supported on the Epic teams.

    **ii. NYU MCIT Epic Organization and Application Lead position.**

58. NYU MCIT's organization remained largely the same during the period at least from 2012 through June 2014, although in the Spring of 2013, after conversion to the Epic software applications being converted to had been implemented at NYU, had stabilized and had reached a steady state for the initial project, MCIT Epic completed what it referred to as a reorganization, as was explained by MCIT CIO Mherabi in his email dated May 7, 2013. *See* Defs. Ex. JJ.

59. The Epic conversion project at NYU was initially funded as a capital expense and then moved to an operating expense under MCIT at or about the time that the software system became operational in the early spring of 2013, but organizationally and functionally there was no change.

60. MCIT had eight groups, each of which had various sub-groups, which in turn had smaller organizational groups known as "teams."

61. The Clinical Systems and Integration Group ("CSI" or "Clinical Applications") was one of the eight Groups. CSI had approximately eight to nine teams.

62. One of the subgroups to CSI was known as  Epic.

63.  Orders/Lab, where I was employed, was one of the Epic teams.

64. NYU used Epic and other computer software programs in connection within inpatient orders and used other software applications for laboratories which were handled by the Orders/Lab team, which also had to be interfaced with the Epic applications being used by other areas of NYU.

65.  Each Epic team had at least one Application Lead position, and some of the larger teams with multiple system functions and applications, had more than one Application Lead. For example, Orders/Lab had two Applications Leads. As another example, the EpicCare Ambulatory team had three Application Leads. *See* attached hereto as, Exhibit 10, an organizational chart produced by Defendants as marked as Beale Ex. 5.

66. During the time that I was Application Lead and until my employment at NYU terminated in June 2014, the Orders/Lab Team was headed up by a Director who reported to the Vice President in charge of CSI, who in turn reported directly to the Chief Information Officer ("CIO"), the top MCIT position, that was held by Nader Mherabi.

67. Nancy Dean was the Senior Director over Clinical Applications until she left NYU in or about the beginning of July 2013. Kathryn McClelland was the VP during most of my time on the Epic project. McClelland left NYU in April or May of 2013. She was replaced by Dana Kimmel ("Kimmel") as interim VP until they hired Beale. Beale acted as Senior Director until she became CSI VP in or about September, 2013. Bierman Decl. Ex. 85, Beale Dep. p. 9 L 6-16. Beale acted more as an administrator and did not exhibit any expertise in any particular software applications. Analysts at NYU often had to challenge Beale's application knowledge because she

-16-

had become somewhat out of touch with how the system had advanced as she moved up the ladder into more administrative roles.

68. Long was hired by NYU in 2011 as an Application Lead in Orders/Lab.  Long reported to Dean about general orders issues, while I reported to Dean about lab and orders issues. Long became the Director of the Labs/Order Team on or about July 1, 2013, although she had performed some transitional managerial duties in the Orders/Lab team beginning sometime in March or April, 2013, which she and Dean told me she was doing at or about that time. *See also* Ex. 84, Long Dep. pp. 13.

69.  According to Long, before coming to NYU, she had previously worked with other former employees of  a medical facility known as Sisters of Mercy Health System Sisters of Mercy employees, including, but not limited to, Bushman, Kathleen McClellan, Andrew Himes and Nancy Dean. *See* Ex.84, Long Dep. pp. 13-17, 19-22, 26-31, 35-36, 73 L 18-75 L 15.

### iii. The Application Lead Position

70. The Application Lead position summary was stated on NYU's ePerfromance review form for that position as follows:

> Responsible for facilitating the change across NYU Langone Medical Center related to Epic process redesign and system implementation. Application Lead will facilitate integrated processes and workflow changes across the Medical Center and to optimize the software's usefulness. This position provides effective business and operational guidance/support along with expertise in Epic integrated workflows and builds to the analysts on their team. He/she will actively engage in workflow analysis, system build and validation and system optimization to ensure and deliver the highest level of standardization, consistency and efficiency across the Medical Center.

*See* Ex 9. Annexed hereto as Exhibit 11 is NYU's job description for the Application Lead position that was provided to me, as marked as Beale Ex. 19.

-17-

71. There was no requirement or practice that was communicated to me that Application Leads or Directors have three years experience in a specific application.

### a. My Pre-FMLA Promotion to the Application Lead Position-MCIT EPIC Orders/Lab Team.

72. In or about June 2012 I was promoted to the position Application Lead on the Orders/Lab Team.

73. My duties as Application Lead first commenced in or about June, 2012.

74. In the position of Application Lead in the Orders/Lab team, I worked on and supported software applications relating to both laboratory and inpatient orders, and was assigned to head up the analysts working on applications for laboratories. My job as Application Lead required me to understand, which I did, the essentials of the entire orders team, not just lab orders.

75. Moreover, when I was on-call, it was not just for lab issues, it was for all orders handled by the Orders/Lab team.

76. Initially after being promoted to Application Lead, I was also working on lab orders, leading a team of two people in both maintaining the existing build for lab ordering in the Ambulatory physician practices, making any changes needed for subsequent Ambulatory go-lives as well as updating the build for the subsequent Outpatient Clinic and Inpatient go-lives. I needed to know the fundamentals of how the Orders application worked in Epic in addition to the specific way lab orders worked in terms of allowing providers to place orders so other users could collect lab specimens, send these specimens to various labs for processing and eventual entry lab test results.

-18-

77. Since the Orders application overlaps with the Ambulatory application, I also was required to and had an understanding of that application as well, and helped to support that application.

**b. Long's Pre-FMLA Support for My Promotion to Application Lead**.

78.  Long was familiar with my work performance prior to my promotion to the Application Lead position. *See also*, Ex. 84, Long Dep., pp. 48 L 18- 59 L 11;  Exs. 5 and 9.

79. Based on her awareness of my knowledge and performance, Long recommended and supported my promotion to the Application Lead position. *See also* Ex. 84, Long Dep., p. 82 L. 2-5.

80. Long enthusiastically notified and congratulated me on my promotion to the Application Lead position in her email dated June 7, 2012, where in connection with my promotion being approved she was so thrilled she wrote: "**woo hoo!!**" (exclamation marks in the original, bold supplied.) Annexed hereto as Exhibit 12 is a true copy of an email exchange containing Long's June 7, 2012 email, as marked as Long Ex. 2.

81. The Application Lead position that I was promoted to and held until January 2014, was a full-time position, requiring at a minimum thirty-five hours per week, five days per week, for a total of a minimum of 1,820 hours a year (including holidays and vacation time), although I typically worked ten or more hours a day as well as weekends in that position.

**c. Andrew Himes NYU Employment Background and Promotion to Application Lead**.

82. At the same time that I was promoted to the Application Lead position in the Orders/Lab Team, Andrew Himes ("Himes") was also promoted to the position of Application Lead on the Orders/Lab Team. *See* Exhibit 12 hereto.

83. Himes had been employed by NYUHC for approximately a year at the time of his promotion to the Application Lead position.

84. Himes had limited experience in Orders/Lab applications. On information and belief, Himes was primarily in a physician support role in his previous employment.

85. Himes was more restricted in his knowledge and skills, had little knowledge or understanding of the lab orders applications, and had performance issues in his role as Application Lead assigned to orders.

86. Although Himes was known at one point as the Application Lead for the Orders Team and I was known as the Application lead for the Lab Team, there was overlap in that we were using the same Orders application of the Epic system in addition to another shared Epic application called 'Order Transmittal' which takes an order and routes it in any given way depending on the operational needs. My role demanded much more and deeper knowledge of lab operations and lab-specific workflows even though we were using the same Epic functionality to create workflows. We both used the same tools to create workflows.  Himes had no knowledge of how lab systems worked until he got to NYU and was only peripherally involved and often made mistakes when he did get involved.

87. On information and belief, Himes did not have any clinical experience or training, nor did he  have extensive experience as an IT analyst. Supporting an application means you know how it works and you can explain that to front-end users. The design, build, test, implement process of application development requires a completely different skill set that Himes did not have extensive experience in. In healthcare IT, clinical application analysts need to understand the needs of the patient for their care, the care provider's needs to provide that care and then

understand all of that within the context of the business needs of the organization. Then the analyst's job is to translate that information into useful software to facilitate patient care within the limitations of the software being implemented. It is a complex balancing act that requires some technical skills and superior people/communication skills. Himes was inexperienced in this kind of analyst role, let alone in a leadership role.

88. Himes also did not have any people management experience when he was promoted to an Application Lead position, something I already had from working in the NYU labs as a supervisory technologist.

89. At the time of his promotion to an Application Lead in the Orders/Lab team, Himes had far less experience and knowledge than me in Lab and Orders applications.

90. According to Long, Himes was never promoted at Sisters of Mercy Health Center. Moreover, Long testified that although she was Himes' manager at Sisters of Mercy Health Center, Long never promoted Himes and never recommended him for a promotion. Bierman Decl. Ex. 84, Long Dep., p. 75 L6-15.

91. Beginning in or about June 2012, after my promotion to Application Lead of the Orders/Lab team, although I worked with both Dean and Long at that time, I initially officially reported to Nancy Dean. Beginning in or about June 2012, after Himes' promotion to Application Lead of the Orders/Lab team, Himes reported to Long.

92. Beginning in or about mid-April 2013, Long began transitioning to Dean's position as Director of the Orders/Lab team and began to assert authority as a manger over me while I was on the FMLA leave, but before she was formally assigned the title Director of the Orders/Lab

Team. Both Long and Dean had informed me of the transition at or about that time, and that Long was assuming managerial and supervisory functions over the team.

93. Himes was more restricted in his knowledge and skills, had little knowledge or understanding of the lab orders applications, and had performance issues in his role as Application Lead assigned to orders.

94. When Long telephoned me on May 25, 2013, to pressure me to return from my FMLA leave (as is further discussed below), she also spoke at length about problems she was having with Himes' work performance and how he was lacking in skills the areas required for the Orders/Lab team, asked me for help with her relationship with Himes and asked what I thought she could do to about Himes' problematic work performance.

### C. Nature of the Orders/Lab Team

95. The function of NYUHC MCIT Orders/Lab Team was to develop, support and maintain order entry functionality in Epic that would allow care providers to place orders for supplies, consults, lab tests and other procedures not covered by other applications (medication ordering was handled by Willow, the pharmacy application and radiology procedure ordering was handled by Radiant, the radiology application).

### D. Epic Goes "Live" at NYU

96. The term "go-live," as was applied to certain Epic software applications at NYU, was used to describe the time when NYU ceased using its former software application for the particular application and began utilizing the Epic software application for that operational function.

97. The term "stabilization" as applied to software being utilized by NYU, refers to the time immediately after the go-live, typically two to three months, during which the functioning of the software application when being actually in use by the hospital, when the system is reviewed and any initial problems in its functioning are resolved.

98. The term "steady state" as applied to software being utilized by NYU, refers to the time when a particular software application is in use by NYU, teams supporting the application generally work together to establish support and maintenance processes, along with updates and integration of any new systems that are added. The term "steady state" in a large healthcare setting such as NYU is largely a misnomer; it is more of an aspirational term than a reality. There were many subsequent go-lives at NYU after the initial project was completed by March 2013, as hospital mergers, new releases and updates occurred.

99. NYU was, at the time up until my employment with NYU terminated in 2014, a constantly expanding and evolving business entity, with new sites and systems being acquired all the time. While steady state was something to aim for, in the hospital business, especially for large healthcare entities such as NYU, the IT landscape is ever changing, evolving and expanding, requiring the addition and integration of other entities software systems, and as new applications and software changes are issued that need to be addressed. In 2014, the Epic 2014 application was released, which had to be installed and required another "go-live."

100. Beginning in or about December 2012 and through February 2013, the Epic software go-live for many of the Epic applications occurred at NYU and the applications of those Epic software applications being adopted by NYU became operational during that period depending on the particular NYU entity (e.g. Epic for NYU's Hospital for Joint Diseases had its go-live in

December 2012). Others, such as EpicCare ambulatory, had previously become operational and were in use by NYU prior to February 2013.

**E. My Pre FMLA/Disability Leave Performance as Application Lead**

101. In the years prior to my April 2013 injury ("Injury") and first FMLA/disability leave associated therewith that began after my injury ("First Medical Leave"), I received no disciplinary warnings and was not subjected to any other disciplinary action in my positions as Epic Analyst II on the Ambulatory team and Application Lead.

102. Prior to my Injury and First FMLA Leave, I performed the duties of my position of Application Lead in accordance with the requirements of that position, and was fully qualified and competent in that position.

103. Prior to my Injury and First FMLA Leave, I received no communications from any supervisors or from Bushman, that I was not satisfactorily performing my duties in my position of Application Lead.

104. Prior to my Injury and First FMLA Leave, I received no performance reviews in my position of Application Lead that were less than satisfactory, and, as described above, my work performance was generally rated as exceeding NYU's expectations.

105. As noted above, during the period prior to my taking the First FMLA Leave, and after Long and Bushman were hired in or about 2011, I had a good working relationship with Long and Bushman, and received frequent compliments from both Long and Bushman on my work.

106. During the period prior to my taking the First FMLA Leave, neither Long, Beale, Dean, Bushman nor Mherabi communicated to me dissatisfaction with my work as Application Lead.

**F. My April 2013 Accident Shattering My Shoulder and Need to Take Medical Leave.**

107. On Saturday, April 13, 2013, I suffered a bad fall, that, along with other injuries, caused by shoulder to shatter.

108. The following day, Sunday, April 14, 2013, I emailed Long and Dean to inform them of what had occurred. Annexed hereto as Exhibit 13 is a true copy of my email to Long and Dean dated April 14, 2013, as marked as Long Ex. 4.

109. The injuries I suffered as the result of the fall were extensive, causing my humerus to fracture in three places and requiring reconstructive surgery through metal plates and screws to try to piece my shoulder and surrounding areas together. A true copy of x-rays of my shoulder showing the extent of the surgical reconstruction after the accident is annexed hereto as Exhibit 14. Annexed hereto as Exhibit 15 is a true copy of my doctors and surgeons report detailing the nature and extent of the Injury.

110. On April 29, 2013, I wrote to Long and Dean to advise them that I had gone through the surgery and that I needed to wait for the bones to heal before I could even start physical therapy, which was expected to take at least four weeks. Annexed hereto as Exhibit 16 is a true copy of my email to Long and dean dated April 29, 2013, as marked as Long Ex. 5.

111. Both as the result of the injuries I suffered as the result of the fall, and the subsequent reconstructive surgical procedures, I experienced severe pain, physical limitations, discomfort and extreme fatigue.

112. In order to try to lessen the severe pain, my doctors prescribed medications which helped to lessen, but not alleviate the pain.

113. The medications prescribed for the pain from the injury and surgery had considerable side effects, including amplifying my feelings of exhaustion and further decreasing by stamina and ability to concentrate.

114. The injury and subsequent surgery also placed limitations on my ability to engage in my ususal daily activities, including basic activities necessary for daily living.

115. I made arrangement with NYU's HR department to take a medical leave. The papers that I was sent from HR indicated that I was eligible for both disability leave and FMLA leave, although NYU never informed me as to which days I was on leave were for which, or which days were being counted for which. *See* Defs. Ex. G.

116. Still I was initially, albeit unrealistically optimistic that I would be able to return to work by sometime in June. However, as time went by, it became apparent that the healing process would take longer than I had hoped, before I could even begin physical therapy to begin to restore use in my right shoulder and arm.

**G. After Epic Goes Live and During my FMLA Leave-the Director of Orders/Lab Team Is Overwhelmed with Work**

117. Most of the Epic software applications being adopted by NYU, including certain applications to be used on the Orders/Lab team, first became operational, or as is known in IT parlance the "go-live," during the period between December 2012-Feb 2013.

118. Once a system goes live, there are different and additional challenges to keeping the system functioning properly.

119. The volume of work necessary for the Orders/Lab team to maintain the system after the go-live, was equal to or greater the amount of work required during the period before the Epic system was operational.

120. After the Epic go-live in the Orders/Lab Team, the work load for the team did not diminish, and in many ways increased.

121. For example, we finished the inpatient orders go-live and moved immediately to another go-live in NYU's Cancer Center for the entire next month. That meant trying to get the inpatient implementation to a "steady state" while implementing new functionality someplace else and supporting that application. Most teams at NYU in 2013/2014 were stretched to their limit all the time, and the Orders/Lab team was no exception.

122. Also, the demands of healthcare IT are endless because healthcare is both a highly regulated yet extraordinarily dynamic business. There are always new treatments and along with them come new regulations to comply with. NYU is an organization that wants to maintain a global brand, so that adds even more pressure to an already high pressure environment.

123. According to documents produced by Defendants, Dean wrote on April 17, 2013 in connection with my being out due to my injury, the workload in the post-go live period was extremely high. Annexed hereto as Exhibit17 is a true copy of a documents produced by Defendants, an email exchange from Dean dated April 17, 2013, as marked as Long Ex. 6.

124. As Dean wrote in response to an inquiry about some work being requested of the Orders/Lab Team, citing  my being out due to my injury, she described there being "only two people absorbing the work of  3++ people's work." *Id.*

125. As Long testified about the 2013 workload in the Orders team after she began to transition to that :

There was a lot of work. We were trying to continue with the project after Super Storm Sandy. It was a lot of additional unexpected workload. A lot of changes. Rebuild.

Bierman Decl. Ex. 84, Long Dep., pp 104 L. 7-15. *See also Id.* p. 106 L. 6-16.

126. As Long testified, in reading Dean's April 17, 2013 email, she understood Dean to be saying, even regardless of my being out on leave, that "there was a lot of work on the table." *Id.* p. 112 L 10-23.

127. As Long also testified, she was having meetings about the limited resources the team had in contrast to the workload and its impact on project deliverables. *Id*. p. 104 L 16-105 L2.

128. According to an email exchange dated May 23, 2013 concerning a question relating to a project that I had worked on before my First FMLA Leave, there was concern about the analysts on the team, Susy Helme and Shahida Kwaja being able to handle an order issue relating to that matter, as the analysts on the team were "overwhelmed." Annexed hereto as Exhibit 18 is a true copy of a document containing an email exchange dated May 23, 2013 produced by Defendants  as marked as Long Ex. 7; see also Bierman Decl., Long Ex. 84, Long Dep. pp. 115 L 15-116 L 10.

129. Long testified that both of those analysts, who I oversaw as Application Lead, had reported to her at a meeting with them, held while I was on my First Medical Leave, that they had felt overwhelmed by the work load–that "there was a lot on their plates." *Id.* 115 L 18-25. Long testified that the analyst's complaints were about the general workload on the team and that there was "a lot to get done and catch up with." *Id.* 116 L 9-20.

