**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────

**JEFFRY ZICCARELLI,**

                    **Plaintiff,**          **15-cv-9307 (JGK)**

          **- against -**                  **MEMORANDUM**
                                           **OPINION AND ORDER**
**NYU HOSPITALS CENTER ET AL.,**

                    **Defendants.**
────────────────────────────────

**JOHN G. KOELTL, District Judge:**

     The plaintiff, Jeffry Ziccarelli, brought this action
against NYU Hospitals Center ("NYU") and its employees Cheryl
Long, Sheryl Bushman, Nader Mherabi, and Nancy Beale. Remaining
in the action are claims of interference with the plaintiff's
rights and retaliation under the Family Medical Leave Act, 29
U.S.C. §§ 2601 et seq. ("FMLA") and claims of hostile work
environment and retaliation under the New York City Human Rights
Law, N.Y.C. Admin. Code §§ 8-101 et seq. ("NYCHRL") against NYU,
Long, Bushman, and Beale. The defendants move for summary
judgment on all claims pursuant to Federal Rule of Civil
Procedure 56. For the following reasons, the motion is **granted**
in part and **denied** in part.

                              I

     The following facts are undisputed unless noted otherwise.

     Ziccarelli was employed at NYU at various information

technology ("IT") positions for almost thirty years until his

resignation in 2014. First Amended Complaint ("FAC") ¶¶ 3, 7, 116. Around 2007, NYU started transitioning to a new IT system vendor, Epic, and around 2010, Ziccarelli began working in the group running the Epic system at NYU. Pl. Dep. 39-40; Mherabi Dep. 16-20. The Epic group was organized into several teams. Ziccarelli Decl. ¶¶ 60-63.

In or about June 2012, Ziccarelli was promoted to the position of Application Lead on the Epic "Lab" team. Pl. Dep. 40-42. In that position, Ziccarelli initially reported to Nancy Dean, a Senior Director overseeing the Lab team who left NYU during the summer of 2013. Pl. Dep. 41, 49-50, 55. Shortly before Dean's departure, Ziccarelli started directly reporting to Long, who had become a Director of Orders and Lab, which included the Lab team. Long Dep. 98-100. In late June or early July 2013, Beale, who was then an interim Senior Director, started overseeing the "orders application" which included the "Orders" and "Lab" team members. Beale Dep. 13. Beale worked at NYU since 2012, first as a consultant and, in September 2013 she became a full-time employee and assumed the role of "Vice-President of Clinical Systems and Integrations" for the Medical Center Information Technology ("MCIT") department. Beale Dep. 9-11, 37-38. The two remaining individual defendants served in senior leadership roles of NYU's IT organization during the relevant period. Mherabi has been the Chief Information Officer

since 2011. Mherabi Dep. 7-9. Bushman was NYU's Chief Medical

Information Officer ("CMIO") from 2011 until she left NYU in

2014. Bushman Dep. 24, 27.

In 2013, Ziccarelli took two medical leaves of absence. Pl.

Dep. 80. The first leave started on April 15, 2013, after a

slip-and-fall accident, and ended on July 1, 2013, when

Ziccarelli was officially cleared to return to work by his

doctor. Pl. Dep. 81-82, 156-57, 206. Ziccarelli sent an email to

Dean and Long on May 24, 2013, in which he stated that his

doctor recommended not coming to work until he completed the

first six weeks of therapy, and that his return to work date

would be July 8, 2013. Nunez Decl. Ex. H. The following day, on

May 25, 2013, Ziccarelli received a 75-minute phone call from

Long, in which Long informed Ziccarelli that she was taking over

as the director, that she would like him to come back to work

sooner, and that his "job was safe for now." Pl. Dep. 184.

Ziccarelli testified that because of this phone call, he felt

pressured to cut his leave short and asked the doctor to clear

him to return to work prematurely, and Ziccarelli believed that

he could start working then. Pl. Dep. 209, 221. Other than the

75-minute phone call from Long, Ziccarelli testified that he did

not know of any other facts indicating that NYU, Long, Bushman,

Beale, or anyone else interfered with his first leave. Pl. Dep.

158, 176-77. After returning from the first leave, Ziccarelli

continued attending physical therapy sessions for his injury.
Pl. Dep. 211-12. In late August 2013, upon his doctor's
recommendation, Ziccarelli decided to take the second medical
leave to focus on his recovery. Pl. Dep. 214. Ziccarelli
testified that no one interfered with the second leave. Pl. Dep.
211. He returned from the second leave on a part-time basis on
October 7, 2013. Pl. Dep. 220.