**H. Long, Feeling Overwhelmed By Work In the Orders/Labs Team, And Team Members Unable to keep Up With the Work, Pressured Me to Return Early From My FMLA Leave.**

130. While on FMLA leave, I received work related e-mails, was presented with work related questions, and received work assignments for which I had not volunteered.

131. During that leave I also began receiving e-mails from other employees as well concerning work related matters, apparently with the direction and/or encouragement of Long.

132. Long called me on several occasions as well. *See* Bierman Decl. Ex. 84, Long Dep. pp.118-122 acknowledging calls.

133. At no time did I in any way invite, solicit, encourage, approve of or authorize communications from Long as to work or FMLA related status while I was on my First FMLA Leave.

134. On May 24, 2013, after a post-surgical appointment with my surgeon, I emailed Long and Dean to advise them that I could begin physical therapy to restore te use of my right arm and shoulder, which was also critical since I am right handed, and that he thought that I might be able to return to work on a part-time basis in six weeks, by July 8, 2013, but that I would have a further post-surgical appointment to assess my condition on July 5, 2013. Annexed hereto as Exhibit 19 is a true copy of my email to Long and Dean dated May 24, 2013, as marked as Long Ex. 8.

135. On May 25, 2013, while I was on FMLA leave, and the very day after my May 24, 2013 email to Long, two days after the email about Long's team's analysts being overwhelmed, and the day I had begun physical rehabilitation to help restore use and function to my right

shoulder and arm, I received another extremely disturbing telephone call from Long. (the "May 25 Call.").

136. At her deposition, Long testified under oath that she did not try to contact me after receiving my May 24, 2013 email. Ex. 84, Long Dep .p. 116 L 17-20.

137. Long was then forced to alter her testimony and admit the call after she was confronted with my Verizon telephone bill showing her 70 minute call and confirming that the incoming number shown was her cell phone number. Annexed hereto as Exhibit 20 is a true copy of my Verizon billing statement for the period May 21 to June 20, 2012, redacted to show the incoming call that was from Long's phone, as marked as Long Ex. 9. *See also* Bierman Decl. Ex. 84, Long Dep. pp. 123 L 3-21.

138. In her May 25 Call, Long, acknowledged to me receiving that May 24, 2013 email from me, and understood that my leave would not end until July 8, 2013 at the earliest. *See also*, Bierman Decl. Ex. 84, Long Dep., pp. 117 L 16- 118 L 16.

139. Long, on her May 25 Call, pressured me to end my FMLA leave.

140.   According to a document produced by Defendants, Long later wrote, she was aware that I should not be contacted while on medical leave. Annexed hereto as Exhibit 21 is a true copy of a email from Long to NYU HR dated September 24, 2013 produced by Defendants, as marked as Long Ex. 10. As noted in that email exchange, Long had used her personal cell phone to place the call, avoiding use of her NYU office number.

141. Long, in her lengthy May 25 Call, which call lasted 70 minutes, extensively discussed work issues.

-30-

142. Long, at the time of the May 25 call, although had been transitioning to Dean's position as Director of the Orders/Lab team, possessed neither the skills, knowledge or managerial experience to handle the position. On information and belief, and so long as I knew, Long at the time had only received Epic certification in Epic orders and possibly Orders Transmittal. Long was sent by NYU to get another certification related to Hospital Outpatient Departments, but on information and belief, she was unable to pass the certification, and Epic did not so certify her.

143. On the May 25 Call, Long, in her highly aggressive tone of voice and threatening language, sounded desperate for me to return to work to assist her.

144. Long went on at length about the overwhelming workload on our team, the enormous difficulties she was facing in handling the workload due to my absence, and how stressed out she was with my not being there.

145. As part of her ongoing effort to pressure me to return back to work before my First FMLA Leave ended, Long discussed my starting physical therapy, indicting that she believed that that meant that I was well enough to return to work, and which she used to support her attempts to get me to cut my FMLA leave short.

146. As part of her effort to pressure me into returning before I had recovered from my Injury and before my leave was to end, Long stated ominously the May 25 Call that "your job is safe for now," which was clearly intended to convey to me, and which I understood to mean, the gravity of her demands that I return to work before my recovery and completion of my First FMLA Leave.

-31-

147. I took Long's threat seriously and was extremely concerned about losing my job if I did not give into Long's pressure to cut short my leave return to work as she was demanding, and that I could lose my medical insurance.

148. In the May 25 Call, I tried to explain to Long why I was not physically able to return to work, that I was on pain medications, that my right shoulder and arm were not functioning well, and that I was experiencing extreme fatigue due to the recovery and medications. Long became testy, dismissive and angry in a way that she had not been with me previously which further raised my concern level about my job security. I was also facing huge medical bills and could not afford to loose my health insurance if I was fired for not returning, which I was fearful of.

149. When I resisted Long's pressure tactics that I return to work, Long proposed that I work as a consultant to her department while I was on leave, which I told her I could not do due to my ill-health. That further angered her.

150. Long refused to take "no" for an answer. She told me that, while she understood I was still recovering from surgery, she would limit my hours if I returned before my FMLA leave ended.

151. Long's pressuring made me feel that my job was in jeopardy and that I had no choice but to accede to her demands that I return early from my FMLA leave.

152. At that time, due to my injury and surgery, I was continuing to experience substantial pain, limitations on movement, serious loss of stamina and lack of energy, became easily fatigued and was on strong medications that affected my ability to work.

153.  After I explained why I was just not physically capable of returning to work as she was demanding, Long continued to harshly pressure me to return, saying that I could return on a part-time basis and that I would receive a light work load until I was fully healed. When I tried to explain why I just could not do that at that time, it was clear that any further attempts to explain my medical situation would further anger her.

154. Although I was far from being recovered sufficiently to return to work, as the stress of possibly losing my job mounted in the weeks after the May 25 pressuring call from Long, I decided that I had no choice but to return to avoid job loss, and hope that Long's promise and representation that I could continue my leave on a part-time basis and with a light work load until I was fully healed would be followed.

155. I did not contact anyone at NYU at that time about the call, since I was in ill-health, on medications and fearful of what would happen if I complained about who was about to be my permanent Director, felt that to preserve my job, it was best to try to stay "under the radar."

156. I returned from my full-time First Medical Leave early, on July 1, 2013, even though I had not fully recovered from my injuries, I had not even yet had my scheduled July 5, 2013 post-operative evaluation at which my doctor was to evaluate my condition and advise me about returning to work, and although, at the time, I was not scheduled to return from my medical leave until July 8 at the soonest.

157. I was so fearful at that point of losing my job and medical insurance, that when I saw my doctor, Dr. Youm, on June 28, 2013, I brought an NYU work return form and  requested that he indicate on the form that I could return to work, although he told me that he thought that I was not medically ready to return to work.

-33-

158. Dr. Youm on the form, however, wrote that he was prescribing a four to six week period of rehabilitative physical therapy, two to three times a week, and was prescribing 500mg doses of Naprosyn, a strong anti-inflammatory, anti-pain medication, whose side-effects include drowsiness and dizziness. Defs Ex. G at PL00294; *See also* Bierman Decl. Exhibit 93.

**I. NYU's Retaliation Against Me In Connection With My First FMLA Leave and Second Interference With My Restricted Hours Leave.**

159. Although I was forced to return to work before end of my full-time First Medical Leave, it was clear that Long was disgruntled and angry that I did not return immediately after the May 25 Call.

160. Long's attitude towards me and the nature of our working relationship when I returned from my FMLA leave on July 1, 2013, changed completely.

161. Before taking my First FMLA leave, I had a good relationship with Long who regarded me as a highly accomplished professional, and who treated me as a peer, with dignity and respect.

162. Long immediately upon my return spoke to me with a highly negative edge in her voice, spoke to me in surprisingly harsh and confrontational tones, made snide comments, and kept me at a distance in our working relationship in a way she had never done before my First FMLA leave.

163. While before my FMLA Leave Long she was appreciative of my skills and contributions, after I returned, she was dismissive and hypercritical of work that I was performing, although I was performing that work in the same way as work that she had previously complimented.

164. Contrary to her agreement and promise that I could continue my leave part-time until I healed and was able to return on a full time basis, and would be assigned a light work load, almost immediately upon my return I was given a heavy work load that could not reasonably be accomplished without my working more than ten plus hours a day, and more than five days a week.

165. Since within days of my supposedly returning on a part-time work/part-time FMLA basis, I was being forced to work long hours and not being given the days off as promised, I had to try to schedule appointments for physical therapy during times that I was not required to work in the early morning hours or after work in order to avoid having to take off from work. On the few occasions that I could not schedule therapy before or after work, I made up those hours. I also did this to avoid further hostility from Long and others. Long knew that I was scheduling the therapy during mainly off-work hours, and I neither requested nor received from her any accommodation for attending physical therapy sessions.

166. From the time I returned from leave on July 1, 2013 and thereafter, Long exhibited extremely hostile, confrontational, excessively critical, demeaning and condescending behavior towards me that she had never before exhibited towards me before I took my First FMLA Leave.

167. While before my First FMLA Leave and when Long was supervising me, Long and I met only occasionally  to review the status of my deliverables, and which typically occurred in team meetings. Beginning shortly after I returned from leave on July 1, 2013, Long began aggressively and in a very hostile manner, coming to my desk, frequently two or more times a day, to ask and pressure me about the status of my work assignments. This was something that I had never before experienced from Long, or any supervisor or manager at NYU, prior to my

return from First FMLA Leave. It was clear that Long was not checking the status of my work assignments-- she was engaging in deliberate harassment in tandem with other conduct to make the work environment intolerable for me.

168. Long's conduct after my First FMLA Leave was extremely hostile to the point of being abusive.

169. While Long was overall not a good manager, the only other employees that I had witnessed Long treat in such an extreme manner were Adrian McClean and Renee Walker, two black employees she used similar tactics on, by relentlessly attacking their work, until they were forced out of NYU.

170. Of the work assignments that Long gave me on and after my July 1, 2013 return from my First FMLA Leave that were not completely unrealistic or outside of my job description, those assignments necessarily required working long hours in order to accomplish them within the time periods set by Long for them to be completed.

171. Almost immediately upon my early return from full-time First FMLA Leave and when I was supposed to be on part-time FMLA as Long had represented to me, I was often required to work more than ten, and often up to 12, hours a day.

172. The list that Defendants claim to be the entirety of my work assignment upon returning is false and misleading. *See* Defs. Ex. J. The four items listed are a small part of the work that Long unloaded upon me.

173. In addition to those work assignments, there was an extensive number of daily tasks I was required to perform as part of my position, I was required to attend every meeting related to labs, was given help desk tickets to solve, was helping the team solve problems, and was

-36-

working on error queue cleanup. I was pulled directly into the issues with the providers,

physician champions and physicians who began to routinely give me work that had previously

been the responsibility of the Director, and which work Dean had performed before she left

NYU.

174. While I did not officially report to Bushman, after my retrun from my First FMLA

Leave, Bushman began to assert managerial and supervisory functions with respect to my work.

Bushman, as a high level manager at NYU MCIT, assigned me work, assigned me to attend

meetings, prepared documents purportedly related to my performance, could and threatened to

discipline me in connection with my work, and communicated with other NYU managers about

my performance, including on assigned tasks. Bushman began assigning me tasks directly,

including, but not limited to the impossible lab pathology fix assignment. Bushman also began to

demand directly that I attend meetings.

175. Long, initially upon my return from my First FMLA leave, assigned me to unrealistic

projects with short turn around times, constantly confronting me about whether they would be

completed within her arbitrary and unrealistic deadlines.

176. For example, Long, along with Bushman, insisted that I resolve within two weeks a

complex software problem involving developing electronic orders for providers to place in Epic

for anatomic pathology testing that had defied workable solutions for years in the IT industry,

and despite years of  IT workers across the country trying to find solutions to the same problem.

177. Long also demanded that I perform work that was clearly not a part of my job

description and that no IT person could perform, since it required substantive medical

information input and judgment required to be prepared by doctors in the particular filed of medicine for which the software was being adapted.

178.   Many of the work assignments from Long were unnecessary and unreasonable, and her treatment of me unprofessional and uncalled for. For example, with respect to the "pathology orders fix" demanded of me by Long and Bushman the instant I returned, as I detailed in my August 4, 2013 complaint initially sent to Howard. *See* Defs. Ex. M NYULH001079-001080.

179. The complexity and absurdity of the assignment can be further explained as follows: For general lab blood tests in clinical pathology, entering an electronic lab order is a simple task. For example, say a person wants a CBC (complete blood count test) on a patient. The person selects the patient, selects the test, signs the order and someone collects the specimen and sends it to the lab to be performed. For anatomical pathology orders, a specimen can come from any part of the body that is being operated on. Identifying a specimen can get very complex, especially when it is in a hurry. The functionality available that Bushman wanted me to use, provided only for the listing of questions on the order. That part of the system was not designed for composing such complex orders.

180. The result, for example, was that a consult to pathology order for a left, lower, knee, metal, hardware, equipment, extraction, would require the user to answer seven separate questions to compose the order. In addition, the user would have to know how to answer these questions in the correct order, otherwise they would be composing nonsense. Now expand that to the entire human anatomy and it was impossible to account for the extreme variation in specimens that could be sent. I would have had to offer dozens and dozens of questions with no way of directing users to answer them. It was a bad and dangerous idea that Bushman and Long

-38-

telling me to design. No one in an operating room would have the time to use these orders. It was an impossible and unworkable solution.

181. This was a long-standing problem with ordering pathology orders with Epic. Every other site in the country was having that same problem. Therefore, to ask me to solve an Epic-related system problem in two weeks in coming up with solutions that I knew would not work, Long and Bushman knew to be a bogus make-work assignment that would place impossible time demands on me and make me miserable.

182. Due to the fact that the orders functionality available at the time was not workable, I recommended to Long and Bushman that NYU use the EPIC recommended tool to solve the problem, known as OpTime Specimen Navigator. Although Defendants were aware of this solution, and the fact that the same problem existed in other hospitals using similar software and had been unable to be resolved for years at NYU and other health care facilities across the United States, as I also advised them, Long and Bushman insisted that I fix the problem within two weeks of my return from my First FMLA leave without adopting the appropriate software application. I again tried to explain that to Long and Bushman, as well as to other of my leadership, that there was an Epic option that was designed to handle this very problem, but they refused to even consider implementing it, instead insisting that I fix that problem.

183. As another example that I recounted in my complaint:

-I am in a meeting discussing a part of the system called order transmittal. I am angrily told by Long that the no one should have ever turned off pathology order requisition printing. I calmly tell her that the department didn't want requisition printing, so that it was never turned on. Long nastily responds that the department doesn't tell us how to install Epic, we tell them how to do it. Long then in front of the team brings up the Istat meeting, and falsely accuses me of lying.

*See* Defs. Ex. M. at NYULH001080. In truth, someone had set up the system to print a requisition in the anatomic pathology department in addition to printing one for the ordering user to send with specimens. When a pathology was placed in Epic, an order transmitted electronically to the anatomic pathology system so a second piece of paper was not needed. This is one of the main benefits to using electronic health records: less paper waste. The lab was already wasting reams of paper so that department asked us to turn this feature off.

184. Another example was the lab queue error problem that Long directed me to fix within two weeks immediately upon my return from my full-time First Medical Leave.

185.The lab queue errors issue was also a longstanding problem that presented a complex and difficult problem to resolve, and that NYU had been unable to resolve for an extended period of time. A lab queue error refers to electronically interfaced orders and results to reference labs that NYU and NYU providers have relationships with, primarily Quest Labs and LabCorp, but there were others as well.

186. Simply put, an Epic user places an order for a lab test, a specimen is collected and sent to the reference lab, the order is sent to the reference lab electronically, the test is performed and the result files back to Epic electronically. For any number of reasons, an order or result can fail to file so that order or result goes into an error queue.

187. A large portion of these errors happened because not all NYU providers were using Epic software. These non-Epic providers could send paper requisitions to the reference lab and results would come back as 'unsolicited' meaning the reference lab never got an electronic order. By law, labs are required to perform all tests for specimens received even though they never got an electronic order. The problem happened when results for these 'unsolicited' tests

were generated electronically. These results would be sent from the reference lab even though they might fail in Epic. There was no way to stop them.

188. The lab queue error problem at NYU became large. Many of the errors should have been processed by medical records because these errors involved missing or incorrect patient demographic information, something an Epic analyst would not be privy to, nor should be responsible for correcting. The other group of errors involved lab test code mapping for tests that weren't built in Epic. This required clinical oversight.

189. Dean had engaged Dr. Adam Szerencsy, who reported to Bushman, to help with this task but he didn't like doing it. When Dean left, Long and Beale pressed me to do this clinical analysis, even though the task clearly required clinical input.

190. I tried to convince Long, Beale and Szerencsy that we needed the NYU laboratories to be involved and I had convinced the lab director to participate, but Long would have none of it stating: "They don't tell us how to do our jobs, we tell them how to do their jobs".  This was just one of many examples of Long's lack of knowledge when it came to managing a lab team, and yet Bushman supported her.

191. The lab queue errors  assignment, like the pathology orders fix assignment, were part of Long and Bushman's early efforts to drive me out for not having returned from my FMLA leave sooner or, if I did not resign, to create a fabricated paper trail to claim that I could not do the job, by repeatedly rejecting simple, clear, and realistic solutions to the problems that I offered.

192. The lab queue errors problem continued and was not solved when the problem was apparently assigned to Long and Ackerson to solve, while I was out on my full-time Second

Medical Leave. Attached hereto as Exhibit 22 is a true copy of an email exchange produced by Defendants.

193.  Nor, to my knowledge, had the lab queue errors problem it been solved by the time that my employment at NYU terminated, although I had not been a part of that team for five months as of that time. On information and belief, the lab queues errors at NYU was never solved.

**J. My Complaints to Long Re: Retaliation and Interference With the Modification of My Leave That Management Had Insisted Upon.**

194. Shortly after my forced return from my full-time First FMLA Leave, I complained to Long about the heavy workload she had assigned to me when I was supposed to be on part-time FMLA leave, and that as a result, I was suffering from exhaustion, the effects of strong pain medications, a deteriorating health condition due to work load and stress.

195. Long's response was both angry and dismissive. She scoffed at my need to be on part-time FMLA leave, despite her representations and promises that I would be afforded such leave if I returned early from my full-time leave. Long tried to humiliate me for even requiring any medical leave, telling me that she snapped back quickly after giving birth and returned to work full-time quickly, and that I should too

196. After I complained to Long about the impact of the heavy workload and stress on my recovery and health, Long did nothing to reduce my work load, and she continued to exhibit highly hostile behavior towards me.