After returning from his leaves of absence, Ziccarelli
received assignments that he believed were in retaliation for
taking the leaves because of the volume and difficulty of the
assignments. Pl. Dep. 232-33. Ziccarelli acknowledged that this
occurred during a period when everybody in the department was
very busy. Pl. Dep. 243. Ziccarelli testified that he felt
"beaten up" by a "litany" of complaints from Long. Pl.
Dep. 243-44. For example, on July 24, 2013, Long sent Ziccarelli
a blank e-mail with the subject "We need to talk about the lack
of preparation for the lab meeting this morning." Nunez Decl.
Ex. L. In response, Ziccarelli wrote to Long that he is worried
about his physical ability to deliver what the leadership is
expecting of him. Id. In a note to herself summarizing a
subsequent conversation with Ziccarelli about the e-mails, Long
wrote that she told Ziccarelli that he would not need to work
long hours if he spent less time on socializing, and that if he
continued to struggle, he may need to speak to his doctor. Id.

4

Ziccarelli also acknowledged that Long treated his colleagues, none of whom took medical leaves of absence, the same rough way that she treated him. Pl. Dep. 243-45.

Dissatisfied with Long's management style, on August 12, 2013, Ziccarelli e-mailed the person overseeing the entire Epic team, Dana Kimmel. Pl. Dep. 308-10; Nunez Decl. Ex. O; Mherabi Dep. 41. In a subsequent meeting with Kimmel, several members of the Orders and Lab teams, including Ziccarelli, aired their complaints about Long. Deale Dep. 210-14. Ziccarelli testified that he did not raise complaints about retaliation for taking a medical leave of absence during that meeting. Pl. Dep. 280. After this meeting, Kimmel and Wayne Boney, the Senior Director for the MCIT's Business Office, conducted an investigation and on August 28, 2013, a written warning was issued to Long. Forte Dep., 106; Boney Dep. 166-67; Nunez Decl. Ex. Q.

Ziccarelli concluded that Bushman also retaliated against him for taking a medical leave by giving him the "impossible" task of "fixing pathology orders." Pl. Dep. 249-50. Unhappy with Ziccarelli's progress on the pathology orders issue, Bushman raised concerns about his performance with Beale. Beale Dep. 187. On August 22, 2013, Bushman sent Beale and Long an e-mail outlining these concerns. Nunez Decl., Ex. K, at 2-3. In particular, Bushman thought it showed poor judgment that Ziccarelli informed her that he would be unable to attend a

particular meeting to discuss the pathology orders issue because he was going to be on medical leave, without any advance warning. Id. Bushman advised Long and Beale to add the complaints "to [Ziccarelli's] personnel file, formally counsel him, and monitor his behavior for improvement." Id. at 3.

On August 25, 2013, Ziccarelli sent an email to Derek Forte, the Employee and Relations Manager at NYU, in which he stated, among other complaints, that he observed Bushman engage in inappropriate conduct with an Epic employee. Nunez Decl. Ex. AA, at 5. In this email, Ziccarelli also complained that Bushman asked to have him written up for failing to tell her in advance that he will not be attending the pathology orders meeting because he is taking a medical leave and accused her of retaliating against him on behalf of her friend, Long, "who was recently reported for creating a hostile work environment." Id. Forte subsequently investigated the allegation about Bushman's sexual misconduct and was unable to substantiate it. Forte Dep. 160-62; Nunez Decl. Ex. BB, at 4. Nonetheless, Forte recommended that Bushman be informed about NYU's policies and potential consequences of workplace misconduct. Nunez Decl. Ex. BB, at 4. Mherabi met with Bushman, informed her about the investigation into her conduct, and gave her a verbal warning about the workplace conduct policies. Nunez Decl. Ex. DD; Mehrabi Dep. 105. Bushman, Long, and Beale all testified that

they were unaware of Ziccarelli's allegations regarding Bushman's alleged inappropriate conduct until this suit was filed. Bushman Dep. 245; Long Dep. 165; Beale Dep. 195. Ziccarelli admitted he has no facts to prove that Bushman was aware of his complaints to Forte. Pl. Dep. 330.