197. Therefore, on July 24, 2013, I wrote to Long as follows:

Hi Sheri, This worries me. Right now, I'm not able to routinely put in 10+ hour days like I could before my accident to get things done. I'm just not there yet. I'm a little worried that

-42-

I might have come back too soon and that leadership's expectations of what I can deliver might not be ín sync with what I'm physically capable of. Do we need to discuss this?

Annexed hereto as Exhibit 23 is a true copy of a document produced by Defendants that contains my July 24, 2013 email, along with what appears to be an email that Long sent to herself that she never sent to me, as marked as  Long Ex. 12.

198. Long's email to herself appears to have been created by her as part of an effort to create false cover for her unlawful retaliatory conduct. Long's statement to herself is a false portrayal of what I discussed with her. Long did not discuss with me my purported  "socializing" with others at work, which is a falsehood. Long never claimed that the nature of the work assignments did not require me to work ten plus hours a day. As noted above, Long in response to my complaints of how the unexpected heavy work load was impacting my recovery after having had to return early from FMLA at her insistence, was dismissive, with her repeating how she returned to work soon after she gave birth, indicating that I should just endure it.

199. After my July 24 email to Long, my health and interference/retaliation concerns continued to be dismissed or ignored. I continued to be assigned heavy workloads that continued to force me to work long hours (more than ten hours a day) and weekends. Based on Long's prior threats, and leave interference and retaliation since I returned from leave, I was fearful that if I went back out on a full-time leave I would lose my job.

200. As is shown in documents produced by Defendants, Long's documented excuse to upper management to explain away complaints about her behavior, was that my, and other employees, complaints were  "a result of her team being overworked" and she claimed to

Kimmel and Beale that she had voiced concerns to leadership about the workload in her Team, but that nothing was done. *See* Defs Ex. X at NYULH008146, "8/20/13 Verbal Discussion."

201. According to Kimmel's, Beale's and Boney's report of their meeting with Long, Long dismissed complaints about her conduct as follows:

> Sheri did not feel these concerns were valid and instead stated that these concerns were a result of her team being overworked and also being weak and dysfunctional. She stated her team doesn't like being told what to do and claimed they are manipulative. She also stated that she had voiced concerns to previous leadership about the workload and nothing was done. Wayne asked about previous performance reviews and if they reflect what Sheri was stating. Sheri indicated that the past performance reviews did not reflect this because of the go live workloads...

*Id*.

## K. Impact on My Medical Condition Due to NYU's Interference with my FMLA Leave and Retaliatory Conduct.

202. In the weeks following my coming back to work early from my full-time FMLA Leave, I was still struggling with low energy and lack of stamina due to my medical condition.

203. After about three weeks of struggling with the heavy workload, and experiencing a deterioration in my condition due to my premature return, I communicated to Long that I believed that my return from my full-time FMLA leave was too soon, and asked Long what to do given my condition.

204. Long did not respond to or address my concerns that I was not being allowed to take the part-time FMLA leave, as she had represented in forcing me to return early from my full-time FMLA leave. Nor did Long agree to abide by that part-time FMLA leave arrangement that she agreed upon.

205. Rather, Long's response was just that I'll "get over it." She then again, dismissively repeated how it was for her when she came back after her pregnancy, and she got right back to work, a correlation that I did not understand.

206. Instead of addressing my health, working hours and workload concerns, Long continued to demand that I perform the heavy or impossible tasks she assigned to me, which forced me to continue to put in 8-10 or more hour days, even though I was physically exhausted, in pain and on medication, as I told her.

207. After the fourth week since I was forced to return early from my full-time First FMLA Leave, and despite what was supposed to be my part-time FMLA leave, there was no let up on the work demands by NYU management.

208. The toll on me of continuing to have to work eight to ten or more hour days continued to increase, in terms of pain, exhaustion and impaired recovery. I again communicated what I was experiencing to Long at that time, who repeated to me what she said when I approached her after the third week after my return from my First FMLA leave.

209. I met with Long on July 25, 2013 to complain about the hostile treatment, heavy work load, the full-time days and long hours I was working, and its impact on my health.

210. Long's email documentation to herself (*see* Defs. Ex. L) is a complete fabrication of the actual conversation or distortion of what I said, other than my telling her that I was working ten hour days, that my condition was continuing to deteriorate and that my condition and the huge work load I was being assigned were making it difficult for me.

211. The fact is, I had approached Long to try to address her newly minted hostility towards me since my return from medical leave. I asked, but received got no answers from her.

-45-

212. There was never any mention of socializing or talking about time off. She states 'He did not disagree,' but I never agreed to what was written because we had never talked about it. I was a popular person on the team and people routinely stopped by to say hi when I got back or I would say hi in passing on my way to or from meetings. That was the extent of my socializing, which was just as it had been before my First Medical Leave.

213. I did admit that coming back to work was hard after my being away on leave and early return, and that it was going to take some time to get up to speed. I also told this directly to Beale at or about that time, in a conversation that took place at my desk.

214. I also told her during the meeting that at that moment my shoulder did not hurt because I was still taking pain medication, which was contributing to my lack of stamina and fatigue.

215. I told Long that, in addition to the long days during the week, the workload was forcing me to work weekends to keep up with the work she was assigning me.

216. Long continued to demand that I perform the heavy or impossible tasks she assigned to me.

217. After the fifth week since I was forced to return early from my full-time First FMLA Leave, there was still no let up on the work demands by NYU management.

218. I again communicated to Long my exhaustion from trying to perform the heavy work load I was being given due to my medical condition. Long responded to my complaint by accusing me of using my medical condition as an excuse to avoid work.

219. My situation in enduring the retaliation for having not cut even shorter my FMLA leave, and interference with my part-time leave, was creating an extremely difficult situation for me. I began documenting what had been occurring. *See* Defs. Ex. M.

**L. NYU'S Purported Non-Harassment/ Non-retaliation/Non-Discrimination Policies.**

220. NYU's policy, as contained in its handbook that was distributed to me, regarding retaliation against employees who complain about their rights under various federal, state and local civil rights and leave law, states, in part, as follows:

> It is the responsibility of all supervisors to maintain a work environment free from harassment and the responsibility of employees to assure a non-intimidating work atmosphere for their coworkers. Immediate and appropriate investigation and corrective action where necessary will be taken where incidents of harassment or intimidation are alleged. Any employee who perceives such a problem should immediately contact his/her supervisor or Human Resources,/Employee Relations without fear of retaliation. Harassment related to discrimination will not be tolerated and Medical Center will take all appropriate steps to stop the harassment and take disciplinary action, up to and including termination of an offending individual, where warranted.

Annexed hereto as Exhibit 24 is a true copy of the NYU Staff Handbook, as marked as Sanchez Ex. 2, *see* p. 34 thereof, PL00035.

221. According to the NYU Human Resources Policies and Procedures Guide, NYU's policies regarding retaliation and harassment provide:

> **Definition of Harassment**
>
> Harassment is a form of prohibited discrimination. Harassment includes verbal and physical conduct that denigrates or shows hostility or aversion toward an individual because of his or her race, color, religion , gender, sexual orientation, age, national origin, disability, military service, marital status or membership in any other protected class as established by law. Harassment:
> (a) has the purpose or effect of unreasonably interfering with an individual's work performance;
> (b) has the purpose or effect of creating an intimidating, hostile or offensive working environment; or

-47-

(c) otherwise adversely affects an individual's employment opportunities.
Harassing conduct includes , but is not limited to:
• Verbal abuse or hostile behavior, such as insulting, teasing, mocking, degrading, or ridiculing another person or group...

Annexed hereto as Ex. 25 is a true copy of NYU Human Resources Policies and Procedures

Chapter 4:Workplace Conduct as produced by Defendants, as marked as Sanchez Ex.3, *see* p. 11

thereof.

222. NYU's policies regarding investigation and responsive action for discrimination,

retaliation and harassment further provide:

**Investigation**

All reported allegations of discrimination, harassment or retaliation will be promptly investigated in a fair and expeditious manner. The investigation may include individual interviews with the parties involved and, as deemed appropriate by the Medical Center, individuals who may have observed the alleged conduct or may have other relevant information. Confidentiality will be maintained throughout the investigatory process to the extent it is consistent with performing an adequate investigation and taking appropriate corrective action.

**Responsive Action**
If it is deemed that inappropriate conduct has occurred by a Medical Center employee or third party entering our workplace, the Medical Center will take such action as is appropriate under the circumstances, as determined in its sole discretion. Responsive action may range from counseling to termination of employment, and may include other forms of disciplinary action as deemed appropriate under the circumstances.

**Retaliation Prohibited**
The Medical Center prohibits retaliation against any individual who, in good faith, reports discrimination or harassment or participates in an investigation of such reports. Retaliation against such an individual is a violation of this policy and will be subject to disciplinary action, up to and including termination of employment.

*Id.*  p. 14.

223. NYU's Senior Director in NYU's IT Department testified that NYU has a "zero tolerance" policy for retaliation. *See* Bierman Dec;. Ex. 89, Boney Dep p. 6 L 6-14, p. 124 p, 13-15.

**M. My Early August 2013 Complaints to Other NYU Upper Management about FMLA Retaliation and FMLA Interference**.

**i. Complaints to NYU Senior VP Howard.**

224. Feeling desperate and at a loss to know what to do about Long and Bushman's conduct, on a number of occasions prior to August 4, 2013, I went to Howard after working late into the evening.

225. On those occasions, I spoke with Howard about how I had to come back too soon from my full-time First FMLA Leave, that I was not feeling well and was physically exhausted, that I had not fully recovered from my injuries, that I was being treated in a hostile manner by Long and Bushman, that I had been being assigned excessive amounts of work when I was supposed to be on part-time FMLA leave due to my health condition, and that I was having trouble keeping up with the excessive work load, long hours, and five days a week and weekend that I was being required to work, and that were far beyond what had been represented to me in connection with my returning early from medical leave.

226. I did not complain to Howard that Bushman had high standards or expectations; I complained that she was making unjustified and unreasonable demands on me since I returned from my First FMLA Leave, and even though she was not my manager. In those conversations, I discussed with Howard how challenging it had been working with Bushman since my return from FMLA leave due to her hostility and unreasonable work demands, and how she was behaving entirely different towards me since my return from my leave.

-49-

227. I communicated to Howard that I had told Long that I had not been physically ready to return to work at the time that I was forced to return to work, and that I was not ready to work at the extreme level being required of him, but that Long was ignoring my complaints and that her conduct was continuing unabated.

228. Howard said she agreed with what I was saying about Long,

229. On August 4, 2013, I sent by email some of what I had spoken with Howard about, but now documented it to Howard as  NYU's Senior Director directly under NYU's VP of Clinical Systems and Integration, Beale, in an email in which I wrote, in part, about some of the extremely hostile and retaliatory environment Long was creating, as follows:

> I am also being accused of lying, that I can't do my Job, that I am making up excuses to get out of work. I am very upset by all of this. I guess that Nancy Dean was able to mitigate some of this but this is getting way out of hand. I know I may not the perfect employee esp at my current half-speed, but when my professional integrity is assaulted on a daily, sometimes hourly basis, I have no idea how to work with this.

Annexed hereto as Exhibit 26 is a true copy of an email exchange with Suzanne Howard on August 4, 2013, as marked as Howard Ex.1, *see also* copy, Defs. Ex. M.

230. I had previously worked under Howard and had learned aspects of NYU's procedures from her, and Howard was a Senior Director at NYU who I thought might be able to guide me in how to handle what I was experiencing.

231. I inquired of Howard what she though the next step should be, and if I should submit a complaint to HR.

232. Howard did not transmit my compliant to HR. Instead Howard steered me away from going to HR, and instead advised me that I should to speak to Beale.

233. Howard responded "I recommend you speak with Nancy Beale and run thru the details you have outlined below." *See* Ex. 26.

234. Shortly thereafter, per Howard's email, and although I was dubious of the effectiveness of Howard's instruction given Beale's past failure to act, I relayed to Beale the information that I had sent to Howard concerning what was occurring since my early return from my First FMLA leave and Long's interference in my part-time leave that she promised I would be afforded due to my early return from FMLA leave at her insistence.

235. Shortly thereafter, feeling physically unwell and exhausted due to my medical condition, and feeling as if my medical condition was deteriorating further, I went to meet with Beale about my complaints. Beale told me that I did not look well. I told Beale that I had been told by Long that, in cutting my FMLA leave short, that my return would be on a reduced part-time FMLA work schedule, but that I was being forced to work long hours and weekends.

236. I spoke to Beale about my concerns even though she had expressed little interest, and annoyance, when I had previously spoken with her at my desk about Long.

237. Beale was curt and dismissive when I tried to further detail what I had been experiencing, saying in a brusk manner, "see a doctor if your not feeling well." Beale, like Howard, did not advise me to go to HR, and did nothing in response to my complaints, knowing what I was being subjected to.

238.  In that meeting with Beale, Beale told me that I would need to get a doctor's note if I was not yet up to returning to work on a full-time basis, but otherwise failed to address or respond to my complaints. The response from Beale was guarded, cold and clinical. It did not

feel anything remotely like human empathy coming from her. Ominously, Beale offered no assurances that I would not suffer further employment consequences if I returned to leave.

239. Almost immediately thereafter, on August 8, 2013, an issue arose with rerouting printouts for the blood bank move to a new location. An email was sent to Long, myself and others, outlining the request. After the analysis was done, Long determined that we were going to do the minimum amount of work for this move. Long told me to contact the department and tell them this, which I did. The issue was escalated to a higher manager and we were asked to determine what was possible. I then overheard Long discussing the issue with Leadership. She lied to Leadership saying that I did not report the initial request to her (although the request was directed to her in the email) and that that is why there was a delay in moving things forward.

ii. **Additional Complaint to NYU Upper Management about FMLA Interference and Retaliation**.

240.  Having received no response to my complaint to Beale at Howard's direction, and it seeming like more than coincidence that right after I complained to Beale, Long tried to set me up by lying to Leadership, on August 9, 2013-I complained to NYU Senior VP and interim head of Clinical Applications, Kimmel, about the hostile treatment, FMLA interference and retaliatory conduct I had been experiencing.

241. I felt my job was at risk. I had seen what had happened to the minority employees who had previously gone through what I was going through with Long. It was clear Long, along with Beale, were trying to punish me, up to and including terminating my employment or forcing me to quit.

242. A request to meet with Kimmel to address my complaints and other complaints from members of the team about Long, was made on August 12, 2013.

243. Other members of the Orders/Lab Team had raised additional issues about Long, including, among other complaints, Long's racist behavior, dishonesty, fabrication of facts, spinning facts and manipulative conduct.

244. The purpose of and agenda for the meeting with Kimmel was to discuss Long's conduct.

245. On August 13, 2013, I and other members of the team met with Kimmel and Beale to discuss complaints about Long.

246. At the August 13, 2013 meeting with Kimmel and Beale, I again raised the hostile, harassing and burdensome conduct that Long had been subjecting me to since my return from my full-time First FMLA Leave, beginning with the May 25 Call. I gleaned from Kimmel at that managers were not supposed to contact employees on FMLA leave.

### iii. NYU'S Findings That Long Engaged in Unlawful Retaliatory, Discriminatory, Racist, Dishonest, Manipulative and Unprofessional Behavior.

247. According to a document produced by Defendants, Kimmel in her notes of a meeting with myself and other Orders/Lab staff, and at which Beale was present, listed some of the complaints, some of which are stated  as follows:

- Hostile work environment
  - o This term was repeatedly used by several analysts.
  - o They remarked about feeling fear and intimidation.
  - o They expressed fear of retaliation in response to them speaking out about their concerns.

- Racial slurs

-53-

       o Remarks about a person's accent, asking an analyst to repeat certain words to hear the sound of their accent
       o Repeating a specific analyst's name multiple times in a purposeful way stating "...like the way it sounds."
       o Told one analyst "..,why don't you go pick some cotton"
       o Lack of respect
       o Feel manipulated
       o Demoralized

- Trust
       o Analysts feel as if they don't necessarily hear the truth, but rather the "spin" of what the message needs to be
       o Analysts feel as if she creates, distorts or suppress facts,

Annexed hereto as Exhibit 27 is a true copy of an email dated August 15, 2013 email from Dana Kimmel to Wayne Boney, and forwarded to Forte on August 21, 2013, produced by Defendants, as marked as Forte Ex. 5; annexed as Exhibit 28 is the August 5, 2013 email with hand notes, produced by Defendants, as marked as Mherabi Ex. 7.

      248. According to Kimmel's email, and disregarding my complaints of retaliation and interference related to my medical leave, Mherabi instructed Kimmel to interview four of Long's Team, members, restricting the interviews to those who complained of racial discrimination. *Id.*

      249. While Kimmel's August 15, 2013 email makes clear that I was one of the principal persons making the complaint, and I was the highest ranking person under Long on the Lab Orders Team, and despite my complaints of FMLA retaliation and interference and the creation of an extremely hostile environment as the result, Mherabi omitted me as a person to be interviewed, showing no interest in investigation complaints of retaliation and resulting hostile work environment. *Id.*

      250. I was never interviewed with respect to those complaints as part of any investigation, nor was I informed that any investigation into my complaints to Kimmel was being conducted,

notwithstanding NYU's supposed "zero tolerance" for retaliation policy, and its policy of

requiring a thorough investigation into all claims of retaliation and discriminatory treatment.

### iv. NYU Upper Management Disregards its Own Managers' Recommendations That Long Be Removed from Any Supervisory Position Due to Her Unlawful and Unprofessional Conduct.

251. According to the testimony of Boney, all of the complaints against Long were

determined by NYU to be true. Bierman Decl. Ex. 89, Boney Dep. 122:13-123:14.

252. Despite NYU's findings that Long engaged in retaliatory, racist, dishonest,

manipulative, unprofessional and other improper behavior, NYU took no steps to terminate

Long's employment, or even remove her from her supervisory responsibilities.

253. According to an email from Kimmel dated August 21, 2013, after meeting with Long

about complaints, Kimmel wrote to Mherabi that due to Long's behavior, she should be removed

from any supervisory duties and placed in a position where she had no staff:

> Nancy and I both feel that a future option for Sheri with NYU could be a non-staff
> managerial position...

Annexed hereto as Exhibit 29 is a true copy of an email exchange between Kimmel and Mherabi

and Boney and copied to Beale dated August 21, 2013 produced by Defendants, as marked as

Beale Ex. 12.

254. According to the August 21, 2013 email, Long had reported to Kimmel and Beale

what she characterized as the complaints being the product of the  "personal agenda" of certain

team members, which I believe refers to my complaints to Long regarding my post-FMLA

treatment. *See Id.*

255. NYU never removed Long from supervisory duties, as had been recommended by Kimmel, during the time that I reported to her, or thereafter.