After Ziccarelli's second leave, Beale signed off on what Ziccarelli says was the worst evaluation he had ever received in his time at NYU, which he understood as another act of retaliation. Pl. Dep. 248. In the review dated November 19, 2013, Ziccarelli received an "Overall Performance Rating" of 2 out of 5 based on the ratings provided by Long. Nunez Decl. Ex. FF, at 11. Soon thereafter, on December 5, 2013, Ziccarelli also received a written warning from Long for failing to respond while on-call to an urgent call from a doctor user of the system. Pl. Dep. 334.

According to Beale and Mherabi, in the late summer and early fall of 2013, the Epic team at NYU started a reorganization process that commonly occurs after an organization completes a transition to a new IT system (a "go-live") and achieves a "steady state." Beale Dep. 66-67; Mherabi Dep. 136. The reorganization resulted in the elimination of several positions and the people who held those positions were either moved to new roles or terminated. Beale Dep. 133-34. Among the positions that were eliminated in the reorganization

was Ziccarelli's position of "Application Lead – Laboratory."
Mherabi Dep. 134-36, 158-60. Beale testified that the position
was eliminated because NYU did not implement the Epic's
laboratory application. Beale Dep. 113. Beale also testified
that the elimination of positions was not about individual
employees, but rather about the number of staff required to
support the Epic system after implementation. Beale Dep. 145-46.

On January 27, 2014, Ziccarelli was notified that his
position was eliminated and he was offered the position of
"Senior Analyst I, EpicCare Ambulatory" at the same salary
level. Nunez Decl. Ex. NN, at 3. According to Beale, Ziccarelli
was not considered for an Application Lead role because there
was no Application Lead position available. Beale Dep. 164-166.
He was the only employee, whose position was eliminated, who
received an offer to stay in a different position. Beale
Dep. 153-54.

Ziccarelli disputes the entire narrative about the timing
of the Epic implementation, the steady state, and the subsequent
reorganization. Pl.'s Rule 56.1 Stmt. ¶¶ 167-73. He claims that
the steady state was achieved a full year before his job was
eliminated. Id. ¶ 172. The record shows that Mherabi announced
an MCIT reorganization on May 7, 2013. See Nunez Decl. Ex. JJ,
at 3. Further, Ziccarelli claims that out of the five positions
eliminated, his job was the only lead position or lab analyst

position eliminated, whereas the others were either directly related to the completion of the Epic implementation or were a result of two teams merging and unrelated to the Epic implementation. Pl.'s Rule 56.1 Stmt. ¶¶ 693, 696-97. Next, Ziccarelli points out that during the relevant period everyone in the organization was very busy, which directly contradicts the proffered justification that the reorganization was driven by the need to right-size the staff. Id. ¶ 368. Ziccarelli claims that there were many vacant positions including Lead positions that he could have been assigned to. Id. ¶¶ 712-13; see also Beale Dep. 131. Ziccarelli asserts that instead of being moved to a position of Senior Analyst I, he should have replaced A.H., who was the application lead on the Orders team. Pl. Dep. 347-49.

Nonetheless, Ziccarelli accepted the position he was offered, he was subject to a 6-month probationary period, and reported to Elizabeth Broglio. Pl. Dep. 351; Nunez Decl. Ex. NN, at 4. In light of Ziccarelli's low rating in the November 2013 review, a performance improvement plan ("PIP") was required, but it was not developed until Ziccarelli assumed the new position. Broglio and her supervisor Suzanne Howard developed the PIP and it was delivered to Ziccarelli on March 26, 2014, with a target date for the improvements on May 15, 2014. Howard Dep. 206; Nunez Decl. Ex. OO, at 2-3. After failing to meet the PIP goals,

a final written warning was issued by Howard on June 18, 2014.
Nunez Decl. Ex. OO, at 4. Shortly after the final written
warning, Ziccarelli left his employment at NYU and started
working at the Hospital for Special Surgery, a job he began
seeking in or about January 2014. Pl. Dep. 73, 140-41.
Ziccarelli claims that he did not resign voluntarily but was
instead constructively terminated. Pl. Dep. 369-71.