**N. Further Retaliation by Long, Bushman and Beale**

256. The consequences of the complaints against Long were brutal for me. Long and Bushman made what seemed like every effort possible to undermine and destroy my professional credibility, and which Beale allowed to occur.

257. After complaining about Long in early and mid-August 2013,and beginning the day after Kimmel and Beale met with Long on August 15, 2013 about my complaints, and although I did not report to Bushman, who was not a part of the Epic group, much less the Orders/Lab Team, Bushman for the first time began sending a series of emails attacking me and my work.

258.  I tried my best to appease Bushman, but her attacks continued, and became still more severe after I witnessed her sexual harassment on August 22, 2013, as is discussed below. See some of Bushman's emails. Attached hereto are true copies of the following documents produced by Defendants: as Exhibit 30, an email from Bushman dated August 16, 2013 produced by Defendants at NYULH004243-004255; as Exhibit 31 an email from Bushman dated August 20, 2013 produced by Defendants at NYULH004550-004551;and as Exhibit 32, an email from Bush dated August 23, 2013 produced by Defendants at NYULH000619-000621. *See also*, an email from Bushman dated August 22, 2013 produced by Defendants at NYULH000615-000616, as marked as Beale 17, Defs. Ex. K

259.  Almost immediately after my complaints to NYU management and HR about Long, I experienced still further retaliation by Long and her friends Bushman and Beale, making it clear that my complaints had been communicated to Long.

-56-

260. As Long and Bushman testified, they had worked together for years at Sisters of Mercy Health Center, and were friends who regularly socialized together outside of work. *See* Bierman Decl. Ex. 84, Long Dep. 247:16-250:12, 36:2-19; Ex.. 86, Bushman Dep. 152:20-153:10, 153:18-154:4, 159:4-161:13, 168:11-176:17, 157:15-158:7.

261. According to documents produced by Defendants, on August 16, 2013, the very day after I met with Kimmel and Beale about Long, Bushman sent an email to Beale, in which she had manufactured a complaint about a historical project that I had worked on. *See* Exhibit 30.

262. Bushman's August 16, 2013 email is highly unusual, and the first of that nature that I am aware of. Moreover, Bushman had never even previously raised any issues about the project referred to in her email with me prior to the date and time of her email.

263. Moreover I did not report to Dr. Bushman, and there was no reason for her criticizing me directly to Beale. It also appears from the August 16, 2013 email (Exhibit 30) that Dr. Bushman had sent the email in response to discussions with Beale requesting that Dr. Bushman send emails critical of me, with Dr. Bushman stating about the contents of her email: "Not sure this is what you wanted."

264. Moreover, Dr. Bushman's August 16, 2013 email is disingenuous and manufactured. The email is a conflation of long-standing issues that were in place long before Bushman even got there. I never "hid behind Nancy Dean," ever, and no examples were ever given or articulated. One of the issues she mentions in this email involved how to route the results of NYU lab-system initiated orders when the results filed back to Epic and errored out or were misrouted. This occurred when the lab got a paper requisition and specimens from an NYU provider who wasn't using Epic. The question was about who would get notified of those results

-57-

since it wasn't often clear which provider sent the specimens. All the lab had to go on was the most recent provider listed in their system. If I had reached out to Dr. Szerencsy, who reported to Dr. Bushman, it was to understand the medical/legal requirements that had to be met. It wasn't for him to come up with a solution. The pathology orders issue is the same as is discussed above.

265. On August 20, 2013, the week following my August 13, 2013 meeting with Kimmel and Beale, where I communicated my complaints about Long, I received an unusual email from Dr. Bushman about how she claimed that I had identified a problem rather than proposing solutions, although I had given her exactly what she had requested. She also complained that I had copied customers in what she then referred to as "a preliminary plan," when it was expected that these customers be copied on matters that would directly affect them, and this was routine NYU procedure. *See* Exhibit 31 hereto.

266. Dr. Bushman then attempted to mask her attack on my work by claiming that she had suggested the work "as an effort to as a learning experience in your growth as the lead of the lab team." She also copied Long and Beale. *Id.*

267. Again, prior to my complaint about Long, I had not received complaints about my work from Dr. Bushman, and was unaware of any. As noted, Dr. Bushman headed up an entirely different group outside of Epic, and it was not her job to help me "grow" as a Lead, nor was that she was actually trying to do.

268. Moreover, the allegations in the August 20, 2013 email were false. Long never made clear to me that I was supposed to exclude anyone who was involved in prior conversations on the issue. We needed the customer's input to come up with collaborative solutions that would

work for the provider, the patient, and the lab. Excluding them from the conversation as Long states, was ridiculous and unprofessional.

269. Also out of the ordinary, and as part of a rapid fire succession of critical emails issued by Dr. Bushman right after I complained about her friend Long and after they were aware that I was about to return to my medical leave, according to documents produced by Defendants, on August 22, 2013 after 8:00 P.M., on the day that Dr. Bushman saw me witness her sexual harassment of a worker, Dr. Bushman circulated yet another negative narrative style email about me based on some supposed historical context, again sending them to Beale and Long. *See* Defs. Ex. K,.

270. Dr. Bushman notes in her August 22, 2013 email that she was already told that day that I was returning to my medical leave. *Id.*

271. Then, just in case Dr. Bushman's negative email of August 22, 2013 was not enough to try to torpedo my reputation and career at NYU, according to documents produced by Defendants, Bushman then sent a follow-up email on August 23, 2013, just as my Second Medical Leave was  beginning. *See* Exhibit 32.

272. Dr. Bushman's August 23, 2013 email was sent for the sole purpose of adding more supposed criticisms of me to her August 22, 2013 email, seemingly just in case the August 22 email was not enough to meet Bushman's Long's and Beale's objective of laying the ground work to get rid of me for having the temerity to complain about one of their management group. *See* Exhibit 32 hereto.

273. Dr. Bushman begins her August 23, 2013 attack email "Just to complete the picture..." to which Beale responds that she'll be sure to add it "to my documentation," further

revealing the effort underway to create a paper trail against me to mask their unlawful retaliatory conduct. *Id.*

274. The negative assertions in Dr. Bushman's August 23, 2013 email were also fabrications. This email refers to an issue with microbiology test ordering. We had to configure Epic around a 20 year-old Sunquest lab system and lab operational workflows that had been in place for that many years as well. We came up with the most simple and streamlined solution so providers could enter orders and the lab could do their work. I recall being asked to write up a tip-sheet because the Epic trainers didn't understand the system regarding how to place these orders for microbiology specimens, second only in complexity to anatomic pathology specimens. Since no one else, including Dr. Szerencsy, wanted to work on this project, I worked with the director of the lab. I did not go to Dr. Bushman or Dr. Szerencsy to work on that project, as I  would have been accused of asking them to do my job. If I didn't go to them, I was accused of not doing my job. Also, we needed a clinician to lead the error pool cleanup, not an IT analyst. Dr. Szerencsy was either disinterested and did not want to be bothered with it or did not understand how to do it. As noted above, I had engaged lab leadership to work with the team but that idea was dismissed even though they understood the complexity involved in these errors and the level of clinical understanding required to resolve them. The technical part was easy.

275. Furthermore the reference in the August 23, 2013 email to the meeting was a complete distortion concocted by Dr. Bushman right after she saw me witness her highly inappropriate sexually harassing conduct against another worker, as is more fully described below.

276. Moreover, these type of highly negative narrative emails about an employee, is far outside of the usual and proper protocol and discourse at MCIT. I am unaware of any manager writing emails, such as Bushman's about myself ,in my almost thirty years at NYU.

277. By around the end of the third week to the beginning of the fourth week in August, it was also becoming apparent that Long, Bushman and Beale were acting in a concerted attack to force me out or destroy my career at NYU because of my First Medical Leave and complaints against Long related thereto, and the witnessing of Bushman's unlawful sexual harassment as is described below.

**O. My Witnessing and Complaint of Bushman's Sexual Harassment in the Workplace**

278. On the morning of August 22, 2013, I was told that I needed to find Dr. Bushman to tell her that I was not available to attend an upcoming pathology orders meeting, but that I had made arrangements to have another member of my Team attend and cover the meeting.

279. I located Bushman in what is known as the Op Time row of desks. I did not see any NYU employees there at the time.

280. I was about to approach Dr. Bushman who I thought was alone, but then noticed that she was with someone. To my surprise and embarrassment, I observed Dr. Bushman seductively rubbing her body up against the back of a young man, the OpTime person from Epic, one of the many young men who are sent here from the vendor.

281. I overheard Dr. Bushman say in a seductive voice to the young worker "when are you going to take me out for that dinner?" I also hear her referring to the young man as "my boyfriend."

282.  I was extremely uncomfortable and embarrassed at coming upon inappropriate sexual conduct on behalf of Leadership, so I turned and walked away, although Dr. Bushman clearly saw that I had seen what she was doing, as she looked right at me.

283. I finally got to meet with Dr. Bushman later in the day. Long also showed up at the meeting with Bushman.

284. Dr. Bushman, at the August 22, 2013 meeting, was extremely hostile towards me and demeaning in her tone. Dr. Bushman repeatedly scolded me in the meeting claiming I did not tell her in a timely fashion that I was not attending a meeting. Bushman aggressively stated that she needed to write me up by issuing me a written warning. In fact, I had told her that I had previously made plans to have another team member cover the meeting she was referring to. Dr. Bushman later conceded the threat, but tried to defend her conduct by telling Boney that she did not actually issue the written warning as she had threatened. Attached hereto as Exhibit 33 is a true copy of the Bushman email.

285.  I had never previously in my entire long work career been confronted by such viciousness as Bushman directed towards me at that August 22, 2013 meeting.

286.  It was clear that Dr. Bushman was continuing the retaliation against me on behalf of Long, for having reported Long's conduct to upper management a few weeks earlier and for having witnessed her sexual harassment.

287.  Bushman's undeservedly extremely hostile conduct towards me at that meeting was especially disturbing, as I had communicated to Bushman that my physical condition was deteriorating due to the workload and environment.

288. At the August 22, 2013 meeting with Bushman and Long, it was clear that I was in considerable pain, and that due to the deterioration of my condition, I was losing much of the function in my right arm and shoulder.

289. It was right after this occurrence that Bushman wrote two highly negative emails about me. *See* Defs. Ex K and Exhibit 32, as are discussed above.

**P. My Deteriorating Condition Due to Over Work and Stress Related to Defendants' Retaliation and FMLA Interference Results in My Having to Take a Further Medical Leave.**

290. The stress of being so viciously attacked by Bushman and Long at the August 22, 2013 meeting, caused my arm and shoulder to seize up, feeling as if it had become inoperable, which terrified me. I informed Long at that time that I need to go out again on medical leave, in response to which she abruptly left in a huff.

291. According to documents produced by Defendants, on August 23, 2013, Long emailed Howard, copying Beale, Kimmel and Stephanie Chiachio that "...[Jeff] decided late yesterday to go on Med leave effectively immediately..." Annexed hereto as Exhibit 34  is a true copy of a document produced by Defendants containing an email exchange between Long and Howard dated August 23, 2013, as marked as Long Ex. 17.

292. In accordance with NYU's policy for sexual harassment reporting  requirements (*see* Exhibit 26, p. 34), on August 23, 2013, just before taking my second medical leave, I reported the sexual harassment by Bushman that I had witnessed to NYU's HR representative for MCIT, Forte, along with a further complaint concerning Long and Bushman's ongoing retaliation.

293. Per Forte's request during my complaint to him on August 23, 2013, on August 25, 2013, I prepared a formal written complaint in which I detailed some of the FMLA

retaliation/interference/discrimination that I had been experiencing, which also included some of the complaints that NYU had failed to previously investigate. *See* Defs. Ex. AA; annexed hereto as Exhibit 35 is a true copy of an email from Forte to Boney dated August 26, 2013 attaching my formal complaint of August 25, 2013, as produced by Defendants and as marked as Forte Ex. 9.

294. According to documents produced by Defendants, Forte informed Boney of my complaints on August 26, 2013. *Id.*

295. According to documents produced by Defendants, on August 26, 2013, Boney forwarded Forte's email about my retaliation/interference complaints to NYU's CIO Mherabi, who responded on August 28, 2013 only that he wanted to speak with Bushman. Annexed hereto as Exhibit 36 is a true copy of an email exchange with my August 25, 2013 complaint attached as produced by Defendants, and as marked as Mhirabi Ex. 11.

296. Mherabi acknowledged receipt of my complaints, and emailed Sanchez about the need to discuss, but only about Bushman, and making no mention of my FMLA retaliation/interference complaints or Long, completely disregarding those complaints. *Id.*

297. As is clear from Mherabi's August 28, 2013 email, and Sanchez's response of that same date, NYU had no concerns about, or interest in investigating, my FMLA interference and retaliation complaints.

298. To the best of my knowledge, my August 23 and 25 complaints of FMLA retaliation, interference and discrimination were never investigated or addressed by NYU.

299. In fact, NYU management never prepared a report on my August 23/25, 2013 FMLA retaliation and interference complaint. *See also* below regarding my subsequent interactions with Forte with respect to my complaints.

300. Even after I sought to meet with Mherabi directly by email dated November 22, 2013, well after he received my FMLA retaliation/interference complaints and failed to act, and after I was experiencing further retaliation and interference after my return from my Second Medical Leave, that I also sought to meet with him about, Mherabi refused to meet with me despite my direct request. Annexed hereto as Exhibit 37 is a true copy of email exchanges dated November 21 and 22, 2013, produced by Pl. at PL00547-000548.

**Q. NYU Top Management Attempts to Circumvent NYU Policy and Procedures by Handling My Sexual Harassment Complaint Against Bushman Outside of Hr or Third Party Investigators.**

301. According to documents produced by Defendants, NYU's top MCIT manager, CIO Mherabi, sought, contrary to and in violation of NYU's own policies and procedures, to handle my sexual harassment complaint against Dr. Bushman, internally within MCIT, rather than by Human Resources or a third-party investigator, per NYU's policies. Attached hereto as Exhibit 38 is a true copy of an email exchange by NYU management concerning my complaint at having witnessed Bushman engaging in sexual harassment produced by Defendants, and as marked as Boney Ex. 17 (as redacted by Defendants).

302. According to NYU's documents produced by Defendants, Nancy Sanchez, the then Senior Vice President and Vice Dean in command of NYU's HR Department, objected to Mherabi's attempt to "handle" the sexual harassment complaint within his own department, stating that the compliant should be handled outside that department as required by NYU's procedures. *Id. See also* annexed hereto as Exhibit 39, a true copy of a contact document showing NYU's HR structure and organization as produced by Defendants, and as marked as Sanchez Ex. 1.

303. According to documents produced by Defendants, Mherabi countermanded Forte and Sanchez's recommendation to contact the employee that I had reported had been sexually harassed by Bushman, with Mherabi opting instead to first "discuss" the complaint with the employee's manager. Annexed hereto as Exhibit 40 is a true copy of the email exchange dated August 30, 2013 between Mherabi and Sanchez produced by Defendants, as marked as Sanchez Ex 18.

304. According to that August 30, 2013 email exchange, Sanchez, perplexed, wrote to Mherabi about contacting the employee:

> Is there a reason you want us to wait?
> This is what I asked Derek [Forte]to do

*Id.*

305. According to documents produced by Defendants, someone from NYU purportedly spoke to the Op Time worker that I had seen Bushman making sexual overtures to, Nick Stocherro, on September 6, 2013, who confirmed that he was present with Bushman on August 22, 2013, that Bushman was calling him "her boyfriend," and that Bushman asked him when he was going to take her out to dinner. In that purported statement of the conversation, Stocherro, although not denying that Bushman was rubbing her body against him, purportedly stated that he did not remember Bushman "rubbing his back" (which is not in any event what I had witnessed and reported, which was that Bushman was rubbing her body against his when calling him her boyfriend, that he had seen her refer to other worker's as her "boyfriend," and asking about dinner.) Attached hereto as Exhibit 41 is a true copy of documents produced by Defendants, as marked as Boney Ex. 19; *see Id.* at NYULH004634.

306. The documents state that the worker is employed by a vendor, yet makes no reference to any assurances that his communications would be kept confidential or that his job would not be at risk for cooperating. *Id.*

307.  According to documents produced by Defendants, Boney, upon receiving Mherabi's email instruction to close out the matter of my complaint, stated that he would let the HR representative know. Attached hereto as Exhibit 42 is a true copy of an email exchange dated October 7 and 9, 2013 produced by Defendants, as marked as Boney Ex. 20.

308.   I was never thereafter contacted or interviewed by or on behalf of NYU as part of any investigation into either Long or Bushman in connection with my August 23 and 25, 2013 complaints.

309. Although my compliant about Bushman's sexual harassment of a worker was first made on August 23, 2013, and although, according to documents produced by Defendants, any inquiries by HR were completed by September 6, 2013, it was not until October 4, 2013, the Friday before I was scheduled to return from my second medical related leave, that Mherabi claims to have mentioned my complaint to Bushman during the course of a regularly held monthly meeting, and closed out the matter after Bushman told him nothing inappropriate had happened. *See* Exhibit 42 hereto;.*see also* Bierman Decl. Ex. 88  Mherabi Dep. 108:7-114:11.

310.  According to Mherabi's October 7, 2013 email to Boney, Mherabi had no discussions with Bushman concerning my complaint of FMLA retaliation by Long and Bushman or my complaint of FMLA interference against Long as is discussed below. *Id.*

**R. My August 23/25, 2013 Complaint to NYU about Being Subjected to Retaliatory Conduct in Connection with My FMLA Leave and Complaint Against Long and Bushman's Sexual Harassment of Another Worker**.

311. On or about August 23, 2013, I communicated to Derek Forte of NYU's Labor and Employment (Human Resources) Department assigned to NYU's MCIT that the retaliation by Long and her close friend Bushman, and interference with my ability to exercise my FMLA partial/intermittent leave rights had become unbearable, having grown to a level that I stated to be "violent" after I complained about Long's FMLA retaliation and interference. *See also* email from Forte to Boney dated August 26, 2013, Exhibit 35 hereto.

312. Forte, in response to my complaint, requested that I summarize in an email to him some of what I was experiencing.

313. On August 25, 2013, per Forte's request, I sent him the email he requested on August 23 in response to my complaints about Long and Bushman, in which I wrote:

> Here are a few things that I've documented. I don't have exact dates for everything. As I said, I've been a long time employee of NYU and I have never experienced anything like the last few months when I began reporting to Sheri Long. In the last week it feels like things went from hostile to downright violent after Sheri Long was confronted about her workplace behavior. Most of it has come from Dr. Bushman who is clearly inventing ways to retaliate. Maybe this is the way it is done in the Midwest and South where Sheri Long and Dr. Bushman come from? The last 8 weeks have taken their toll. I am grateful that I am given the opportunity to go on leave again so my shoulder has a chance to fully heal. Maybe things will be in better shape when I get back.