## II

The standard for granting summary judgment is well
established. "The Court shall grant summary judgment if the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett,
477 U.S. 317, 322-23 (1986).[1] "[T]he trial court's task at the
summary judgment motion stage of the litigation is carefully
limited to discerning whether there are any genuine issues of
material fact to be tried, not to deciding them. Its duty, in
short, is confined at this point to issue-finding; it does not
extend to issue-resolution." Gallo v. Prudential Residential
Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). The
moving party bears the initial burden of "informing the district
court of the basis for its motion" and identifying the matter

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all
alterations, citations, footnotes, and internal quotation marks in quoted
text.

that "it believes demonstrate[s] the absence of a genuine issue
of material fact." Celotex, 477 U.S. at 323. The substantive law
governing the case will identify those facts that are material
and "[o]nly disputes over facts that might affect the outcome of
the suit under the governing law will properly preclude the
entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a
court must resolve all ambiguities and draw all reasonable
inferences against the moving party. See Matsushita Elec. Indus.
Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary
judgment is improper if there is any evidence in the record from
any source from which a reasonable inference could be drawn in
favor of the nonmoving party. See Chambers v. TRM Copy Ctrs.
Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets
its burden, the nonmoving party must produce evidence in the
record and "may not rely simply on conclusory statements or on
contentions that the affidavits supporting the motion are not
credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532
(2d Cir. 1993). "Something more than a fanciful allegation is
required to justify denying a motion for summary judgment when
the moving party has met its burden of demonstrating the absence
of any genuine issue of material fact. A 'bare assertion' that
the evidence supporting a plaintiff's allegation is in the hands

of the defendant is insufficient to justify a denial of a motion for summary judgment." Contemporary Mission v. United States Postal Serv., 648 F.2d 97, 107 (2d Cir. 1981).

### III

### A

The defendants argue that summary judgment is appropriate on the FMLA interference claim because Ziccarelli received his requested FMLA benefits and was reinstated to his position after each leave. Furthermore, the defendants argue that Long's statements in the May 25, 2013 phone call do not amount to interference.

The FMLA provides that an eligible employee suffering from a serious health condition is entitled to twelve workweeks of leave during any twelve-month period. See 29 U.S.C. §§ 2612(a)(1)(D), (c). While an employee is on FMLA leave it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. Id. § 2615(a)(1). "To establish a prima facie claim of interference with rights under the FMLA, a plaintiff must establish by a preponderance of the evidence that: (1) she is an eligible employee under the FMLA; (2) defendants constitute an employer under the FMLA; (3) she was entitled to leave under the FMLA; (4) that she gave notice to defendants of her intention to take leave; and (5) defendants denied her benefits to which she

was entitled by the FMLA." <u>Reilly v. Revlon, Inc.</u>, 620 F. Supp. 2d 524, 535 (S.D.N.Y. 2009). Interference with the exercise of an employee's rights includes discouraging an employee from using a leave. <u>Id.</u> (citing 29 C.F.R. § 825.220(b)). A plaintiff asserting interference on a discouragement theory must offer evidence of acts of discouragement that "would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." <u>Id.</u> Finally, even when an employee can demonstrate interference with her FMLA rights, the Act "provides no relief unless the employee has been prejudiced by the violation." <u>Ragsdale v. Wolverine World Wide, Inc.</u>, 535 U.S. 81, 89 (2002). "The employer is liable only for compensation and benefits lost by reason of the violation, for other monetary losses sustained as a direct result of the violation, and for appropriate equitable relief, including employment, reinstatement, and promotion." <u>Id.</u>

The dispute in this case centers around the fifth element of the interference claim, whether the defendants denied Ziccarelli any FMLA benefits. In his deposition, Ziccarelli narrowed his claim to one single act of alleged interference: the May 25, 2013 phone call from Long while he was on his first FMLA leave, in which she urged him to come back sooner and told him that his job is "safe for now." As a result of this phone

call, Ziccarelli claims that he feared he might lose his job and ended his first leave prematurely.

The defendants do not dispute that the May 25, 2013 phone call occurred or its contents. Instead, they argue that Ziccarelli cannot show FMLA interference because, in combination with his second FMLA leave, he ultimately received in excess of the twelve weeks of leave that he is entitled to under the statute. This argument misses the mark. While it is true that an interference claim cannot succeed without prejudice to the employee resulting from a violation, see Ragsdale, 535 U.S. at 89, it is not true that there is no prejudice to the employee so long as an employer makes up for its interference by providing additional leave at a later time. For example, if the employer violated the employee's rights by interfering with a leave, under the FMLA, the employee could recover a range of remedies, including "monetary losses sustained . . . as a direct result of the violation," 29 U.S.C. § 2617(a)(1)(A)(i)(II). And such monetary losses that resulted from a violation would not be obviated by the employee being permitted to take a subsequent leave. As a result, the fact that Ziccarelli eventually took medical leave in excess of the statutory entitlement does not render his interference claim regarding the first leave moot.