*See* Exhibit 35.

314. According to the document produced by Defendants, Forte relayed my retaliation/interference compliant to Boney, Mherabi and HR head, Nancy Sanchez on August 26, 2013. *See* Exhibit 36 hereto.

**S. NYU'S Continued Interference with and Retaliation Against Me Causes My Condition to Deteriorate to the Point That I Am Medically Advised That Failure to Cease Work until I Properly Heal Could Result in My Loss of the Use of My Arm and Shoulder.**

315.   As the result of NYU's demands that effectively deprived me entirely of my part-time FMLA leave by requiring me to work long hours and weekends, my medical condition continued to deteriorate, and in August, 2013, I began losing use of my shoulder and arm.

316.   Feeling increased pain and decreased mobility in my arm and shoulder, I visited my doctor, Thomas Young, M.D. on August 19, 2013. Dr. Youm included in his notes of that visit:

> As far as his right shoulder he needs more therapy. We will see him again after his MRI. He may consider taking some time off work because the work is aggravating his pain. I feel this is reasonable.

Annexed hereto as Exhibit 43 is a true copy of my doctor's, Thomas Youm, M.D's, notes from my August 19, 2012 and September 13, 2013 office visits, as marked as Defs. Ex. 10.

**T. The Severity of the Hostile Environment Forced Me to Begin to Think about Other Employment**

317.   Although I was trying as best I could to deal with the enormous levels of hostility and retaliation being directed at me by Long, Bushman and Beale after my return, and with Defendants' refusal to abide by even the part-time medical leave that I was forced to take after returning early from my full-time medical leave, the conditions were growing worse by the day and my being forced to work long hours and weekend under enormously stressful conditions when I was supposed to be recovering from my injury, was causing my pain to increase.

318.   Although I was trying my best to deal with the situation, when I received an email from a person that I knew at Memorial Sloan-Kettering Cancer Center reaching out to me about

possible employment, I responded with some interest. Annexed hereto as Exhibit 44 is a true copy of email exchanges produced by Defendants, as marked as Defs. Ex 12.

319. When I was asked to interview for the position in late August, 2013, the retaliatory conduct by Long and Bushman was so unbearable and so damaging my health and interfering with my recovery from my injury, that I decided to at least interview for the position, although my preference was to remain at NYU if its upper management and HR department took serious steps to put a stop to the extreme retaliation that I had been experiencing.

320.  Reflecting why I might consider leaving NYU, when I received an inquiry on August 22, 2013 from the person at MSK who was encouraging me to seek a position there, I responded in my email dated August 22, 2013 as follows:

> Interviews next week. **Things have been a bit wild here. Hostile work environment stuff. Craziness...** (Bold inserted.)

To which the person at MSK responded:

> All the more reason for you to LEAVE!!!!!

*Id.* at NYULH004037.

## U. My Second Full-time Medical Leave.

321. Having lost most use of my right shoulder and arm due to my deteriorating condition after being forced to return early from my First FMLA Leave, and my partial FMLA Leave having been interfered with by management, beginning on or about August 23, 2013, I started my Second Medical Leave.

322. According to documents produced by Defendants, Bushman, Long and Beale emailed each other about my taking my Second Medical Leave. Annexed hereto as Exhibit 45 is a true copy of an email produced by Defendants dated August 23, 2013, as marked as Bushman Ex. 19.

323. While Defendants assert that a meeting was held with the Orders/Lab team for Long to address the complaints against her, according to Defendants, that meeting was held on August 23, 2013, the day after I emailed that I would be beginning my medical leave. I was never told about that meeting and therefore did not attend in person or remotely, nor was that meeting ever mentioned to me after I returned from my Second Medical Leave.

324. On September 9, 2013, I wrote to Beale and copied Long, seeking to arrange to continue my leave on a part time basis after my retrun from my full-time Second Medical Leave, as follows:

> Hi all, Checking in with an update of my health status. The intensive focus on PT seems to be working and I'm now headed in the right direction of unfreezing the shoulder and avoiding further surgery. Shoulder range of motion and strength are improving by the week. It now feels like a very tight rubber band is restricting motion instead of a hard metal cable, Progress.
> I have a question about my return. It looks like the doctor is going to recommend coming back part time for a period of time so I can ease into things and avoid any backsliding. Would it be possible to use up some vacation time as a way of making this work? Just trying to understand my options.

Annexed hereto as Exhibit 46 is a true copy of my September 9, 2013 email as produced by Defendants with their internal responses, and as marked as Long Ex. 18.

325. According to the document produced by NYU, Long, in a highly unusual act for a manager, wrote to NYU's HR department second guessing my doctor's advice, and seeking to discourage my being allowed to return on a part-time basis using leave, as follows:

Wayne, I believe that I need your input on this situation. There is no heavy lifting, or any lifting, here at the office, so I am not sure what physical restrictions will apply to his work. If Jeff has vacation time, and wants to use it, I can certainly approve that...but coming back part time is not clear. Please advise.

*Id.*

326. Under NYU policy and procedure, medical leave decisions are supposed to be made by NYU's HR Department after being referred to a neutral third party evaluator.

327. According to NYU's documents, Boney wrote back to Long:

Since Jeffery is on disability, any requests regarding his return, be it may part time or vacation, should be directed to the NYU Benefits dept. Once the paperwork is sent to them, they utilize an outside firm to evaluate and process...

*Id.*

328. On September 13, 2013, I attended a post-operative appointment with my doctor, who found that my right shoulder had improved some with rest from work, that my range of motion continued to be limited, that I required additional physical therapy, and that he would prescribe medicine for the painful scarring from my surgery. *See* Exhibit 43.

**V. My Concerns of Further Retaliation and Interference Expressed to HR Regarding My Part-time Return to Work in October 2013 and Part-time FMLA and Request for Mediation.**

329. After being advised by my doctor that I would be able to return to work, but only on a part-time basis initially, beginning the week of October 7, 2013, on September 9, 2013 I wrote by email to Beale, copying Long and NYU HR representative Henry Nabong, to inquire about my options for returning to work on a part-time basis. Annexed hereto as Exhibit 47 is a true copy of the email exchange as produced by Defendants, and as marked as Long Ex. 19.

330. I received no response to my September 9, 2013 email for ten days, until on September 19, 2013, only two and a half weeks before I was scheduled to return part-time, I

received an email from Beale, stating in substance that she was deferring to Henry Nabong

regarding my options. Long was copied on that email as well. *Id.*

331. On September 17, 2013, having not received any information about the status of my

August 23/25, 2013 complaint, I wrote to Forte to express my concerns about returning to work

given the enormous hostility and retaliation that I had faced by Long, Bushman and Beale, and to

seek guidance. Annexed hereto as Exhibit 48 is a true copy of the email exchange dated

September 17, 2013, as produced by Defendants, and as marked as Forte Ex. 25.

332. Specifically, I wrote in that September 17, 2013 email to Forte:

> Is there any chance that I could meet with you to discuss next steps in re-entering my
> work environment once my disability period is over. I got clearance to return to work
> part-time on the week of October 7th, but I am not entirely comfortable walking back into
> that environment. It was extremely hostile when I left it, Is there any sort of mediation
> that can happen so I can ease back into things?...

*Id.*

333. Forte, in his response dated September 17, 2013, stated that he had conducted an

investigation based on the allegations contained in the email that I had sent to him on August 25,

2013, and that he would send me a formal response to my complaint the next day. *Id.*

334. I was relieved and appreciative at the time that NYU's HR Department had

seemingly investigated my complaint as Forte had stated, and that I would be receiving a formal

response based on that investigation, which relief and appreciation I relayed to Forte the

following day, September 18, 2013. *Id.* The source of my relief at NYU's HR seeming to take

action, was stated in part in my email as follows:

> Thank you, Derek. I've never been through anything quite like this.
> I have never felt so threatened in a work environment ever.

*Id.*

335. Indeed, I was concerned about exercising FMLA rights in the future since NYU management made clear to me the severe consequences of taking such leave, or of not cutting that leave short upon their demand, or of trying to exercise any right to a partial or intermittent FMLA leave. I was similarly concerned about complaining about any unlawful conduct that I might witness in the workplace, given the initial retaliatory conduct that I was subjected to after reporting Bushman's sexual harassment.

336. However, I never received any formal report or response to my August 25, 2013 complaint from Forte on September 18, 2013, despite his representation that I would in his September 17, 2013 email. Nor did I receive any response to that complaint from anyone at NYU.

337. Having not received any report of any investigation of my retaliation complaint from Forte on September 18, 2013, and concerned about the passage of time with no clear action being taken and my scheduled return in a few weeks, I contacted Forte and scheduled a time to meet with him about my complaint of FMLA retaliation and interference by Long and Bushman in connection with my FMLA leave and observation of Dr. Bushman's sexual harassment.

338. On September 20, 2013 I met with Forte at NYU and went over with him in detail the retaliation and interference with my FMLA rights that I had experienced and which I had wrote to him about, and about Dr. Bushman's extremely hostile conduct after I witnessed her sexual harassment.

339. According to a document produced by Defendants, as part of his report to Nicole Delts, NYU's HR Assistant Director for Employee Relations ("HR"), about his activities on September 20, 2013 , Forte, NYU's Manager of Employee and Labor Relations, wrote:

-74-

Met with Jeffry Zicarrelli (sic), Epic Analyst- Discussed his concerns about retaliation after returning from medical leave. Also updated him the investigation concerning his complaint about Cheryl Long and Dr. Bushman.

Annexed hereto as Exhibit 49 is a true copy of an email from Derek Forte to Nicole Delts dated September 20, 2013 produced by Defendants, as marked as Forte Ex. 18.

340. In my September 20, 2013 meeting with Forte about retaliation, Forte made only vague reference to complaint about Bushman's sexual harassment of a worker, still did not provide me with the report that he claimed to have prepared about my FMLA retaliation/interference/discrimination complaints against Long and Bushman, and failed to provide me with any concrete information about my complaints. Forte merely made general references to having spoken to Long, Bushman and Beale about my complaints.

341. At no time after my August 23/25 complaints to Forte, including in his September 17 and September 20, 2017 communications with Forte, did Forte, or anyone else from NYU's Employee Relations, tell me that my August 23/25, 2013 complaints had been resolved or that the issuance of the written warning to Long encompassed those complaints.

342. On September 20, 2013, I also met with NYU's HR representative Henry Nabong, per Beale's September 19 email telling me she was deferring to Nabong, and at that time provided him with the paperwork he had requested for my returning part-time. Unbeknownst to me, Long was away from NYU on the day that I came to meet Nabong.

343. Although I had written to Beale in my September 9, 2013 email to request and explore options for returning part-time on which I copied Long, and although Beale responded copying Long on September 19, 2013 that she was deferring to Nabong (see Exhibit 47 hereto), just after my delivery of the part-time leave paperwork to Nabong, I received an extremely angry

and almost unbearably hostile phone call from Long, berating me about my part-time return and demanding in an extremely aggressive and hostile manner, what days and hours I planned to work.

344.  I was stunned by Long's aggressiveness, nastiness and hostility, and felt her anger was completely uncalled for and unjustified under any circumstances by a manager, but especially given that I had expressly written to her and her boss, Beale, to discuss arrangements for my return, which they declined to do, and after they had specifically told me to deal with Nabong over my return from my leave. *See* Exhibit. 47 hereto.

345.  According to documents produced by Defendants, on September 24, 2013, Long wrote to various NYU management, falsely stating that I had not before contacted her about my return, stating that she had told me in our conversation after my meeting with Nabong that it was appropriate for me to communicate about my part-time leave and work scheduled with her, and clearly intimating that I had acted inappropriately and behind her back. Annexed hereto as Exhibit 50 is a true copy of an email exchange produced by Defendants dated September 24, 2013, as marked as Long Ex. 20.

346. According to documents produced by Defendants, Long and Beale, who refused to discuss my days and hours upon my return and claimed to be deferring to HR, then emailed each other on September 26, 2013, insistent that I would need to provide medical documentation if I did not agree to the hours they would be demanding. Annexed hereto as Exhibit 51 is a true copy of a document produced by Defendants of an email exchange between Long and Beale dated September 26, 2013, as marked as Long Ex. 21.

347. Long then, on September 27, 2013, telephoned me and left a message demanding that I provide documentation from doctor as to the meaning of the "part-time" work I could perform. *See also* document annexed hereto as Exhibit 52 a true copy of a document produced by Defendants of an email between Long and herself dated September 27, 2013, as marked as Long Ex. 22.

348. On September 30, 2013, I provided the doctor's letter that Long requested, receipt of which Long and Nabong acknowledged in their emails of October 1, 2013. Annexed hereto as Exhibit 53 is a true copy of a document produced by Defendants of emails dated October 1, 2013 and Disability Status and Work Release Report dated September 30, 2013, as marked as Long Ex.23.

**W. Defendants' Further Retaliation Against Me After My Second Medical Leave In Connection with My FMLA Leaves and Sexual Harassment Complaint Against Bushman.**

349. After returning from my full-time Second Medical Leave on October 7, 2013, after having filed my previous complaints against Long and Bushman in connection with their FMLA retaliation, and after having filed a complaint in connection with Bushman's sexual harassment that I witnessed, I was subjected to still more hostility and vengeance upon my part-time return to work from Long, Dr. Bushman and Beale.

350. Almost immediately after I returned to work on October 7, 2013 on what was to be a part-time basis and part-time extension of my Second Medical Leave, in addition to being subjected to a high level of hostility and confrontations by Long, Bushman and Beale, I was again subjected to a heavy work load that prevented me from being on my part-time leave.

351. Shortly after my return from my full-time Second Medical leave, Defendants then took even more aggressive steps to try to force me to leave NYU, or to create a paper trail to terminate or demote me if I did not leave.

### i. Defendants' Issuance of a False and Retaliatory Review That, While Supposed to Be an Annual Review, Was Restricted to the Period That I Was out on My First FMLA Leave and the Short Period after My Return from That Full-time Leave When I Was Recovering from My Injuries.

352. Almost immediately after returning from my full-time Second Medical Leave and while still on my part-time leave after my part-time return to work on October 7, 2013, Long and Beale apparently began preparing an extremely negative performance review of my work, that was unlike any that I had ever received in my then nearly thirty years as an annually reviewed employee at NYU, or from any employer in my professional life. *See* Defs. Ex. GG/HH.

353. I had not worked directly with Beale during the period that the Performance Review encompassed and she had no personal knowledge of my work performance.

354. Long clearly had begun working to prepare my review with Beale at least as early as October, 2013, as she had advised the Order/Labs team in October that input for reviews were required, and that all review were due by the end of business on November 6, 2013. Annexed hereto as Exhibits. 54, 55 and 56 are true copies of documents produced by Defendants as minutes of the Orders/Labs Team for October 24, 2013, October 31, 2013 and November 4, 2013, respectively, as marked as Long Exs 26, 27, and 28, respectively.

355. Significantly, Long neither raised nor identified any negative issues or problems about my work at these weekly team meetings, or with respect to any work that I had been assigned,

nor did she identify any of my assignment deliverables as being in jeopardy of not being timely or adequately performed, as is reflected in Long's own minutes of those weekly meetings. *Id.*

356. The 2013 Performance Review, dated November 19, 2013, was signed for by me electronically on December 5, 2013. *See* Defs. Ex. GG/HH at NYULH000400.

357. The supposed 2013 review was especially alarming and appeared to have been manufactured as part of series of acts of retaliation designed to force me to leave NYU and to destroy my career there.

358. Long had been officially assigned as my supervisor in my position as Application Lead on July 1, 2013,  just when I had returned from my First FMLA Leave. As noted above, in 2013 before my First FMLA Leave, I was being supervised by, and reporting to, Nancy Dean.

359. Dean had not informed me of any deficiencies in my work in 2013 prior to my First FMLA Leave, but rather, had frequently praised my work.

360. At NYU, reviews were on an annual basis based on the calendar years. According to Chapter 6, ¶ 6.1.b. of NYU Human Resources Polices and Procedures as produced by Defendants, NYU's requirement, practice and policy is for employees to be reviewed on an annual basis (Attached hereto as Exhibit 57 is a true copy of document entitled HUMAN RESOURCES POLICIES AND PROCEDURES Chapter 6: Performance Management & Corrective Action, as marked as Forte Ex. 1.)

361. Therefore, rather than being an annual review, as is NYU's requirement, practice and policy, my 2013 Performance Review as prepared by Long, was, in reality, a review for the approximately seven week period from when I returned from my First FMLA Leave, and encompassed the time that I had declined to return from my leave as early as Long had pressured

me to do, and after I made repeated complaints about FMLA retaliation and interference as is

detailed above, as well as sexual harassment complaints against Long's friend, Dr. Bushman.

362. Moreover, I was shocked to learn that my 2013 Performance Review was based on

purported job duties and requirements that had never been communicated to me and that,

according to documents produced by Defendants, were supposedly newly drafted in August

2013, and not adopted until just prior to my review. Attached hereto as Exhibit 58 is a true copy

of a document dated August 15, 2013 that Beale identified as a draft containing the duties of the

various positions as newly stated, which she claimed was adopted sometime thereafter. *See*

Bierman Decl. Ex. 85, Beale Dep. 271:25- 273:17, 274:14-275:8. Also compare with Application

Lead duties as described in my 2012 Performance Review, Exhibit 9 hereto.

363. The 2013 Performance Review contained excessive, unfair and baseless criticism of

my performance that bore no relationship to my actual performance, and used generalized

negative comments. Ziccarelli Decl. ¶363; *See* Defs. Ex. GG/HH and comments at

NYULH000387-000398.

364. NYU at the time of the November 2013 Review, provided a procedure for an

employee to formally respond to a performance review by uploading comments to its

performance review data base known as "ePerfromance." Ziccarelli Decl. ¶364.

365.  Although my performance had not diminished from when Long had last reviewed me

(other than his not being able to perform at the same level of intensity due to my medical

condition during the period in July and August after I was forced to return from my First FMLA

Leave early), Long/Beale's 2013 post-FMLA, post-FMLA Complaints and post-sexual

harassment complaint performance review, sharply contrasted with Long's review of my

performance less than two years year earlier and before my FMLA Leave and FMLA/sexual

harassment complaints. For example:

|  | 2011 | 2013 |  |  | 2011 | 2013 |
|---|---|---|---|---|---|---|
| Rating scale 1-3 (3 highest) |  |  |  | Rating scale 1-5 (5 highest) |  |  |
| 3 Ratings: | 6 | 1 |  | 2 Ratings: | 0 | 8 |
| 1 Ratings: | 0 | 10 |  | 4 and 5 Ratings: | 6 | 3 (4 ratings only) |

Compare Ziccarelli Decl. Exhibit 5 (2011 Performance Review) and Defs. Ex. GG/HH (2103

Performance Review.)