The cases cited by the defendants do not support the proposition that an employer does not deny FMLA benefits when

the employer interferes with an FMLA leave on one occasion but
later provides the statutory minimum amount of FMLA leave.
Instead, in all of these cases, the employee plaintiffs were
found unable to show that the employer's alleged interference
ever prevented them from using their FMLA benefits because they
took and completed the leave either before or in spite of the
employer's actions. See Stuart v. T-Mobile USA, Inc., No. 14-CV-
4252, 2015 WL 4760184, at *4 (S.D.N.Y. Aug. 12, 2015)
("[Plaintiff] conspicuously fails to identify a single instance
in which she delayed or cut short her leave as a result of
Defendants' actions."); Geromanos v. Columbia Univ., 322 F.
Supp. 2d 420, 428 (S.D.N.Y. 2004) (concluding that the plaintiff
completed the leave that she was entitled to before the alleged
interference); Sefovic v. Mem'l Sloan Kettering Cancer Ctr., No.
15-CV-5792, 2017 WL 3668845, at *7 (S.D.N.Y. Aug. 23, 2017)
(same). In other words, these cases speak to situations where
the employer's actions could not have affected the employee's
rights because the employee took and completed the leave to
which the employee was entitled. This is not the case with
Ziccarelli who claims that the May 25, 2013 call resulted in his
cutting his leave short by a week and, at the end of that leave,
he had only taken 11 weeks of FMLA leave. Accordingly, the
alleged interference would have resulted in prejudice to
Ziccarelli's FMLA rights.

In the alternative, the defendants argue that Long's comments during the May 25, 2013 phone call would not have "dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." Reilly, 620 F. Supp. 2d at 535. In support of this proposition, the defendants point to the fact that Ziccarelli continued on his leave for several weeks after the May 25, 2013 conversation, and therefore, they argue, he was clearly not dissuaded from continuing his leave. However, establishing that Ziccarelli did not return to work immediately does not disprove that he ended his leave prematurely as a result of the phone call. Furthermore, a reasonable jury could conclude that a person of ordinary resolve confronted with the statements (1) "I am the new director," (2) "I would like you to come back to work sooner," and (3) "your job is safe for now," would be justified in feeling threatened and compelled to end the leave sooner. Accordingly, summary judgment on this claim is **denied.**

### B

The defendants next argue that the FMLA retaliation claim fails because Ziccarelli cannot establish he suffered any adverse employment actions, that any action against Ziccarelli permits an inference of retaliatory intent, and that, in any event, NYU has legitimate, non-retaliatory reasons for all decisions affecting plaintiff's employment.

In FMLA retaliation claims, "[i]n order to make out a prima facie case, [the plaintiff] must establish that: 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Potenza v. City of N.Y., 365 F.3d 165, 168 (2d Cir. 2004). "If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 429 (2d Cir. 2016). "To determine this, the court must use a case by case approach that evaluates the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports or undermines the employer's case." Di Giovanna v. Beth Israel Med. Ctr., 651 F. Supp. 2d 193, 205 (S.D.N.Y. 2009). Ultimately, a plaintiff need only show that FMLA leave was a "negative factor" in the employer's decision to take an adverse action, rather than a "but for" cause. Woods v. START Treatment & Recovery Ctrs., Inc., 864 F.3d 158, 169 (2d Cir. 2017).

Ziccarelli claims that he was retaliated against by the following actions: (1) the volume and difficulty of the workload

beginning after the first leave, including the pathology orders assignment from Bushman, (2) the negative treatment by Long beginning after the first leave, (3) the unusually negative performance review in November 2013, (4) the written warning in December 2013, (5) the elimination of his position in January 2014, (6) the PIP implemented in March 2014, (7) the final warning in June 2014, and (8) the constructive discharge in June 2014.

The defendants first argue that Ziccarelli fails to make a prima facie case of FMLA retaliation because none of the employer's actions regarding him meet the definition of adverse employment action because they are not materially adverse changes in the terms and conditions of employment.

The defendants' argument fails because it relies on an incorrect legal standard. In 2011, the Second Circuit Court of Appeals established that "[f]or purposes of the FMLA's anti-retaliation provision, a materially adverse action is any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising his legal rights." Millea v. Metro-North R.R., 658 F.3d 154, 164 (2d Cir. 2011). In adopting this standard in the FMLA retaliation context, the Court of Appeals in Millea rejected the more demanding standard for materially adverse actions that requires a "materially adverse change in the terms and conditions of employment." Id.