### ii. My Formal Response to the 2013 Performance Review.

366. I wrote and uploaded to NYU's performance review data base, an extensive response

to that review, wherein I used specific facts to refute the offending false, misleading or

manufactured statements. *See* Defs. Exs GG/HH at NYULH000387-000398.

367. First, and concerned that it was essentially prepared in retaliation, I questioned its

legitimacy through the following four questions:

1. Why was the time period from January-April excluded from this evaluation? This evaluation seems to focus on seven very challenging weeks when I came back to work too early from medical leave and a second four week period when I was once again back from medical leave and was working part-time based on medical advice. Maybe this wasn't intentional and was an oversight. I'm not clear why other weeks were not considered.

2. Why was I never evaluated as an application lead until now? For some reason, the wrong template was loaded into ePerformance for me so I never was given any real sense of how I was performing in this role. I made many requests for this to be updated but that never happened. The template was for a trainer and I was told to 'just fill it in' by the person I reported to at the time. Based on one previous evaluation that seemed to say I was doing OK, I was blindsided by this evaluation. I'm sure this wasn't intentional, but this raises questions of fairness. I would think that if I was doing such a terrible job I would have learned about it much sooner than now. I am a little confused.

-81-

3. Why am I being evaluated on job standards that changed drastically from anything that I ever knew I was responsible for? Again, I feel there are issues of fairness here and another blindsiding that, again, may not be intentional. How can I possibly meet standards that I never knew I had to meet? Again, I realize this might not be intentional but, for me, this contributes to a sense of hostility that I thought we, as a team, were trying to move away from.

4. Why was a subordinate asked to contribute to my evaluation? Unless I'm misunderstanding things, this doesn't seem appropriate.

For what it's worth, I have gone through the entire evaluation and responded to each assessment. I have never received such a poor evaluation in 29 years of employment at NYU so I certainly take this serious. In the process of reviewing this evaluation, I have identified some gaps and questions that I have indicated below. I hope we can come to some agreement that I have not been functioning below par for the entire year. I do admit that I have had my struggles for the periods of time when I returned from medical leave but I do not think that these periods reflect the entire year, I also think it's a bit punitive to evaluate me so harshly for the period of time when I was genuinely struggling, something I had escalated to leadership on numerous occasions. Going through this illness was punishment enough.

*Id.* at NYULH000397-000398

368. I then detailed with specificity my comments in a single spaced eleven page response to what I believed for the most part had been unfairly and inaccurately stated in my review. *Id.*

369. I referenced my medical condition, the unfairness of such a harsh review based on my medical recovery period, and my efforts to try to be in a non-hostile environment. *See Id.* at NYULH000394-000398

370. What was supposed to be an annual review, was in fact limited to the seven weeks that I was returned early from FMLA at Long's demands, and although I repeatedly raised the issue of the impact with management and the weeks after I returned on a part-time basis from my Second Medical Leave in October, 2013.

371. Moreover, as I noted in my comments to the 2103 Performance Review, I was in part being rated on a different set of standards and purported performance responsibilities that that I had never before been made aware of and which I later learned were introduced sometime after I left for my Second Medical Leave. *See Id.* at NYULH000387.

372. Also concerned that I was being unfairly evaluated based on my FMLA leave and condition after having to return early, I wrote about this in various places in my response.

373. For example, I wrote in my formal response to the November 2013 Performance Review as follow:

> However, to clarify what is stated here, when I returned from medical leave, I was asked to work on pathology orders, the 2012 upgrade, and ICD-10 in addition to supporting the general day-to day operations of the lab team and contribute to ambulatory work streams. This is not what I was told I would be doing when I agreed to come back from medical leave. I was told that I would be supporting the lab team until I got back on my feet after three months away. So in a sense, I may have been mislead although this might not have been intentional. Also, I was only told that I had to 'fix pathology' and was given no opportunity to meet with users to understand what the issues were. Fortunately, that policy changed in the interim and several solutions were developed.

*Id.*, pp. NYULH000395-000396.

374. As another example, I wrote:

> JZ: This is not so: This does not take into account the go-live period from January to March where pushing for solutions was mandatory. I believe this item is focusing on the period of time when my health was compromised, something that I had escalated to leadership many times before I went out for a second medical leave.

*Id.*, p. NYULH000397.

375. As I further wrote in my response to my 2013 Performance Review, referencing some of the hostility that had been coming at me from management after my return from my medical leave:

JZ: This is not so: I am always actively listening but may seem disengaged when the person speaking is acting out in peculiar ways, having a tantrum, etc. I do not understand the need for this sort of behavior in a professional environment so it sometimes throws me a bit. I tend to stop and take the time to hear what might be the nugget of truth in what is being said and this might appear like detachment and even might seem defensive. Also, as I have been struggling with a health issue over the past 22 weeks, this definitely could have contributed to some lack of engagement (I was on pain meds for part of this time so I can understand how I might have seemed too detached).

*Id.*, p. NYULH000394.

376. As I further wrote in my response to my 2013 Performance Review:

JZ: This is not so: I am always honest and respectful with my peers and have never had any issues with gender, race, etc. Although this item doesn't seem like the correct place to evaluate this, I never, ever have avoided taking on additional work for this project. I came back early from disability to get back to work. During this time, I also took on additional work of peers and subordinates who did not complete their tasks in a timely fashion. An example of this was the 2012 upgrade. The person assigned release notes for reporting did not review them by the deadline he was given. I took on the task of reviewing his notes, making any required changes and writing test scripts. I did not once complain about this or even escalate it to leadership. I did what was needed to meet the deadline.

*Id.* at NYULH000397.

377. As I further wrote in my response to my 2013 Performance Review:

JZ: This is not so: This item excludes anything that happened before July 1 2013. There were many build items, large and small, that I managed during the go-live period and also for the second Cancer Center go-live at 38th st.

*Id.* at NYULH000398.

378. As I also stated in my 2013 Performance Review: " I continue to stand firm for a non-hostile, professional work environment that fosters respect between team members, across teams and within the medical center at large." *Id.* at NYULH000395. As I further wrote:

JZ: This is so. However, there is one misunderstanding/misstatement here. I do not seek to please. I seek to foster a non-hostile environment of mutual respect even when there is disagreement or acting out of some kind with the person I'm

-84-

dealing with.

*Id.* at NYULH000395.

## X. My Post-Second Medical Leave Complaints of Retaliation and Interference.

379. Devastated and demoralized by such blatant and continuing retaliation, I immediately wrote to Forte on November 21, 2013 after receiving the review from Long and Beale as follows:

> Wondering if you have some time today to discuss my recent evaluation. lt was pretty bad and rife with carefully selected words of retaliation. I can't sign it. Wondering what my next steps should be.

Attached hereto as Exhibit 59 is a true copy of an email exchange between myself and Forte dated November 21, 2013 produced by Defendants, as marked as Forte Ex. 22.

380. Having received no response or assistance from NYU's HR Department, and Forte having not scheduled time to discuss my retaliation concerns as I had requested, on November 22, 2013 I wrote to Nancy Calderon, Mherabi s Executive Assistant, to schedule an appointment with Mherabi to discuss the retaliation I was experiencing with regard to my medical leaves and complaint against Bushman. Attached hereto as Exhibit 60 is a true copy of an email exchange between myself and Nancy Calderon dated November 22, 2013, produced at PL00547-00548.

381. In response, on November 25, 2013, Calderon informed me that Mherabi would not meet with me, and that I should speak directly with Beale, who was a part of the problem and who had been involved in preparing my false negative 2013 Performance Review. *Id.*

382. Although Beale and Long admitted to having read my comments to my 2013 Performance review, including those that implicated retaliation and interference relating to my medical leaves, they never responded to or refuted my objective factual statements and examples, nor sought to address my comments with me. *See also* attached hereto as Exhibit 61 is a true

-85-

copy of documents produced by Defendants, consisting of an email exchange between Long and Beale dated December 5, 2013, as marked as Long Ex. 30 referencing my 2013 Performance Review comments.

383. Significantly, Long in her email to Beale draws Beale's attention to the bottom third of my responsive comments, where I raise those FMLA/medical leave/complaints/hostility issues. *Id.*

384. Also significantly, Long and Beale emailed each other about my review comments, including my comments implicating retaliation/interference, **between 2:18 and 2:19 P.M. on December 5, 2013.**  As is discussed below, several hours later after emailing about my Performance Review comments, and focusing on my medical leave, retaliation and hostility issues, Long and Beale, and with Mherabi's approval, issued me a Written Warning as is described below.

**Y. Within Hours of Reviewing My Comments to the My 2013 Performance Review and My Stated Concerns As That Review Related to MY FMLA Leaves, and as Part of a Continuing Pattern of Retaliation, Long, with Beale's and Mherabi's Involvement and Approval, Issued Me a Fabricated Written Warning in Violation of NYU's Own Corrective Action Policies.**

**i. The Retaliatory Written Work Warning.**

385. As noted above, Beale and Long were emailing each other about my comments to my 2013 Performance Review, paying special attention to my comments about my treatment relevant to my medical leaves and health condition. It was not until after those email exchanges by Beale and Long that the Written Warning was issued. Compare the time on the Beale/Long review comments exchange, Exhibit 61 hereto (between 2:18 and 2:19 P.M.) and the time on

-86-

Defs. Ex. II (the "Written Warning") (5:01 P.M., which was shortly after I was within an hour of my being shown the Written Warning) .

386. By way of background to the subject of the Written Warning, during that time, various MCIT employees in NYU's MCIT  Orders/Lab team were assigned from time to time to be available to answer questions or resolve technical issues that may arise during the overnight hours. The process is, a user has a problem, they call what was known as the "Help Desk," and the help desk calls the persons on call for that specific application. The Orders/Lab team covered orders functionality when on-call.

387.  There would be a chain of persons available to handle over-night calls from the Help Desk. Typically two employees who were knowledgeable in both inpatient orders and laboratory orders applications are given the overnight on-call assignment on a rotating basis.

388. The person on call would receive a pager for overnight use. The Help Desk would maintain a list of the persons on-call and the pager number of the pager assigned to that person for the evening. As back-up, the Help desk maintained the cell phone number of the person on-call in case there was a problem with the pager.

389. The Help Desk procedure required that the Help desk clerk first page the persons on-call with the pager supplied for that purpose. If the person did not respond, the Help Desk clerk would then try to reach the person on their cell phone. If a person on-call did not respond to the pager or the cell phone call for any reason, there was a back-up person and another up the chain to the VP (Beale).

390. NYU had no specific time requirements for responding in the event that a call came in, but typically the call would be responded to within a reasonable time given that the call was in the middle of the night.

391. Both Long and I were assigned to on-call duty the night of December 4, 2013.

392. A call was left on my cell phone at approximately 3:10 A.M. on December 5, 2013. I had received no prior pager call.

393. Within approximately one hour of the message left on my cell phone from the person calling about the issue, I responded to the call and then resolved the issue.

394. Long who had also been called by the Help Desk at the same time that I had been called, never responded, having slept through the entire period from the call from the Help Desk until I resolved it.

395. The issue that was the subject of the call was one involving a problem with getting prescriptions to print through the computer. This problem was a common occurrence at NYU, and NYU provided all users with prescription pads, so that if the printer was not working, they could simply write the prescription out by hand. I was never made aware of any significant problems that arose due to the computerized prescriptions not printing in the hour or two that the problem existed.

396. I had determined that the problem occurred because someone from Orders on the Orders/Lab team had made an error in one of the software configurations.

397. The employee that I had called to help resolve the minor computer glitch, expressed his gratitude to me at the time for having resolved the issue.

398.  I did not think about the December 5 on-call matter again, until I was stunned to learn late in the late afternoon or early evening of December 5, 2013, that I was being issued a formal Written Warning by Long and Beale in connection with my response to the on-call matter of December 5.

399. Although NYU had at the time no standards for on-call time responses, although Long never responded to call herself, although Long was also on overnight on-call duty, although I timely resolved the call issue, and although none of the steps required by NYU policy before a Written Warning can be issued. *See* Defs. Ex. II.

400. Long never spoke with me before she issued the Written Warning. Long had no reason to believe that my on-call duties were lacking. In fact, as is noted above, in 2011, Long assigned me the highest possible rating of "5" in the category of on-call performance duty. *See* Exhibit 5 hereto at NYULH000353

401. The sole reason stated for the Written Warning is that I addressed the call issue in response to a call message left at 3:10 A.M. at 4:14 A..M. *Id.*

402. Although Long who was also on on-call duty that night and failed to respond ever to the call, not only was Long not disciplined, but she signed the written warning and emailed it to me. *Id.*

403. In fact, I had learned the morning of December 5, as did Long, that there had been technical issues wit NYU's pager system night/morning of December 4/5, 2013.

404. The Written Warning vaguely referenced "requirements of  On-call responsibilities" although no such requirements were ever provided by NYU or identified in the Written Warning.

405. Defendants never communicated any specific standards for On-call response time.

406.  Moreover, while NYU's policies mandate that the manager issuing the Written Warning identify the policy being violated, there existed, at the time of the Written Warning, no NYU On-call requirement for On-call time response that I was aware of or that was communicated to me. *See Id., see also* HUMAN RESOURCES POLICIES AND PROCEDURES Chapter 6: Performance Management & Corrective Action, Exhibit 57 hereto, p.9, NYULH009375 ("Whenever practical, the supervisor will reference the specific policy or rule that was violated or performance standards that was not met, and explain to the employee what action is necessary in order to meet acceptable standards or expectations.")

407. Neither Long, Beale nor anyone else from NYU management, identified in the Written Warning, at any meeting, or otherwise what specific policy or rule had been violated.

408. In fact, I had not received any warnings or discipline in connection with such overnight call duties since my starting work on the Epic team in 2009. As noted above, Long had previously rated me the highest possible rating in the category.

409. Nowhere in the Written Warning was any written policy of NYU identified as having been violated.

410. I am unaware of any employee in MCIT that was issued any type of Written Warning based on the time that it took to respond to an On-call call.

411. At no time did Long, Beale, Mherabi or any other NYU management identify any NYU policy or requirement that I had purportedly violated that resulted in the December 5, 2013 Written Warning.

412. I was never provided with any standards as to what the response time is for responding to a call overnight when on on-call duty.

413. As is shown in documents produced by Defendants, Mherabi himself, who was well aware of my complaints of retaliation, interference and sexual harassment, and who improperly took charge of the sexual harassment complaint against HR's protests, and had glossed over the complaint about Bushman and quickly closed it out without taking any corrective action against Bushman, and who failed to act on my retaliation and interference complaints, personally approved the issuance of the December 5, 2013 Written Warning. Annexed hereto as Exhibit 62 is a true copy of an email exchange produced by Defendants, as marked as Mherabi Ex. 17 and as Forte Ex. 24.

414. According to NYU's document, Beale and Mherabi were directly involved in the decision to issue me the December 5, 2013 Written Warning, and were entirely dismissive of my complaint. *Id.*

415. It is extremely unusual for NYU Leadership (upper management) to be involved in decisions on Written Warnings at my level, particularly something as minor as the one that is the subject of Long's December 5, 2013 Written Warning, and I am unaware of any other occasions where NYU senior Leadership so involved itself.

416. Indeed, according to NYU's own Corrective Action policy, the responsibility for issuing corrective action is with the employee's supervisor. *See* Exhibit 57 hereto, at 6.2c (" It is the supervisor's responsibility to initiate the Corrective Action process.")

### ii. NYU's Violation of its Own Progressive Discipline Policy in Issuing the Written Work Warning.

417. Moreover, the issuance of the December 5, 2013 Written Warning was in direct violation of and contrary to NYU's own Corrective Action policies.

-91-

418. Even if any violation of any exiting NYU policy had occurred based on the time of my response, which it did not, I received no counseling or verbal warning as is first required under NYU's disciplinary policy as described below, Defendants having opted to circumvent the counseling and Verbal Warning requirements and go straight to a Written Warning.

419. At no time was it communicated to me that the timing of my response was a serious infraction of any NYU policy or standard.

420. I was given no explanation as to why I was being issued a Written Warning in the absence of any prior counseling or Verbal Warning, or for that matter, why any issue was not simply raised in a weekly meeting, as was the practice.

421. According to NYU's Corrective Action Policy:

> This policy ensures that employees are informed when conduct and/or performance is inconsistent with accepted standards. As such, employees are informed of performance or conduct violations, and are given the opportunity to come into compliance with established Medical Center policies, provided that the infraction is not of a nature to warrant immediate termination of employment.

*See* Exhibit 57, at p. 7, 6.2a.

422. According to NYU's Corrective Action Policy, the steps generally to be followed for Corrective Action are as follows:

> Verbal Warning;
> Written Warning;
> Final Written Warning in lieu of Suspension or Final Written Warning with Suspension without Pay;
> Termination

*Id*. 6.2c, P. 8.

423. NYU's Performance Management and Corrective Action policy describes the first step of its progressive discipline policy, a "verbal warning" as follows:

-92-

Verbal Warning
In the Verbal Warning, the supervisor explains to the employee the nature of the infraction and sets forth specific goals she/he is required to meet in order to avoid future corrective action.
Although the Verbal Warning generally is not recorded in the employee's personnel file, the employee is made aware that, with the issuance of a Verbal warning, the Corrective Action policy has officially been instituted. If no improvement is made, a Written Warning will be issued as the next stage in the process; which will become part of the employee's personnel file. Supervisors are encouraged to make an anecdotal notation regarding the date and the reason for the Verbal Warning, as well as the dialogue had with the employee. In the event a Written Warning becomes necessary, this information will be referenced.

*Id.* pp. 8-9.

424. NYU's Performance Management and Corrective Action policy describes the first

step of its progressive discipline policy, a "verbal warning" as follows:

Written Warning - Notice of Corrective Action
A Written Warning generally is issued to any employee whose performance or behavior problems persist, despite having been given a Verbal Warning. An employee whose behavior or performance problem is sufficiently serious may receive a Written Warning without first receiving a Verbal Warning.
When an employee is issued a Written Warning, a meeting is conducted at which the issuing supervisor and the employee are present. The purpose of this meeting is to inform the employee that his or her performance or behavior is unacceptable and that more severe corrective action will be taken as warranted if the problem is not corrected. Whenever practical, the supervisor will reference the specific policy or rule that was violated or performance standards that was not met, and explain to the employee what action is necessary in order to meet acceptable standards or expectations. This meeting also provides the employee with a forum in which she/he may offer an explanation for the behavior and possibly bring to light any extenuating circumstances which may have contributed to the problem.
The nature of corrective meetings is documented on the Notice of Corrective Action Form or other such written memo. Alt parts of this form, with the exception of the Explanation/Defense" section are to be filled out prior to the corrective meeting. During the meeting, the contents of the Notice of Corrective Action Form are read and explained to the employee, and the employee's response is noted. In all cases, the employee should be asked to sign and date the form. The supervisor should inform the employee that signature of the notice indicates receipt; it does not indicate agreement of said notice. If the employee refuses to sign the form, the supervisor or other departmental representative should enter

-93-

"Employee refused to sign form" in the space reserved for the employee's signature and date it. After completion of the meeting, a copy of the form should be provided to the employee with a copy sent to Employee Relations.