18

at 163-64. The Court of Appeals has clarified that while "petty slights, minor annoyances, and simple lack of good manners will not give rise to actionable retaliation claims," id. at 165, "[c]ontext matters, as some actions may take on more or less significance depending on the context," Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 (2d Cir. 2011) (analyzing the same standard in the context of Title VII retaliation).

Here, the employer actions that Ziccarelli points to as instances of retaliation constitute materially adverse action for the purposes of FMLA retaliation because they are more than "petty slights, minor annoyances, [or] simple lack of good manners," Millea, 658 F.3d at 165, and each of them individually—and certainly in the aggregate—could "dissuade a reasonable worker in the plaintiff's position from exercising his legal rights," id. at 164. The defendants' arguments and case law disputing this conclusion all rely on the stricter standard for "materially adverse action" that is not applicable in the FMLA retaliation context. Indeed, the courts in this circuit have found employer actions analogous to some of those alleged by Ziccarelli to constitute materially adverse action under the less demanding standard applicable to his claim. See, e.g., Choi v. Ferrellgas, Inc., No. 17-CV-3518, 2020 WL 122976, at *8 (E.D.N.Y. Jan. 10, 2020) (change in position to one with

diminished responsibilities); Cole-Hatchard v. Cnty. of Rockland, No. 17-CV-2573, 2019 WL 1300814, at *10 (S.D.N.Y. Mar. 21, 2019) (warning letter); Chioke v. Dep't of Educ. of City of N.Y., No. 15-CV-01845, 2018 WL 3118268, at *13 (E.D.N.Y. June 25, 2018) (same); Smith v. N. Shore-Long Island Jewish Health Sys., 286 F. Supp. 3d 501, 513 (E.D.N.Y. 2018) (denials of transfer to other positions); Spaulding v. N.Y.C. Dep't of Educ., No. 12-CV-3041, 2015 WL 12645530, at *43 (E.D.N.Y. Feb. 19, 2015), report and recommendation adopted, No. 12-CV-3041, 2015 WL 5560286 (E.D.N.Y. Sept. 21, 2015) (negative performance evaluations); Davies v. N.Y.C. Dep't of Educ., No. 10-CV-5981, 2013 WL 1245444, at *6 & n.7 (S.D.N.Y. Mar. 27, 2013), aff'd, 563 F. App'x 818 (2d Cir. 2014) (unsatisfactory performance ratings). Accordingly, Ziccarelli has shown that he has suffered materially adverse actions.

The defendants next argue that Ziccarelli has failed to show a causal link between the employer actions and Ziccarelli's FMLA leave, thus failing to support the fourth element of a prima facie claim of retaliation. However, at the prima facie stage, "[i]n th[e Second] Circuit, a plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty., 252 F.3d 545,

554 (2d Cir. 2001). While the Court of Appeals "has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [the Court of Appeals has] previously held that five months is not too long to find the causal relationship." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010). Nonetheless, district courts have found that a period of more than two to three months between the protected activity and the adverse employment action militates against an inference of causation. See Kamrowski v. Morrison Mgmt. Specialist, No. 05-CV-9234, 2010 WL 3932354, at *22 (S.D.N.Y. Sept. 29, 2010) (collecting cases).

Here, Ziccarelli's second FMLA leave ended on October 7, 2013. Even assuming a generous five-month period during which causation can be inferred from temporal proximity alone, the PIP in March, the final warning in June, and the alleged constructive discharge in June were too distant in time from the protected FMLA activity to permit an inference of causation. Moreover, those actions occurred under supervisors who were not involved in Ziccarelli's prior FMLA leaves. Because Ziccarelli offers no other evidence to support an inference of retaliation besides alleged temporal proximity, he has not met the prima facie burden with respect to those actions. Accordingly, Ziccarelli has only made a prima facie case of FMLA retaliation

with respect to the (1) the volume and difficulty of the workload, including the pathology orders assignment from Bushman, (2) the negative treatment by Long, (3) the unusually negative performance review, (4) the December 2013 written warning, and (5) the elimination of his position in January 2014.

Because Ziccarelli has established a prima facie case of retaliation, the burden then shifted to the defendants to offer legitimate, non-retaliatory reasons for these five actions, and then back to Ziccarelli to show why those reasons are pretextual. With respect to the elimination of Ziccarelli's position, the defendants offer a compelling legitimate, non-retaliation reason: the reorganization of the MCIT department which resulted in the elimination of several positions. Further negating an inference of retaliation is the fact that Ziccarelli was the only one to receive an offer to stay in a different position and retained his salary level.