*Id*. p. 9.

## AA. My December 5, 2013 Complaint of Retaliation.

425. The December 5, 2013 Written Warning was issued after my complaints of retaliation by Long and Bushman, after Beale and Long reviewed my 2013 Performance Review comments regarding my medical leaves and treatment, and was issued less than a month after Mherabi had met with Bushman over my complaint of sexual harassment against Bushman.

426. Upon receiving the Written Warning from Long on December 5, 2013, I complained to Long that I believed that she had been engaging in actions as part of a retaliatory effort to get rid of me as an NYU employee.

427. These concerns over a pattern of hostile and retaliatory treatment of me by NYU management resulting directly from my medical leaves, my complaints against Long and Bushman, and the fabrication, or assistance in the fabrication of negative written documents by Long, Beale, Bushman and Mherabi for my file, further raised the alarms that an effort was underway to force me out of my job for having engaged in what was supposed to be protected activities.

428. According to documents produced by Defendants, Long, the same day that I complained and expressed concern that she was setting me up to get rid of me, December 5, 2013, relayed my complaint to Beale who in turn relayed it to Mherabi. The documents show that my compliant was also sent to Boney. *See* Exhibit 62.

429. I received no response to that complaint of retaliation, even though I had stated that I believed that NYU was fabricating reasons to end my employment as part of a constellation of retaliatory conduct.

430. Nor to my knowledge was any investigation conducted by NYU into that retaliation complaint.

## BB. The Retaliatory and Hostile Conduct Continues After My December 5, 2013 Complaint.

431. In the weeks following my December 5, 2013 complaint of retaliatory and discriminatory efforts to end my employment, the hostility coming from Long, Bushman and Beale continued unabated.

432. I felt demoralized and completely hopeless by this point. I even cleaned out much of my desk in anticipation of my employment being terminated and my being escorted out of the building which is the way NYU executes employment terminations.

## CC. Defendants' Retaliatory Actions Result In My Termination Unless I Accept A Severe and Humiliating Two Level Demotion to a Non-Lead Position.

433. During the period after I returned from my Second Medical Leave, the workload on the Orders/Lab team not only did not diminish, rather it had significantly increased.

434. The post-go-live/stabilization/steady period had created enormous amounts of additional work, which became further amplified throughout the year and into 2014.

435. NYU had already started buying up existing facilities or practices in their continuing expansion, and many of these facilities had labs to integrate into the existing NYU IT structure. In addition, there were always new lab tests being offered, new instruments in the lab, and new workflows requested. Lab ordering and resulting is part of nearly every healthcare visit. The

-95-

demand for lab resources was extensive and on-going. Moreover, Epic 2014 would have to be installed in 2014 with another go-live. In 2014, NYU was planning another Epic system upgrade to the latest release of software which is almost like implementing the system again. We had to go through all of the release notes published by Epic to see what was changing, meet with operations to see if we wanted to take optional new features, account for hard-coded software changes and fixes that we had to take, complete all new build or build modifications, test all of this in multiple environments, train all users on upcoming changes and finally, and would have to implement the upgrade with a go-live of at least a week or two, depending on the issues and problems that occurred.

436. Yet Beale sent me a letter dated January 27, 2014, claiming that my position was being eliminated as the result of a purported reorganization. *See* Defs. Ex. MM (the "Termination Letter").

437. The Termination Letter made no claim that the termination of my employment was performance related. *Id*. Neither Beale, nor anyone else at NYU, had given me any prior notice that my employment as Application Lead was being terminated prior to the Termination Letter.

438. The Termination Letter indicated that my only alternative to leaving NYU was to take a two level demotion to a non-supervisory position to a position that was far below my skill and experience level, and below any position that I had held at NYU in more than a decade, and to be subjected to a six month probationary period in that diminished role.

## DD. No Genuine Reorganization of MCIT Occurred in Late 2013-January 2014

439. Defendants and Mherabi are highly educated and sophisticated individuals holding high level positions in a major medical center.

440. It is apparent that understanding that they would have a hard time defending the outright termination of a thirty year NYU employee who had recently made multiple complaints of retaliation, Defendants and Mherabi acted to conceal their true motivations and purpose to get rid of me for my having engaged in protected activities under the pretense of reorganization. What was a minor review of existing personnel resources, has been used as pretext to claim a reorganization that simply did not occur. Whatever so-called reorganization of MCIT occurred, was completed in the spring of 2013. Def. Ex. JJ.

441. As shown in organizational charts produced by Defendants, prior to the alleged MCIT reorganization in January 2014, there was a CIO, Mherabi, under which there were eight Departments each of which had various subdepartments.

442. After the alleged MCIT reorganization, there was a CIO, Mherabi, under which there were the same eight Departments and same subdepartments. Compare MCIT's organization as existing before the alleged late 2013 reorganization, a true copy of which as produced by Defendants, as marked as Boney Ex. 1 is annexed hereto as Exhibit 63, with MCIT organization as existing after the alleged late 2013 reorganization, a true copy of which as produced by Defendants, as marked as Boney Ex. 2 is annexed hereto as Exhibit 64. See also attached hereto as Exhibits 65 and 66 are true copies of organizational documents produced by Defendants as marked, respectively, as Boney Ex. 3, and Mherabi Ex. 20. Moreover, all of the Epic subdepartments as of October 2013 before the alleged late 2013 reorganization as shown in Exhibit 10 hereto, continued to exist.

443. According to Defendants, other than myself, as part of the so-called reorganization in late 2013/early 2014, a total of five positions, were eliminated. This out of 228 shown by Defendants' documents to exist at that time. *See* Exhibits 67 and 69 hereto.

444. Outside of the claim by Defendants that my Application Lead position was being, there were no Application Leads eliminated due to the purported January 2014 reorganization. Attached hereto as Exhibit 67 is a true copy of a Beale email and attachments dated February 2, 2014 as produced by Defendants, and as marked as Mherabi Ex. 22.

445. As is described above, there was no significant change in NYU employees from before to after the alleged reorganization, the actual steady state reorganization having been completed prior to May 2013 as is set forth in Mherabi's May 7, 2013 email (Defs. Ex. JJ).

446. Revealingly, according to a document produced by Defendants, and Mherabi apparently wanting to avoid a papers trail, instructed Beale not to include too much detail in writing about the purported changes. Attached hereto as Exhibit 68 is a true copy of an email exchange produced by Defendants, as marked as Mherabi Ex. 19, wherein Beale wrote on January 28, 2014: "I asked Nader [Mherabi] yesterday, he stated he didn't want too much detail in the communications about the changes and that the executives were already in the loop."

447. Of the alleged four positions eliminated (other than mine), three or four of the four were actually temporary workers used to test the Epic applications during the change over to Epic., and whose function was to test the applications being converted as they were being implemented. The fourth position was eliminated for reasons having nothing to do with steady state or any MCIT reorganization, but rather resulted from the two teams that had duplicative

functions being combined, which was a project that Meherabi had wanted to do for a while. Those two teams were not involved in Epic support.

448. There was no change to the nature of the work of the Orders/Lab team from before to after the purported December 2013/January 2014 reorganization, and, as discussed above, the volume of work for both laboratory and inpatient orders had increased.

449. Moreover, the non-use of Epic's Beaker Application by NYU had no bearing or relevance to the nature and volume work being performed by the Orders/Lab team.

450. NYU had not opted to convert the laboratory applications to Epic Beaker at any time from when the conversion to certain Epic applications began in or about 2009 through to when my employment at NYU ended in 2014. A significant portion of the support work of the Orders/Lab team involved making sure that the diverse and various laboratory applications being used by various NYU users and vendors, were integrated with the various non-Epic laboratory applications in use by NYU. Lab test ordering and resulting touches almost every part of Epic, from the clinical applications to front end patient registration applications to back-end charging and billing applications. NYU's clinical and operational environment was vast and integrated labs in almost every workflow.

451. It is obvious that this is the reason that Epic made no recommendations for staffing levels of employees working on Laboratory applications. Attached hereto as Exhibit 69 is a true copy of an extract from the purported spreadsheet that Beale claims she and Mherabi reviewed in purportedly deciding to follow Epic's recommendation with respect to the Orders/Lab team at NYULH008817-8820, as marked as Mherabi Ex. 21/Boney Ex. 30.

-99-

452. Due to the fact that Epic Beaker was not supported by the Orders/Lab team, those spreadsheets purportedly taken from Epic recommendations, and purportedly relied on by Defendants to justify eliminating my position, in fact show "0" employees for the laboratory application support both as existing (although there were four) and "0" employees as recommended. *See* Exhibit 69 at NYULH008818.

453. Morever, turning to the purported spreadsheet where it lists "Mherabi Recommendations" which were purportedly based on Mherabi's discussions with Beale and Boney, all of the three analyst positions for the analysts on the non-Epic, non-Beaker application laboratory are recommended as being retained, with only one that Mherabi and Beale listing as eliminated–my position. *See Id.* at NYULH008820. According to the purported spread sheet, Aspen listed as recommended four positions for Laboratory (one half-time). *See Id.* at NYULH008817.

454. Therefore, NYU's decision not to renew the contracts of certain contract/consult workers had nothing to do with the Epic Beaker application, and the claim of position elimination based on Beaker, has been used by Defendants and Mherabi as cover to try to finally remove me from NYU, and by sweeping me in with those contract workers/consultants, and then claiming position elimination as part of a reorganization.

455. Moreover, even if, for the sake of argument, the Defendants' claim that my position was eliminated as the result of a supposed reorganization, there exists no genuine or credible reason for my having been chosen for termination over Himes, for not having been offered Himes' position when Defendants knew he was leaving NYU prior to my being transferred to the low level position.

456. Himes, who had far less NYU experience (only two plus years as compared to my 30), and less accomplishments and skills, and who, according to Long, had performance problems, was retained in the Application Lead position.

457. Himes had not taken any FMLA leave during the period that he was Application Leave, and therefore would not have made any complaints related to FMLA during that time period or resisted cutting any such leave short. I am unaware of any civil rights complaints that Himes made to NYU on behalf of himself or others.

458. Moreover, as is further discussed below, and as is shown by documents produced by Defendants, Beale knew at the time that Himes was leaving NYU, that Himes' Application Lead position would be opening, and had begun to recruit outside of NYU for persons to fill the Application Lead opening (in violation of NYU's policy to fill positions in house).

459. Moreover, as is further discussed below, and as is shown by documents produced by Defendants, not only was a single other Application Lead position claimed to have been eliminated as part of any purported late 2013/early 2014 reorganization, Beale knew that there were numerous vacant positions in the Epic group, and, significantly, that there multiple Application Lead vacancies.

460. In fact, as is further discussed below, and as is shown by documents produced by Defendants, Beale and Howard knew that there was a vacancy for an Application Lead on the EpicCare Ambulatory support team at the same time Defendants were discussing ways to get rid of me, and at the time I was given the Termination Letter.

461. In fact, as was known to Beale and Howard, I was perfectly suited for the vacant Application Lead Support position in EpicCare Ambulatory given my background and

experience on the ambulatory team, my high performance ratings by Howard on that team, my extensive work and accomplishment in bringing the EpicCare ambulatory software live, my having achieved in 2013 a perfect 100% score on my EpicCare software application recertification (which Long, Beale and Howard knew), and my considerable experience in my various positions at NYU overseeing NYU employees, including, but not limited to, as an Application Lead.

462. Yet the EpicCare Ambulatory team Application Lead Support position was instead given to Catherine Snapp ("Snapp"), a low level Senior Analyst I who had no supervisory experience at NYU, and who had only worked on the implementation team, and had not held a position higher than Senior Analyst I. Snapp was the person who then oversaw my work as application lead after my two level demotion.

**EE. NYU's Policy to Fill Open Positions In-House .**

463. NYU's policy in effect at the time of the purported elimination of my position is stated in NYU's Staff Handbook, Medical Center Policies and Procedures, as follows:

> A layoff is on involuntary separation from employment caused by such factors as lack of work due to technological change, expiration of funds, elimination of a function, or job, etc.

> It is the policy of NYU Langone Medical Center that every opportunity for transfer to another position for which on employee may qualify is explored before affecting a layoff, and that preference is given for future openings for which the employee is qualified, whenever possible.

*See* NYU Staff Handbook, Exhibit 24 hereto, p.38.

464. Therefore, and even if, assuming the preposterous, for arguments sake, that Defendants were eliminating my Application Lead position on the Orders/Lab team because NYU did not

use the Epic Beaker application, as Defendants fantastically and incredibly contend, Defendants

and Mherabi were required by NYU policy to offer me another open position that I met the

minimum qualifications for.

465. Moreover, based on my almost thirty years employment at NYU, NYU's policy and

practice was to consider tenure and seniority in connection with decisions regarding position

changes.

466. Yet the Termination Letter stated that my employment was terminated, unless I took a

two level demotion to a position that was far beneath my skill and experience level, that they

knew would require me to report to and be supervised by a low level analyst that they were

transferring to the Application Lead position, instead of me, and which required a rare two level

promotion of that employee.

467. The low level position offer was one that Defendants and Mherabi could only have

expected me not to accept, and would compel me to accept the termination package with the

required waiver of all my rights to assert any claims against them.

**FF. Numerous Other Vacancies Existed in Epic at The Same Time That the Decision Was
Being Made to Terminate My Employment and Offer Me A Low Level Position, Including
Other Application Lead Positions.**

468. According to documents produced by Defendants and testimony by Beale, there were

many vacancies at NYU Epic at the time that Defendants claim the decision was being made to

terminate my employment at NYU. *See also* attached as Exhibit 70 a true copy of document

produced by Defendants, and attached as Exhibit 71 a true copy of document produced by

Defendants as marked as Howard Ex, 5.

469. According to Defendants' documents, several of the vacant positions at the time that the decision was being made to terminate my employment as Application Lead and offer me only a low level position, were Application Lead positions, at least two of which were Application Lead Positions that I was qualified for. *See* Exhibit 70.

470. What was most  necessary for the Application Lead position was IT knowledge and experience, both of which I possessed.

### i. At the Time That I Was Being Pressured by Beale to Leave or Accept the Two Level Demotion, Beale Was Aware that Himes Was Leaving the Application Lead Position.

471. Beale had pressured me to give her an answer as to whether I would take a severance package by February 4, 2014. *See also* attached hereto as Exhibit 72 is a true copy of an email dated February 4, 2014 produced by defendants as marked as Beale Ex. 15.

472. According to documents produced by Defendants, Beale knew that Himes employment was terminating, and that the Application Lead position would be vacant. *See* attached hereto as Exhibit 73 a true copy of an email exchange with Beale as produced by Defendants at NYULH 10041-10042.

473. At no time did Defendants or anyone at NYU apprise me that Himes was leaving NYU, offer me the Application Lead position that he was vacating, or even notify me of the opening or that there would be any posting for the position.

474. Defendants' failure to notify me of the expected vacancy on the Orders/Lab team occurred despite the fact that i) the Application Lead position was equivalent to the one that I had held all along, ii) I met all of the minimum qualifications for that position, and iii) that I was Epic certified on the Lab as well as the Orders application, and in fact had achieved a perfect 100%

score on the 2013 Epic Orders certification/New Version Training ("NVT"). In addition, as is noted above, I had extensive experience on the Orders/Lab team, was extremely knowledgeable about the teams functions, operations and procedures, and had in fact been a central and driving force in all of the go-live of the applications used by the Orders/Lab team. Moreover, NYU's In-house policy should have resulted in my being offered the position.

### ii. NYU, Having Never Offered Me the Application Lead Position Being Vacated By Himes, Instead Hires a New Application Lead From Outside of NYU and In Contravention of Their  Own Policies.

475. According to documents produced by Defendants after this Court's order that they do so,  Beale, instead of placing me in the Application Lead position that was being vacated by Himes, or transferring me to that position as required by NYU policy if, assuming *arguendo*, Beale genuinely believed that my position was being eliminated due to a reorganization, sought out a non-employee of NYU who was applying for a different position entirely, to fill the Application Lead position on the Orders/Lab Team, and telling HR to pursue that individual, H.R., for the Application Lead position. *See* Exhibit 73.

476. I was qualified for the Application Lead position for both inpatient orders and laboratory orders applications, and had extensive experience, far more than the person vacating the position, Himes.

477. According to documents produced by Defendants, Beale failed to even mention me while actively seeking to hire a non-NYU employee for that position. *See* Exhibit 73.

478. Rather, Beale acted to further create conditions adverse to my staying at NYU. As is shown in Defs. Ex. LL, Beale wrote to HR on January 23, 2014, three days before the Termination Letter, emphasizing the overall "2" rating on my 2013 review that she helped Long

manufacture, and the improper written warning, and for the first time, months after my 2013 Performance Review, and only four days before she was to send the Termination Letter, claiming that a PIP would need to be prepared for me.

479. When Delts nevertheless asked Beale about other vacant positions I was qualified for, there is no indication in the exchange that Beale informed Delts about all the open Application Lead positions, just as she never told me about all of those open positions. Defs. Ex. LL. Beale also concealed her knowledge about Himes leaving, although there is evidence that Beale knew that Himes' employment was going to be terminated prior to his supposed resignation date of March 3, 2014 (*see* Exhibit 73), due to problems with Himes, as NYU designated Himes as ineligible for rehire on the Epic team. *See* attached hereto as Exhibit 74 a true copy of a document from Himes personnel file as marked as Boney Ex. 38.

480. Defendants have not submitted any documents showing that Beale conducted any search for positions suitable to the position I held at the time.

481. My official transfer letter to the low level position is dated February 14, 2014 ( *see* Exhibit 83; Defs. Ex. NN at NYULG006325), at a time when Beale must have known Himes was leaving, and only two weeks after which she began recruiting from outside NYU to fill the Application Lead position, all the while claiming there was no other position for me if I stayed, other than a low level analyst position.

482. Defendants offered the Orders/Lab team Application Lead position that Beale knew would be vacant, to the same person that Beale began to recruit for the position, and at a time when I was still employed by NYU.