In response, Ziccarelli offers enough evidence to create a genuine issue of fact whether the defendant's explanation is pretextual. Ziccarelli claims that the "steady state," which was the offered justification for the reorganization, was achieved a full year before his job was eliminated and the subsequent reorganization occurred long before his position was eliminated. The email from Mherabi announcing an MCIT reorganization on May

7, 2013 corroborates this claim. Further, Ziccarelli argues that out of the five positions eliminated, his job was the only lead position or lab analyst position eliminated, whereas the others were either directly related to the sunset of the Epic "go-live," or were a result of two teams merging unrelated to the Epic implementation. Ziccarelli also points out that during the relevant period everyone in the organization was very busy, which undercuts the proffered justification that the reorganization was merely driven by the need to right-size the staff. Finally, Ziccarelli alleges that there were vacant positions including Lead positions that he could have been assigned to. While many of these assertions are contradicted by other testimony in the record, at a minimum, these are disputed issues of fact that are appropriate for a jury to resolve. And a juror that credits Ziccarelli on these points could conclude reasonably that the discrepancies and inconsistencies he highlights in the defendants' proffered non-retaliatory explanation are evidence of retaliation. See Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 430 (2d Cir. 2016) ("A plaintiff may prove . . . retaliation . . . by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror

could conclude that the explanations were a pretext for a prohibited reason.").

Besides the elimination of Ziccarelli's position, the defendants do not offer any legitimate, non-retaliatory reasons for the remaining actions. As a result, Ziccarelli did not have an opportunity to show that those reasons were pretextual. Accordingly, summary judgment for the defendants with respect to actions (1) through (5) would be inappropriate and is **denied.**

## C

The defendants also argue that the FMLA claims against the individual defendants fail as a matter of law because they were not "employers" for purposes of the FMLA.

An individual may be liable under the FMLA only if that person is an "employer," which is defined as "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I); see also 29 C.F.R. § 825.104(d) ("[I]ndividuals such as corporate officers 'acting in the interest of an employer' are individually liable for any violations of the requirements of FMLA."); Graziadio, 817 F.3d at 422. The inquiry is "whether the alleged employer possessed the power to control the worker in question, with an eye to the economic reality presented by the facts of each case." Graziadio, 817 F.3d at 422. "To do so, [the courts] consider a

nonexclusive and overlapping set of factors intended to encompass the totality of circumstances, . . . includ[ing] whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Id. "No one of the four factors standing alone is dispositive . . . and any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." Id. at 422-23. "In the FMLA context, courts assessing the economic reality of an employment relationship have construed this test as asking essentially whether the putative employer controlled in whole or in part plaintiff's rights under the FMLA." Id. at 423; see also Haybarger v. Lawrence Cnty. Adult Probation & Parole, 667 F.3d 408, 417 (3d Cir. 2012) ("[A]n individual is subject to FMLA liability when he or she exercises supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation while acting in the employer's interest."). Under these principles, individual liability is not limited to those who grant or deny a leave but may extend to those who participate in retaliation for the exercise of FMLA benefits. See, e.g., Greenberg v. State Univ. Hosp. Downstate Med. Ctr., No. 15-CV-2343, 2019 WL 4752018, at *15-6 (E.D.N.Y. Sept. 29,

2019), <u>aff'd</u>, 19-CV-3570, 2020 WL 7380245 (2d Cir. Dec. 16, 2020) (sustaining claims individual defendants who took disciplinary action against the plaintiff as a result of the plaintiff's alleged negative performance after returning from FMLA leave); <u>Scott v. ProClaim Am., Inc.</u>, No. 14-CV-6003, 2017 WL 1208437, at *11 (E.D.N.Y. Mar. 31, 2017) (finding a question of fact as to whether an individual defendant was an employer under the FMLA "given the conditions [the defendant] imposed in the performance warning"); <u>see also</u> <u>Corrado v. N.Y. State Unified Court Sys.</u>, No. 12-CV-1748, 2014 WL 4626234, at *8 (E.D.N.Y. Sept. 15, 2014) (sustaining claims against individual defendants who participated in various ways in a negative evaluation of the plaintiff after returning from FMLA leave); <u>Smith v. Westchester Cty.</u>, 769 F. Supp. 2d 448, 476 (S.D.N.Y. 2011) (sustaining claims against individual defendants who played various roles in disciplinary action after an FMLA leave).