483. I was unaware of any job posting for the Application Lead position that Defendants claim was posted electronically, and which Beale had already handpicked someone from outside of NYU to fill.

484. Yet it is clear from NYU's documents that Beale and others were determined to keep me from getting that Application Lead position, and had at the very time that they should have kept me in the Application Lead position, they were already setting their sights on an the outsider that Beale wanted to fill the Application Lead position instead of me.

### iii. The Open Application Lead Position for the EpicCare Ambulatory Support Team.

485. According to documents produced by Defendants, as of October 10, 2013, Snapp held the position of Senior Analyst I on the EpicCare ambulatory implementation team in the fall of 2013. *See* listing of employees under EpicCare Ambulatory Implementation, Exhibit 10, at NYULH008673.

486. On information and belief, and according to Defendants' organizational Document, Chung Kit Yeung had held the position of Application Lead on the EpicCare Ambulatory Support team. *See Id.* under EpicCare Ambulatory Support Application Lead

487. Yeung was a consultant who had been temporarily assigned to that position, but who left that position in or about the fall of 2013 leaving the EpicCare Ambulatory Support Application Lead position vacant.

488. The vacancy in the Application Lead on the EpicCare Ambulatory Support team position occurred during the same time period, the fall of 2013, when Defendants claim of have been discussion eliminating my position and transferring me to a low level position.

489. I was never informed that at or about the time that the decision was being made to terminate my employment as Application Lead, there were several other Application Lead positions available, including the Application Lead position for EpicCare Ambulatory Support.

490. Defendants had not filled the Application Lead position for EpicCare Ambulatory Support team position prior to the time the Termination Letter was issued.

491. Beale listed the Application Lead position in the EpicCare Ambulatory team as being vacant as late as February 2, 2014, before I even responded to the Termination Letter and was still working as an Application Lead. *See* Exhibit 67 at NYULH005743 and NYULH005750.

492. Snapp had been a low level Senior Analyst I on the EpicCare Ambulatory Implementation team, who I had previously provided some assistance to hep her understand her assignments. On information and belief, she held no prior supervisory or managerial experience at NYU, nor had she ever before performed the duties of an Application Lead.

493. Since Snapp was hired to the position of Application Lead, had only just been hired to the position, and had far more limited experience, training and knowledge than I in that application, and she had not previous supervisory experience, whereas I had responsibility for supervising and training numerous employees over my years at NYU, including in my position as Application Lead, all of which was known to Long, Beale, Boney and Mherabi, the humiliation I experienced was extreme.

494. Snapp received that Application Lead position through an extremely unusual two level promotion. I am unaware of any such two level promotions, just as I am unaware of any two level demotions such as I suffered in 2014, during the nearly thirty years that I was employed by NYU.

495. Yet I was required to have my work overseen by Snapp after I was transferred to EpicCare Ambulatory team.

496. Moreover, it appears that Snapp was used by Beale as a place holder until after I left NYU to make it appear as if the position was filled.

497. On information and belief, attached as Exhibit 75 is a true copy of Snapp's resume through 2020 as contained on her current LinkedIn site.

498. Notably, nowhere on Snapp's resume does she state that she ever held any Application Lead position. Rather she states that for the past nine plus years, since 2011, she has held the same analyst position she held before I was told that I had to report to her, Senior Analyst I.

499. As with Himes' position, absent retaliation and discrimination against me, no legitimate reason exists for not being offered the Application Lead position in EpicCare Ambulatory, while instead, filling the vacancy with a low level analyst who only held the Senior Analyst I position in an implementation roll, and only since 2011, and who had no supervisory experience or experience in a support role at NYU.

500. As noted above, I was certified in EpicCare ambulatory application as well, having received a perfect 100% score in that recertification in that application and New Version Training ("NVT"), and that had extensive experience in the work performed by the Ambulatory Care team.

501. Throughout the time that I worked at NYU on Epic, I was compliant with all certifications and in all updates from Epic in the EpicCare Ambulatory application, as well as in all other applications that I held certifications for.

502. Indeed, Howard was forced to concede that she knew that I was fully Epic Certified in its EpicCare ambulatory application and had received a perfect 100% score in my 2013 recertification by Epic in all phases of that Epic application, and that I had been Epic certified for at least more than four years, since I had first began performing work for the Ambulatory Care team in 2009. *See also* Bierman Decl. Ex. 87, Howard Dep. 191:14-192:2.

503. My extensive experience and certifications in the EpicCare ambulatory application made me fully qualified to be Application Lead or higher in the EpicCare Ambulatory team, and certainly to perform in a Senior Analyst II position.

504.  As noted above, while I was a Epic Analyst II on the Epic Ambulatory team beginning in 2010, I was rated by Howard on my performance reviews as exceeding NYU's requirements. *See* Exhibit 5 hereto. Howard knew, as I had told her, that I had thirty years of experience at NYU and extensive experience and certifications in EpicCare Ambulatory.

505. In my almost thirty years at NYU, I am aware of no circumstances where a person in an Application Lead role received a two level demotion to a Senior Analyst I position, and/or where an Application Lead was demoted and made to report to someone as Application Lead who had just held the position of Senior Analyst I.

506. Defendants could not have genuinely believed that I would accept such an arrangement, but were well aware that I had extensive retaliation complaints in connection with my medical leaves and sexual harassment report.

**iv. Beale Dodges HR's Inquiry About transferring Me to A Position Commensurate With My Position and Skill As Required BY NYU Employment Policy, In Order to Avoid Compliance With That Policy.**

507. According to documents produced by Defendants, Delts questioned Beale as to whether she had made a search for an equivalent position for me based on my minimum qualifications and overall experience as is required by NYU's In-House policy. Beale side-stepped the inquiry. *See* Defs. Ex LL.

508. Beale apparently never responded or mislead Delts, resulting in the offer three days later of the low level position. *See* January 27. 2013 Termination Letter Defs. Ex. MM.

509. As is contained in documents produced by Defendants, Beale, then, in a thinly veiled email to Long about her assistance in trying to get rid of me, wrote, two days after she wrote the letter terminating my job, to thank Long for "support" during this "organizational change." *See* annexed hereto as Exhibit 76, a true copy of an email exchange between Beale and Long produced by Defendants, as marked as Beale Ex. 20. Since I was the only person on the Orders/Lab team whose employment was being terminated, Beale was clearly speaking in code in connection with their efforts to get rid of me.

510. Based on i) the continuing high volume of work in the Orders/Lab Team, ii) the fact that no genuine reorganization of the Orders/Lab Team, the Epic group or MCIT had occurred, iii) the fact that no other Application Lead position was eliminated throughout the entire MCIT, iv) the fact that Himes, who had worked for NYU for less than three years was being retained as Application Lead over me, v) the fact that the Epic Beaker was not in use at NYU and had nothing whatsoever to do with the workload of the Orders/Lab team in 2103 or early 2014, vi.) the fact that only a few low level short term contract worker's that were being utilized on a

-111-

temporary basis during the Go-live and early post-Go-live period and whose contracts were

expiring, were not having their contracts renewed, vii) the failure to offer me any of the multiple

vacant Application Lead positions at the time, viii) Beale's recruitment outside of NYU for an

Application Lead or Orders/Lab team in violation of NYU policy at the same time she was

pressuring me to leave NYU or else accept a low level position that she knew would humiliate

me, confirms my fears at the time that NYU had targeted me for having engaged in protected

activities, and was the culmination of the more than six months of the relentless retaliatory

conduct that preceded it.

511. Having worked for NYU for some thirty years, and almost sixty years of age, and

believing that what Defendants and Mherabi were doing was unlawful, I decided that I would not

voluntarily end my longstanding career at NYU, but would instead remain as an employee, as

humiliating and embarrassing as that was for me, while trying to get  NYU to step back from its

unlawful conduct.

512. While I decided that I would try to make it work in the hopes that conditions might

change, it did seem as though Defendants would stop at nothing to destroy my thirty years career

at NYU, and so I began exploring possible employment opportunities at the Hospital for Special

Surgery ("HSS") in case things did not change.

**GG. Post Demotion Conditions at NY and Continued Retaliation**

    **i. After My Transfer Long and Bushman Continue to Retaliate and Create
Conditions Designed to Force Me to Leave.**

513. Dissatisfied that I transferred to the demoted position rather than accepting the

severance package, I continued to face the extremely harsh, hostile and retaliatory environment

that Dr. Bushman and Ms. Long created for me and which are believed to be designed to force my resignation.

514. The working conditions at NYU had made intolerable for me as NYU management intended, continued after I transferred to the Epiccare Ambulatory team in February 2014.

515. The daily humiliation and personal degradation and insults that I was forced to endure and suffer continued unrestrained.

516. While Long was not officially reviewing my work as his supervisor for tasks I was performing on the EpicCare ambulatory team, she and Bushman continued to assign me work and comment on that work. Ziccarelli Decl.

517. According to documents produced by Defendants, within days of my informing Defendants that I would not accept termination of my employment, Long and Bushman resumed sending negative emails about me. *E.g. see* attached hereto as Exhibits 77, 78 and 79 true copies of email s produced by Defendants at NYULH004541, NYULH000681-000682, and NYULH000683, respectively.

518. Although I was no Longer reporting to Long after I was transferred to the EpicCare ambulatory team, Long continued to require me to document items I had worked on in connection with the lab build. For example, I had to spend weekends creating support documents for microbiology lab ordering workflows to explain how they worked in tandem with the Sunquest lab system and why they had to be configured the way they were. There were ongoing questions about Blood Bank workflows too. Epic does not offer Blood Banking software so NYU continued to use Hemocare/HCLL which was interfaced to Epic in the same way Sunquest was. I

would get questions not only from the Epic team but from the MCIT employees who managed the Sunquest and Hemocare/HCLL and Anatomic Pathology system software.

ii. **Long's Post-Termination  Fabricated Performance Improvement Plan.**

519. A Performance Improvement Plan ("PIP"), is a document that is sometimes issued to an employee that has been performing less than satisfactory in their position, and is intended to outline performance objectives for that employee in the position that they hold, with follow-up meetings shortly after the issuance of the plan to aid in achieving the goal and bringing the employee's performance in the position to a satisfactory level.

520. At the time that I received my 2013 Performance Review from Long and Beale on November 19, 2013, they told me that I would not be given a PIP.

521. Any PIP's at NYU that were to be issued, were usually issued within thirty days of a review in which a supervisor deemed a PIP to be required.

522. Up through and including the date in February 2014 that I was removed from Application Lead position (nearly three months after I was given my 2013 Performance Review) (*see* annexed hereto as Exhibit 83, a true copy of the February 14, 2014 transfer letter), I had not received any PIP, nor had a single meeting been scheduled in connection with any PIP, although bi-weekly meetings with managers are required for employees on PIP.

523.  It was not until I rejected termination of my employment and transferred informed Defendants that I would transfer to the Ambulatory team, that, around the end of March 2014, more than four months after I received my 2013 Performance Review, and almost two months after I stopped officially reporting to Long, that I was given a document that was purportedly related to my Application Lead position, which I no longer held.

524. On March 26, 2104, I received a document in connection with my 2013 Performance Review, more than four months later, that was entitled "Post 2014 Performance Review" as is set forth in Defs. Ex. OO at 402-403 (up to the signature line, but not including the portion of the document appearing after the signature lines, which material was not included in the document given to me.) It is this document that Defendants refer to as a PIP.

525. According to Long's testimony, the March 26, 2014 referred to as a PIP was drafted by her after I was terminated from the Application Lead position, although it related to my performance in that position.

526. Moreover, in March of 2014, I had been in the Senior Analyst I position for only about six weeks, had not received any performance reviews in that position, had received no performance ratings in that position that could have given rise to a PIP, and was supposedly already on a six month probation for the purpose of performance evaluations per NYU's February 14, 2014 letter , Ex. 83 hereto.

527. Defendants claim that Defs. Ex. OO related to my performance as an Application Lead of the Orders/Lab team, not "in his new role" as a Senior Analyst I on the Ambulatory Care team. *See* DSOF 227. Nowhere in NYU's employment policies that I am aware of is there any provision for a PIP for an employee in a "new role."

528. The so-called PIP was a fiction, one that Long suddenly drafted after I informed Defendants that I rejected the employment termination option.

529. I had never been on a performance improvement plan in my nearly thirty 30 years of employment at NYU, until the one conjured by Long for a position I no longer held.

530. Howard continued to aid Defendants and Mherabi in their retaliatory efforts to get rid of me. Howard knew and understood that the PIP had nothing whatsoever to do with my work on the EpicCare ambulatory team, and was not in accord with NYU policies and practices. Howard, who was well aware of the Defendants' retaliatory scheme to force me out as is discussed above, then further aided Defendants in that scheme by giving me the PIP.

531. When I moved to the Ambulatory Team, there was another Results Routing error queue that had hundreds of results in it that I figured out a way to clean up. No one had looked at it for months before my transfer. These were lab results that didn't go to a providers Epic InBasket which is like Epic's internal system-based email for providers. The idea is that the provider can quickly scan messages there so they don't have to open patient charts one-by-one to see if any abnormal results were returned for their patients. It was through my sole efforts after transferring to the EpicCare Ambulatory team and the expenditure of considerable time by me, that I was able to resolve that error queue problem, which Beale, Howard and other Epic team supervisors were aware of. When not one NYU supervisor/manager mentioned my having corrected a major problem for the EpicCare Ambulatory team, it was clear that after the so-called "six month probationary period," my employment would be terminated no matter how well I performed.

532. I was also placed in an isolated room away from the rest of the EpicCare ambulatory team, as if I didn't exist. This seriously impacted me, as the work on the team was collaborative in nature, and deprived me of contact with my co-workers, which contact had been one of the most rewarding aspects of my job. It also was designed to make me miserable and impact on my ability to perform my job effectively.

**HH. My May 7 Compliant of Retaliation Through My Attorney.**

533. Unnerved that a medical facility would engage in such subterfuge to violate an

employee's basic rights for having availed himself of statutory rights, for having complained

when those rights were interfered with, and for having engaged in other protected activities under

civil rights laws, I subsequently retained counsel, who wrote to NYU by letter dated May 7,

2014. Attached hereto as Exhibit 80 is a true copy of my attorneys' May 7, 2014 letter to NYU.

**II. Still Further Retaliation and Hostility Leading to My Being Forced to Seek Out Other Employment**.

534. Defendants' response to my attorney's complaint letter was to further retaliate

unrestrained by NYU top management.

535. Long and Bushman and Beale continued their post-transfer retaliatory conduct

against me, with Howard continuing to aid them. They continued to harass and confront me

about work regularly.

536. I was required by Long and Bushman to produce documents explaining the build that

I had done on the Orders team that they claimed they didn't understand. I spent weekends of my

own time doing this.

537. Eventually I stopped seeing them because I had been shunted off into isolation, but

the issues never stopped.

**JJ. The Impact of Defendants' and Other NYU Manager's Ongoing Retaliation on Me.**

538. The events leading up to the termination of my employment as Application Lead, the

humiliating and embarrassing two level demotion, the humiliation of my having to report to

Snapp, and the continuing hostile environment, the humiliating PIP, Long's, Bushman's and

Beale's continuing  harassment and retaliation against me, and other continuing efforts by defendants for force me out of my employment with NYU, deeply impacted me emotionally and psychologically and were having an affect on my work.

539. The adverse employment action, the PIP, the isolation, the continuing retaliation and hostility, and the humiliating treatment I experienced as the result of the two level demotion, caused me to suffer severe emotional and psychological symptoms, anxiety and depression.

540. In or about mid-may 2014 conveyed to Howard the emotional and psychological impact on me due to how I was being treated and how it was impacting my work. I specifically complained to Howard about what I was continuing to experience with Long's and Bushman's ongoing retaliatory efforts with Beale's acquiescence, the PIP, the isolation, the humiliating reporting structure, and other conditions I viewed as part of the ongoing stream of retaliation.

541. I communicated to Howard that the continued strain from the ongoing retaliation was impacting my emotional health and work.

542. Howard refereed me to NYU's health care services known as the Employee Assistance Services. *See* attached hereto as Exhibits 81 and 82 true copies of documents produced by Defendants as marked as Forte Exs. 26 and 28, respectively.

543. Shortly after I complained to Howard about what was occurring, how it was impacting me, and within weeks of Howard referring me to NYU's employee assistance services, Howard issued me a Final Written Warning on June 18, 2014 stating my employment would end in thirty days absent improvement. Defs Ex. PP. The claimed work deficiency was that I was not getting a particular workflow up and running. I had needed leadership to sign off on the solution in order to move forward. It was a workflow for prescribing medicines in an outpatient setting, that I

believe was for outpatient pulmonary function exams. Epic's software available at the time had specific inherent limitations that Epic had planned to correct in a future release. I showed Dr. Szerencsy, physician liaison to outpatient providers, the proposed workflow on several occasions. Each time his response was "The doctors aren't going to like this" and said he would speak with them, but failed to do so. The problem, as Howard knew, was that Dr. Szerencsy, who reported to Bushman, was not being a collaborative partner. Howard also knew that I could not contact the providers directly myself, as that would have considered as breaking rank.

544. After even an attorney's letter did not stop the retaliatory abuse I was being subjected to, unable to continue to suffer the emotional and psychological abuse resulting from the commutative affect of the FMLA interference, the continuing FMLA retaliatory conduct and hostile work environment and the continuing retaliatory conduct and hostile work environment in connection with my complaint of Bushman's sexual harassment, fearing that I was in danger of even more severe emotional and psychological harm despite undergoing psychological counseling, and, since the basis for the FWW was false, and therefore there would never be any genuine finding with respect to my improvement within the thirty days, and that I was being set up for the final termination, I was left with no choice but to leave my employment at NYU.

545. Two days after receiving the FFW which threatened to end my employment in 30 days, I told NYU on June 20, 2014, that I would not be returning, citing the conditions that had forced me to resign .

546. After leaving NYU, I accepted employment with HSS.

547. While my base salary at the time that I commenced employment with HHS was slightly more than what I had been earning at NYU (approximately $5,000 more), due to diminished and

less favorable compensation benefits, my total compensation was less than what I was receiving at NYU. Moreover, NYU had better retirement plan than HSS and contributed a greater amount to the retirement fund. Moreover, I started from scratch with HSS's retirement fund, and was not vested.

548. In the now more than six years since I left NYU and have been employed at HSS, I have experienced none of the type of conduct that I experienced at NYU after returning from my First Medical Leave. Second Medical Leave and filing of a sexual harassment complaint against Dr. Bushman, nor have I received a single warning, or been subjected to any disciplinary actions.

Dated: New York, New York
       August 22, 2020

                                        JEFFRY ZICCARELLI