Based on the evidence in the record, "a rational jury could find, under the totality of the circumstances," <u>Graziadio</u>, 817 F.3d at 424, that Long and Beale, but not Bushman, "exercised sufficient control over [Ziccarelli's] employment to be subject to liability under the FMLA," <u>id.</u> Although Long did not formally control Ziccarelli's FMLA leave, she was one of the two managers that Ziccarelli updated on the status of his leave on May 24,

2013. And the crux of his FMLA interference claim is that because of Long's actions alone—the May 25, 2013 phone call—Ziccarelli was compelled to cut his first leave short. Furthermore, the record reflects that after returning from his first leave and before the elimination of his position, Long supervised and controlled Ziccarelli's conditions of employment by assigning him tasks, sending him emails critical of his performance, meeting with him to discuss his performance, and completing his November 2013 review. These various ways in which Long exercised control are also at the heart of Ziccarelli's FMLA retaliation claim. A jury could reasonably conclude that Long "controlled in whole or in part plaintiff's rights under the FMLA" by means of her alleged interference, her alleged retaliation, or both. Id. at 423. Accordingly, the summary judgment motion with respect to Long as to both FMLA claims is **denied.**

With respect to Beale, Ziccarelli admitted that she did not interfere with his FMLA leave. However, Beale was involved in Ziccarelli's review and testified to the meaningful role she played in the reorganization of the MCIT department. These actions are among the adverse actions that support Ziccarelli's retaliation claim and a reasonable jury could conclude that due to Beale's role in these adverse actions, she "controlled in whole or in part plaintiff's rights under the FMLA." Id.

Accordingly, the summary judgment motion with respect to Beale is **granted** as to the FMLA interference claim and **denied** as to the FMLA retaliation claim.

With respect to Bushman, the record indicates she assigned Ziccarelli one difficult task and, when he failed to perform, she reported it to Long and Beale and directed them to note this on his record. Aside from this limited act of supervision, Bushman was not involved in Ziccarelli's review or the elimination of his position. As a result, the economic reality of her relationship with Ziccarelli does not support finding her personally liable under the FMLA. Accordingly, the summary judgment with respect to Bushman is **granted**.

### D

Finally, the defendants argue that the NYCHRL claim fails because none of the defendants knew about Ziccarelli's protected activity and because Ziccarelli cannot rebut NYU's legitimate, non-retaliatory reasons.

NYCHRL provides that "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner." N.Y.C. Admin. Code § 8-107(7). "To establish a prima facie case of retaliation under the NYCHRL, a plaintiff must show that: (1) he participated in a protected activity; (2) the defendant knew about his participation; (3) the defendant

took an employment action that disadvantaged the plaintiff in any manner; and (4) a causal connection existed between the protected activity and the negative employment action." Fattoruso v. Hilton Grand Vacations Co., 525 F. App'x 26, 27 (2d Cir. 2013).

Ziccarelli's NYCHRL claim is based on his reporting of Bushman's alleged sexual misconduct to Forte. Such reporting constitutes protected activity. See, e.g., Corrado v. N.Y. Unified Court Sys., 163 F. Supp. 3d 1, 22 (E.D.N.Y. 2016), aff'd sub nom., Corrado v. New York State Unified Court Sys., 698 F. App'x 36 (2d Cir. 2017); Romero v. Howard Johnson Plaza Hotel, No. 97-CV-3706, 1999 WL 777915, at *7 (S.D.N.Y. Sept. 29, 1999). However, there is no evidence in the record that the defendants knew about Ziccarelli's reporting to Forte. Indeed, all of the defendants testified that they were not aware of his reporting to Forte until they read the complaint in this action. And Ziccarelli likewise testified that he is aware of no facts showing that Bushman knew about his reporting to Forte. As a result, there is insufficient evidence in the record to support the prima facie case of retaliation under the NYCHRL.

Accordingly, the defendants' motion for summary judgment with respect to the NYCHRL claim is **granted.**

**CONCLUSION**

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the motion for summary judgment is **denied** with respect to the FMLA interference claims as to NYU and Long, **denied** with respect to the FMLA retaliation claims as to NYU, Long, and Beale, **granted** with respect to the NYCHRL claims, and **granted** with respect to Bushman as to all claims. The Clerk is directed to close Docket No. 155.

**SO ORDERED.**

Dated:    **New York, New York**
          **February 27, 2021**      **/s/ John G. Koeltl**
                            **John G. Koeltl**
                   **United States District Judge**